**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Ave., 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
        lrosen@rosenlegal.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| AUNG K. SOE, Individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> AKAZOO S.A., and APOSTOLOS N. ZERVOS, <br><br> Defendants. | Case No. <br><br> CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS <br><br> <u>JURY TRIAL DEMANDED</u> <br><br> <u>CLASS ACTION</u> |

Plaintiff Aung K. Soe ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Akazoo S.A. ("Akazoo" or the "Company"), as well as media and analyst reports about the Company and Company press releases. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein.

1

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants (defined below) who purchased or otherwise acquired the publicly traded securities of Akazoo between September 11, 2019 and April 20, 2020, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

4.      Venue is proper in this judicial district pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the alleged misstatements entered and subsequent damages took place within this judicial district.

5.      In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.     Plaintiff, as set forth in the accompanying Certification, purchased the Company's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure. Plaintiff is a citizen of Brooklyn, New York.

7.     Defendant Akazoo purports to be a global on-demand music, audio streaming, media, and A.I. technology company with a focus on emerging markets and a presence in 25 countries.

8.     Defendant Akazoo is incorporated in Luxembourg, and according to its March 25, 2020 Form F-3 filed with the SEC (the "F-3"), maintains its principal executive offices at One Heddon Street, W1B 4BD, London, UK. Akazoo shares are listed on the NASDAQ under the ticker symbol "SONG." The Company's agent for service in the United States, as stated in the F-3, is C T Corporation System, located at 28 Liberty Street, New York, New York 10005.

9.     Defendant Apostolos N. Zervos ("Zervos") is a founder of the Company and is and was at all pertinent times the Chief Executive Officer and a Director of the Company.

10.    Defendant Zervos:

(a)    directly participated in the management of the Company;

(b)    was directly involved in the day-to-day operations of the Company at the highest levels;

(c)    was privy to confidential proprietary information concerning the Company and its business and operations;

(d)    was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

3

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

11. The Company is liable for the acts of the Defendant Zervos and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

12. The scienter of the Defendant Zervos and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

13. The Company and the Defendant Zervos are referred to herein, collectively, as the "Defendants."

**SUBSTANTIVE ALLEGATIONS**
**Materially False and Misleading Statements**

14. On September 11, 2019, Akazoo issued a press release announcing the completion of its reverse merger with Modern Media Acquisition Corp. and the beginning of its shares trading on the NASDAQ under the symbol "SONG" (the "September Press Release"). The September Press Release also stated the following regarding the Company's revenue growth:

> In the first half of 2019, the Company's revenues grew 39% year-over-year. Growth is expected to be driven by an array of existing and new partnerships that include mobile operators, handset manufacturers, media and partnering mobile applications and services, as well as growth in smartphone penetration in their core markets.

15. The September Press Release touted the Company's global positioning, stating: "Akazoo S.A., SONG, operates in 25 countries, including emerging markets that represent the music streaming industry's fastest growing market opportunities. Akazoo's platform boasts

patented Sonic AI music recommendation and profiling technology, developed to support its hyper-local strategy."

16.     The September Press Release also touted the Company's subscriber growth, stating: "In the last 5 years, SONG's premium subscribers have grown from 1.1 million in 2014 to over 5.3 million today."

17.     The September Press Release described the Company as:

**About Akazoo**

Akazoo, founded in 2010, is a global, on-demand music streaming subscription company with a focus on emerging markets. Akazoo's Premium service provides subscribers with unlimited online and offline high-quality streaming access to a catalog of over 45 million songs on a commercial-free basis. Akazoo's free, ad-supported Radio service consists of over 100,000 stations and exists as a separate application. ***With a presence in 25 countries and growing, Akazoo's platform includes 43 million registered users and 5.3 million premium subscribers as of June 30, 2019. Akazoo directly licenses music from thousands of labels*** and provides both online and offline listening platforms, social media integration, and a patented, AI-driven new music recommendation engine. As consumers across the globe continue to shift their media consumption to mobile devices, Akazoo is equipped with a world-class mobile application and user experience which works seamlessly across a multitude of mobile devices and provides a high-quality user experience across a range of mobile networks from 2g to 4g LTE and soon 5g.

(Emphasis added.)

18.     On September 27, 2020, Akazoo filed with the SEC a Form 6-K, signed by Defendant Zervos, which provided the financial statements of Akazoo Limited and Modern Media Acquisition Corp. before the merger (the "September 6-K"). The September 6-K provided the following regarding Akazoo Limited's finances:

**Financial Statements**

**Interim Condensed Consolidated Statement of Operations**

*(Unaudited)*

*(in € thousands, except share and per share data)*

| | Notes | Three months ended June 30, | | Six months ended June 30, | |
|---|---|---|---|---|---|
| | | **2019** | **2018** | **2019** | **2018** |
| Revenues | | 33,804 | 24,627 | 64,521 | 46,455 |
| | * | * | * | | |
| **Gross profit** | | **8,268** | **5,384** | **15,689** | **10,432** |
| | * | * | * | | |
| **Profit attributable to Akazoo Limited** | | **1,308** | **1,362** | **3,108** | **2,808** |

19.    On December 9, 2019, Akazoo issued a press release entitled "Akazoo Reports Third Quarter 2019 Results" (the "3Q 19 Results"). The 3Q 19 Results stated the following regarding the Company's revenue and cash:

> · *Q3 Revenue of €35.0 Million, Up 24% YoY*
> · Nine Month 2019 Adjusted EBITDA of €11.3 Million – Ahead of FY 2019 Guidance of €11m
> · Raising FY 2019 Revenue Guidance from €134 Million to €136.5 Million - up 30% YoY with QoQ revenue growth accelerating in Q4

> *        *        *

> *Revenues increased 24% to €35.0 compared to €28.1 million in the third quarter of 2018, driven principally by ongoing user acquisition spending with Eastern European and select LATAM territories leading growth trends*.

> *        *        *

> *Interim Condensed Consolidated Statement of Operations*

> *(Unaudited)*

*(in € thousands, except share and per share data)*

|  | Three months ended September 30, | | Nine months ended September 30, | |
|---|---|---|---|---|
|  | **2019** | **2018** | **2019** | **2018** |
| Revenues | 34,959 | 28,095 | 99,480 | 74,550 |

(Emphasis added.)

20.     The 3Q 19 Results also provided that subscribers increased from 4.3 million to 5.5 million from the third quarter 2018 to the third quarter 2019, a 28% increase. The 3Q 19 Results also provided that registered users increased from 37.8 million to 44.4 million from the third quarter 2018 to the third quarter 2019, an 18% increase.

21.     On March 19, 2020, Akazoo released an investor presentation (the "Presentation"). The Presentation touted the Company's financial position:





22.     The Presentation touted the Company's global reach, music distribution rights, and deep local knowledge and abilities:

## Investment Highlights



✓ **A Leading Global Music Streaming Platform**
  - Focus on emerging markets
  - Well established – currently in 10th year of operation
  - Positive EBITDA
  - Experienced management – founded by CEO

✓ **Well Positioned for Continued Growth**
  - Strong subscriber growth profile with geographically diversified revenue base
  - 33% 9m 2019 YoY revenue growth
  - Favorable trends in emerging markets

✓ **Competitive Moat & Profitable Business Model**
  - Hyper-local strategy driven by patented Sonic Artificial Intelligence (A.I.) technology
  - Integrated partnerships with telecom service companies and messaging platforms
  - Territory-specific pricing and billing arrangements to optimize customer acquisition and retention
  - Technology designed for premium quality user experience in an EM network environment
  - EM core competency with first-mover advantage

✓ **Solid balance sheet to fuel growth**
  - Opportunities organically and through acquisitions
  - No debt – raised gross new capital of $55 million in September 2019

PAGE 2









23.    The statements referenced in ¶¶14-22 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Akazoo overstated its revenue, profits, and cash holdings; (2) Akazoo holds significantly lesser music distribution rights than it has stated and implied; (3) as opposed to Akazoo's continued statements, it does not operate in 25 countries; (4) Akazoo has a significantly smaller user base than it states; (5) Akazoo has closed its headquarters and other offices around the world; and (6) as a result, Defendants' public statements were materially false and/or misleading at all relevant times.

### The Truth Emerges

24.     On April 20, 2020, Quintessential Capital Management ("QCM") released an equity report (the "Report") detailing, among other things, how Akazoo misled investors and failed to disclose pertinent information, including: (i) Akazoo's overstated its users, subscribers, revenue and profit; (ii) Akazoo overstated the size of the of the Company and its services; (iii) Akazoo overstated where the Company's service is actually available; and (iv) Akazoo is and has been closing offices and losing employees.

25.     The Report stated the following, in pertinent part, about the Company's finances:

. . . what we see at Akazoo, with large discrepancies between earnings and cash flow, sizeable investments in IP and a level of account receivables grossly out of line with its peer group. ***We also observe with great concern, that Akazoo has paid zero taxes for at least the past four years, despite claiming $21.7m of accounting "profit".***

\*      \*      \*

**The curious case of Solutions System Touchmedia a.k.a Veoo Malaysia**

\*      \*      \*

InternetQ [Akazoo's former parent company] was then [2013] doing business with a Malaysian company (Touchmedia) "related to the Group's CEO Panagiotis Dimitropoulos" for the provision of the following services:

• Monthly billing of Malaysia operators
• Collection of Revenue from Malaysian operators

We find it disturbing that a company whose accounts have been questioned as suspicious, was using for its billing and revenue collection a payment processing firm that is "related" to its CEO. ***Clearly, the control of a payment processor could enable a dishonest management to alter the accounts and provide a less than truthful picture of the financial situation of the company.*** Although, this situation relates to InternetQ, not necessarily Akazoo, given the close ties between the two companies we cannot ignore it.

\*      \*      \*

12

*Similarly, the Company might hide any cash shortfall by inflating costs, especially cost of goods sold ($100m in 2019) and investments in intangible assets ($11m in 2019).* The former consists primarily in royalties paid to music label companies. *We hypothesize that Akazoo might have either colluded with, or outright fabricated, small music label companies that generate fictitious cost invoices for non-existing music streams.*

(Emphasis added.)

26.     The Report stated the following, in pertinent part, about the Company's music distribution rights:

**Alleged copyrights violations**

Music streaming companies typically purchase music (along with territorial copyrights) from large music distributors. *We checked with Sony Music, from which Akazoo has purchased the full catalog for redistribution. Surprisingly, despite claiming to be active in 25 countries, Akazoo has purchased from Sony copyrights valid for only five countries, namely Greece, Cyprus, Poland, Ghana and Malaysia.* Obviously, this creates some worrying question marks: has Akazoo exaggerated the number of countries from where it is operating? Has the Greek company been distributing music in certain countries in breach of copyrights (a breach that typically carries very expensive fines)?

For example, we know that Akazoo's service is currently active (if barely used) in Indonesia and has been active in Singapore, Thailand. According to our investigation, Akazoo has no rights to distribute Sony music in these territories and hence may be exposed to serious repercussions.

(Emphasis added.)

27.     The Report stated the following, in pertinent part, about the Company's global reach:

**Doubts on geographic reach**

In its official filings and presentation to investors, Akazoo claims to be active in 25 countries[.] [Image omitted.]

Being a music-streaming business, the map above presumably indicates that Akazoo is actively selling music in the countries appearing on the map. In its 2019 SEC filings Akazoo highlights:

*"Akazoo's revenue is derived primarily in emerging markets (including **Poland, Russia, Malaysia, Thailand, Indonesia, Ecuador, Brazil and Mexico**, among others). The success of the business is largely dependent on the continued demand for music streaming services in these regions".*

QCM's investigation, however, suggests otherwise. First of all, using local contacts in key markets as well as a VPN, we attempted opening accounts in dozens of countries (including many of those in the list above), but in most cases, we received the following message from Akazoo:

**"We would really like to be here. For now, our service is not available in your country. Please check back, you never know."**

**The only countries where we did manage to open an account were Greece, Cyprus, Poland, Malaysia and Indonesia.** It is apparently **not possible to become an Akazoo client in either Russia or Brazil, two of the largest markets that Akazoo claims to be operating in**. This is in line with the options on the app itself which only has these five countries as possible choices of residence (and this stage is only accessible if you are located in one of those five countries).



\*        \*        \*

**Key Market Poland**

Starting in late 2014 Akazoo did have a partnership with Orange Polska SA, providing them a white-label streaming service called *Muzyka-Tu-i-Tam*. . . . Former clients of *Muzyka-Tu-i-Tam* were migrated onto Spotify by Orange with a three-month free Premium subscription. The *Tu-i-Tam* service does not appear to exist since mid- 2016. Currently all Polish operators have streaming music partnerships that they actively promote on their websites – none involving Akazoo[.] . . .

***On the Polish Google Play app store the most recent reviews as of February 2020 are two from 2018, one from 2017*** and a few complaints from 2016. Some older reviews hint that the  reviewers were only downloading it in order to earn credits on a third-party app. However, a grand total of three reviews (!) over the past three years is a clear sign that there is practically no usage. ***For comparison, Spotify has 20-25 reviews per day from Polish Google App store users.*** Spotify does not disclose its subscriber numbers in Poland but the annualized ratio of its reviews to Akazoo's suggests 7,300 : 1. ***Even with an optimistic assumption that Spotify has 19m subscribers (50% of the Population), we would therefore estimate Akazoo to have around 2,000 subscribers in this "key market"*** – even with a margin of error of a factor of 10, this is an insignificant number.

*       *       *

## Key Market Russia

***The Akazoo Music app has been available on the app store since at least 2017. However, in all that time it seemingly was not possible for Russian users to register or log in*** as evidenced by the sporadic commentary of users who seem to have stumbled on it. ***It has also never been translated into Russian*** (a frequent complaint below from people who didn't even manage to get to the point where they are told the service is not available in their country) and ***remains unavailable for registration today.*** [Image omitted.]

## Key Market Brazil

***The service is not available in Brazil.*** It is possible to download the app and there is a Portuguese language page that confirms the service is not available. It is not permitted to open an account or log in with an existing account. This has been tested on multiple local mobile phones and networks. Judging by the comments on the Google App store, this has been the case since at least May 2019 (comments saying it is not possible to log in). [Image omitted.]

In prior years there was some modest commentary activity with a small number of people evidently trying the service out. The vast majority of the reviews were negative with one star. Having taken the time to count them individually, it looks like momentum faded after 2016 – not that 81 reviews per year indicates a popular app. [Chart omitted.]

It is not that Brazilians are shy about commenting Spotify gets hundreds, if not thousands of reviews every single day in Brazil, mostly five stars (it's quite hard work just to scroll down to get to the previous day). . . .

## Key Market Indonesia

It is still possible to subscribe to Akazoo in Indonesia at time of writing. And yes, there was a stream of comments (often even multiple comments on the same day) on the Play Store during 2016 and 2017, carrying into the first months of 2018 when clearly there was some attempt to promote the service in the country. Since then things have clearly tapered off – ***the last comment dates back to 27th May 2019, being the final of only five comments that year***. [Image omitted.]

***While much of this historic activity was likely paid for (the comments rarely say anything useful – typically 5\* and "OK good"), this suggests that, unlike in all the other "key" markets, genuine attempts were made to establish the service in Indonesia.*** It is also worth noting that the Spotify app continues getting approximately 100 comments every single day on the Indonesian store (less than in Brazil but still many multiples of Akazoo at its peak activity in 2016). Unfortunately, these attempts have been abandoned over a year ago and the resulting drop in activity suggests that they were ultimately unsuccessful in building any sort of brand or growing user base.

*    *    *

### Key Market Malaysia

Akazoo did claim a partnership with Sony Ericsson in Malaysia in 2015, whereby the manufacturer preloaded its phones with Akazoo Music software. This would not have been relevant as even then Sony's market share would have been miniscule and has declined further since.

***Although Malaysia is one of the handful of markets where it is actually possible to sign up for the service, activity on the Google Play Store is negligible. The latest comment dates back to July 2017*** and there is only around a dozen comments in total. Clearly Malaysians are not engaging with Akazoo via the flagship app and it cannot account for any significant number of subscribers.

*    *    *

### Key Market Thailand

***It is seemingly not possible to subscribe to Akazoo in Thailand even though the website has been translated into Thai.*** The Thai Play store shows minimal activity over the past years so ***it is safe to say this was never an active market***.

### Key Market Mexico

***It is seemingly not possible to subscribe to Akazoo in Mexico even though the website has been translated into Spanish.*** The Mexican Play store shows minimal activity post 2014 (with just a handful of reviews in that year), so ***it is***

*safe to say this was never an active market.* Confirmation also from the year 2020 that it is not possible to register.

*        *        *

**Knowledge of Emerging Markets?**

A claimed advantage of Akazoo is an intimate knowledge and AI processing of local music tastes. This ostensibly allows them to stream local artists who let them do it at lower cost than global artists. To illustrate this, they present the following:



Let's pause for a minute on the ***"Top 5 Artists on Akazoo in Brazil", which is an example of a huge potential market with a dynamic local music scene – and the fastest growing for Akazoo according to this presentation***.

Anyone with a modicum of music history knowledge will recognize the top two artists in the list as giants of the Bossa Nova movement which was huge during the 50s and 60s. This music went global with Frank Sinatra and Stan Getz among many others to record their songs. We hear it in various forms to this day in elevators and chill-out bars around the world. ***To suggest that young Brazilians primarily stream Bossa Nova on their phones today is akin to saying Americans mainly listen to Elvis and Frank Sinatra*** while the British primarily stream Beatles classics. To summarize these top 5:

| | | | |
|---|---|---|---|
| 1 | Antonio Carlos Jobim | Bossa Nova, Big in 60s | Died 1994 |
| 2 | Vinicius de Moraes | Bossa Nova, Big in 60s | Died 1980 |
| 3 | Elis Regina | Bossa Nova, Big in 60s | Died 1982 |
| 4 | Gilberto Gil | Big in 70s - 80s | 77 yrs old |
| 5 | Marisa Monte | Big in 90s | 52 yrs old |

Brazil does have a huge music market today with young artists and music styles. It is absolutely impossible that a representative sample of the Brazilian online population would stream primarily these relics of history. It is also impossible that anyone with even a bit of local music knowledge would guess that any of these were anywhere near the top streamed artists between 2015 and 2018 in Brazil.

A brief look at the other "markets" top artists shows somewhat more plausible results although again, ***Russian top stream, the band TaTu was dissolved in 2011 and was largely famous internationally for risqué videos: they definitely would not have been the top streamed artist between 2015-2018 in Russia***.

It appears therefore that these lists have been compiled without any access to local knowledge or information as would be expected from a popular music platform.

(Emphasis added.)

28.    The Report stated the following, in pertinent part, about the Company's user base:

***Search volume for Akazoo is negligible***, especially if compared with competitors claiming similar user bases. For example, Pandora has some 80m users and Deezer 14m (vs 44m claimed by Akazoo). Yet, the search volume for the Greek company is almost trivial compared to both firms.

*        *        *

Because Akazoo's business model is similar to that of many competing apps in the market (e.g. Pandora, Spotify, Tidal, TuneIn, etc.), one would expect it to score comparably in basic industry ratios. For example, a selection of Akazoo's competitors shows that there is on average 1 app review for every 31 registered users on Google Play (the Android app store). Other ratios we checked include revenue/employee, subscribers/employee and others. ***While its competitors exhibit ratios which are similar to one another, Akazoo's figures tend to be an extreme outlier. For example, Akazoo claims to have over 500 users per review while its competitors on average have about 31.*** So, either Akazoo's users are far more reluctant to write reviews or the Company's user base is a lot smaller than what management has been telling investors. Similar anomalies show up also in the number of likes/followers on social media and in revenue/employee ratio.

. . . ***By extrapolating the average figures and applying them to Akazoo, we estimate that its users base may be inflated by at least a factor of 10.*** [Images omitted.]

**Trends analysis: Akazoo's visibility is negligible**

*        *        *

On an absolute basis, search volume for Akazoo appears to have peaked somewhere around 2011-2012 and has since shrunk to almost zero. This fact obviously clashes with growth rates and trajectory claimed by the Company.

The near totality of web searches originates in Cyprus and Greece, rather than in the emerging countries where Akazoo claims to be so popular.

*      *      *

**Data from third-party apps confirms: Akazoo app number of downloads is minimal**

*      *      *

Akazoo scores pitifully on both platforms. ***For Sensor Tower, Akazoo was below the minimum threshold for detection (<5000 downloads). Worse still, Mobile Action seems to estimate the number of Akazoo downloads at about 40/month (December 2019). Obviously, such dismal data is impossible to reconcile with the 44m of registered users growing at double-digit rates claimed by management.*** Should anyone doubt the accuracy of the software we used, we performed the same analysis on several competitors of Akazoo's and the findings were consistent with the official figures reported by these companies. [Image omitted.]

**The app reviews: few and shameless**

Opening the Akazoo page on Google Play (the Android app store) something odd immediately jumps to the eye: the most relevant text reviews date as far back as January 2019 (15 months ago) and, perhaps surprisingly for an app that claims to cater mostly emerging markets, are signed by three Greek-sounding names. The authors of these reviews are: Chris Spiliotopoulos, Yiannis Karalis and George Zervos. As you can readily verify clicking on the hyperlinks, ***these characters are all Akazoo's senior employees and the latter, George Zervos, may be the brother of the company's CEO. A quick glance of the remaining reviews shows that many of them look fake or complain about the app being either unusable, disappointing or claim having downloaded it to get credits elsewhere.***

(Emphasis added.)

29.     The Report stated the following, in pertinent part, about the Company's offices and

staffing:

**The incredible shrinking Akazoo**

19

*According to Akazoo's official filings, the Company's headcount decreased by 17% per year from 45 to 26 in 2016-2018 (we estimate the current number to be even lower). One has difficulty reconciling these figures with the claimed revenue growth rate of 24%*: why would a company claiming to grow at that rate *halve* its workforce in three years starting from an already impossibly low base?

*The very low number of employees (26 or less) on $145m of sales implies a most unlikely $5.5m of sales/employee.* This ratio is 8x times higher than the ratio for its peer group and for companies such as Facebook or Apple (which have industry-leading ratios).

*Consistent with the significant shrinking headcount, we noticed that Akazoo seems to have closed most (or perhaps all) of their offices outside of Greece, including its headquarters in London.* We visited recently Akazoo's London headquarters at the Pavillon Center at 96 Kensington High Street, in London UK. The facility is a co-working space akin to WeWork. After speaking with the receptionist, we learned that Akazoo left the premises a long time ago. Even at its peak, the office was apparently manned by only four people: Pablo, George, Neilah and Pierre. We believe these names may correspond to Pablo Monstrous, Nailah Peeroo, George Zervos and Pierre Schroeder (CFO): *the former three have left the UK office in February 2019, while Pierre lingered until December then closed down the office permanently*. We also visited other addresses in London, including the ones of their subsidiary R&R, and found them either closed or belonging to Akazoo's legal advisors rather than to Akazoo proper.

The office in the Ukraine is also either closed or in the process of being closed as Tatiana Ostapenko, Akazoo's Chief Accountant, is *"open for offers"* on her LinkedIn page and cites as a reason "*[Akazoo's] HQ is currently closing business in Ukraine*".

We also visited the Luxembourg address in Rue de Bitbourg and failed to find any trace of Akazoo whatsoever (we presume that this address belongs to Akazoo's legal advisors). Similarly, our field sources claim that Akazoo has no proper office in Cyprus and may be using an accountant's address or similar. So, where in fact is Akazoo? The company may be operating from some other unknown location, but *QCM did find an Akazoo's office inside the headquarters of its former parent company InternetQ in Athens*, at 340 Kifissias Ave, Neo Psychiko. The (barely readable) sign on the doorbell simply says "*InternetQ*".

(Emphasis added.)

30.     Also on April 20, 2020, QCM released a slideshow (the "Slideshow") supplementing the Report.

31.     The Slideshow noted the following, in pertinent part, regarding Akazoo's finances:

• **Suspicious signs of accounting manipulation:**
• **Cash inconsistencies; total lack of taxes.**

*      *      *

**WHY AREN'T SALES TRANSLATING INTO CASH? WE SEE LARGE AND GROWING ACCOUNT RECEIVABLES…**

**Akazoo sales don't translate in cash, but in unexplained, increasing account receivables…** [Image omitted.]

**…OUT OF LINE WITH INDUSTRY PEERS: AKAZOO DSO [Days Sales Outstanding] ARE A SUSPICIOUS OUTLIER…**



**WHY DOES AKAZOO PAY ZERO TAXES DESPITE CLAIMING $22M IN PROFIT FOR THE LAST FOUR YEARS???**



32.    The Slideshow stated the following regarding Akazoo's music distribution rights:

**QCM CHECK: MUSIC DISTRIBUTORS**

• We checked with Sony Music, a major music distributor to Akazoo.
• ***Akazoo has purchased distribution rights for only 5 (five) countries***, namely:
      • Greece, Cyprus, Poland, Ghana and Malaysia.
• ***We fear that either Akazoo is lying about its geographic reach (25 countries claimed) or may be breaching music copyrights.***

(Emphasis added.)

33.    The Slideshow stated the following, in pertinent part, about Akazoo's global reach:

• ***App unavailable in many core countries***.

*    *    *

• QCM has attempted to open an [Akazoo] account in dozens of countries.
• We succeeded in opening an account (using a VPN) only in Poland, Malaysia, Indonesia, Greece, Cyprus.
• ***For other countries we tried, including those where Akazoo claims to be active in, we received the following message: "We would really like to be here. For now, our service is not available in your country. Please check back, you never know."***



(Emphasis added.)

34.     The Slideshow stated the following, in pertinent part, about Akazoo's user base:

We use three third party tools to estimate the number of downloads of Akazoo app and traffic on its websites.

**The Evidence: numerical analysis**

Akazoo's operating metrics are indicative of a far smaller company

AKAZOO CLAIMS SUBSCRIBERS AND REVENUE COMPARABLE TO ITS COMPETITORS… [Image omitted.]

NUMBER OF USERS PER REVIEW: AKAZOO RATIO IS 17 TIMES HIGHER THAN AVERAGE…



REVENUE PER EMPLOYEE: AKAZOO RATIO IS 8X HIGHER THAN AVERAGE…



OTHER STATISTICS TELL A SIMILAR STORY…



PANDORA HAS 1500 TIMES (!) MORE INSTAGRAM FOLLOWERS THAN AKAZOO (DESPITE COMPARABLE NUMBER OF CLAIMED SUBSCRIBERS) [Image omitted.]

PANDORA HAS 370 TIMES (!) MORE FACEBOOK FOLLOWERS THAN AKAZOO (DESPITE COMPARABLE NUMBER OF CLAIMED SUBSCRIBERS) [Image omitted.]

EXTRAPOLATING FROM PEER AVERAGES: AKAZOO MAY HAVE LESS THAN 400K SUBSCRIBERS (VS 5.5M CLAIMED)[] [Image omitted.]

GOOGLE TRENDS SUGGEST THAT BARELY ANYONE SEARCHES FOR «AKAZOO» ANYMORE…



GOOGLE TRENDS: AKAZOO IS VIRTUALLY UNDETECTABLE VS. PEERS CLAIMING COMPARABLE SUBSCRIBER BASES [Image omitted.]

\*      \*      \*

MOBILE ACTION: ONLY 40 DOWNLOADS, UNDETECTABLE REVENUE (DEC 2019)

\*      \*      \*

**The Evidence: app reviews**

A large portion of the (very few) reviews appearing on Google apps store, have been written by Akazoo's employees, including senior management



35.    The Slideshow stated the following, in pertinent part, regarding Akazoo's closing

offices and staffing:

• Disappearing infrastructure
     • (undisclosed) closed offices
     • Disappearing workforce

*       *       *

**The Evidence: infrastructure**

*Despite claiming multiple offices around the world, our field due diligence revealed that Akazoo has closed offices in most of its locations.*

27



AKAZOO'S MAIN OFFICE IS IN 96 KENSINGTON, LONDON. REALLY???

QCM FIELD CHECK IN LONDON AT 96 KENSINGTON PAVILLION CENTER

Receptionist: «Akazoo left several months ago!» [Images omitted.]

*     *     *

AKAZOO BUSINESS IN UKRAINE…CLOSING UP!

• Akazoo's Chief Accountant in her LinkedIn profile is open for offers since Akazoo is closing business in Ukraine!

• According to our sources Akazoo/R&R has shut down business in both the UK and Ukraine.

(Emphasis added.)

36.     On this news, Akazoo shares fell $0.53 per share over the rest of the trading day and the next trading day, or over 20%, to close at $1.99 per share on April 21, 2020, damaging investors.

37.     As a result of Defendants' wrongful acts and omissions, and the decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

38.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of Akazoo during the Class Period (the "Class") and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

39.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

40.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

41.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

42.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether Defendants' acts as alleged violated the federal securities laws;

(b)     whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(c)     whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether the Defendant Zervos caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(e)     whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(f)     whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

43.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the

damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

44.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     the Company's securities are traded in efficient markets;

(d)     the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e)     the Company traded on the NASDAQ, and was covered by market analysts;

(f)     the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

(g)     Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(h)     Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

45.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

46.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

### **COUNT I**
### **Violation of Section 10(b) of The Exchange Act and Rule 10b-5**
### **Against All Defendants**

47.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

48.     This Count is asserted against the Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

49.     During the Class Period, the Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

50.     The Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

51.     The Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and

misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

52.     Defendant Zervos, who is a senior officers and director of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

53.     As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Defendants' false and misleading statements.

54.     Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Defendants' misleading statements and by the material adverse information which the Defendants did not

disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

55.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

56.     By reason of the foregoing, the Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

**COUNT II**
**Violation of Section 20(a) of the Exchange Act**
**Against the Defendant Zervos**

57.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

58.     During the Class Period, Defendant Zervos participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

59.     As an officers and director of a publicly owned company, Defendant Zervos had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

60.     Because of their positions of control and authority as senior officers, Defendant Zervos was able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout

the Class Period, Defendant Zervos exercised his power and authority to cause the Company to engage in the wrongful acts complained of herein. Defendant Zervos therefore, was a "controlling person[]" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, he participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

61.     Defendant Zervos, therefore, acted as a controlling person of the Company. By reason of his senior management positions and being a director of the Company, Defendant Zervos had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Defendant Zervos exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

62.     By reason of the above conduct, the Defendant Zervos is liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff hereby demands a trial by jury.


Dated April 24, 2020                    Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

<u>*/s/Phillip Kim*</u>
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Ave., 40th Floor
New York, NY 10016
Tel: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
Email: pkim@rosenlegal.com

*Counsel for Plaintiff*