THE ROSEN LAW FIRM, P.A.
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Ave., 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
      lrosen@rosenlegal.com

*Lead Counsel for Lead Plaintiffs*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| IN RE AKAZOO S.A. SECURITIES LITIGATION | Case No. 1:20-cv-01900-BMC |
|---|---|
| | AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| | <u>JURY TRIAL DEMANDED</u> |
| | <u>CLASS ACTION</u> |

Lead Plaintiffs Tim Caldwell, Sharon Caldwell, Nikolaos Poulakis, and John Pullen ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Akazoo S.A. ("Akazoo" or the "Company"), as well as media and analyst reports about the Company and Company press releases. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein.

## I.     NATURE AND OVERVIEW OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants (defined below) who: (1) purchased or otherwise acquired the publicly traded securities of Akazoo between January 24, 2019 and May 21, 2020, both dates inclusive (the "Class Period"), including, but not limited to, those who purchased or acquired Akazoo securities pursuant to the private placement offering agreement ("PIPE Financing"), seeking to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder; (2) held common stock of Modern Media Acquisition Corp. ("MMAC" or "MMDM") as of August 9, 2019, eligible to vote at MMAC's August 28, 2019 special meeting, seeking to pursue remedies under Section 14(a) of the Exchange Act, and/or; (3) purchased or otherwise acquired Akazoo common stock pursuant or traceable to the Company's registration statement and prospectus issued in connection with the September 2019 Merger, seeking to pursue remedies under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act").

2.      Akazoo was formerly known as Modern Media Acquisition Corp. ("MMAC" or "MMDM"), a "blank check" company formed in 2014 for the purpose of entering into a merger, share exchange, asset acquisition, stock purchase, recapitalization, reorganization or other similar business combination with one or more business entities or entities in the media, entertainment or marketing services industries.

3.      On May 17, 2017, MMAC completed its initial public offering ("IPO") from which it derived approximately $209 million of net proceeds that were placed into a trust account.

4.     The prospectus for MMAC's IPO identified MMAC's general criteria for prospective target businesses, including a focus on "media, entertainment, and marketing services companies positioned to compete in the new modern media ecosystem" and a "market-leading participant with experienced and motivated management teams."  While MMAC had considerable discretion in identifying and consummating a business combination, there were three general limitations imposed by its Second Amended and Restated Certificate of Incorporation.

- *First*, the target business that MMAC acquired or merged with had to have a fair market value equal to at least 80% of MMAC's net assets (excluding deferred underwriting discounts and commissions) at the time of such acquisition/merger, determined by the MMAC Board based on standards generally accepted by the financial community.

- *Second*, MMAC only had eighteen months to complete a business combination from the closing date of the IPO (or 21 months from the closing date of the IPO if it had executed a letter of intent, agreement in principle, or definitive agreement for the business combination within 18 months from the closing date of the IPO but had not yet completed the business combination).  If MMAC had not completed a business combination in time (*i.e.,* by November 17, 2018 or February 17, 2019), its corporate existence would cease, except for purposes of winding up its affairs and liquidating.  As such, MMAC was required to hold the approximately $209 million of proceeds from its IPO in a trust account, which were to be released only upon the consummation of a business combination or liquidation.

3

- *Third*, if MMAC's stockholders approved an amendment to the Certificate of Incorporation that would affect the substance or timing of MMAC's obligation to redeem 100% of the public shares if MMAC did not complete a business combination on time, MMAC was required to provide the holders of its public shares with the opportunity to redeem all or a portion of their public shares upon approval of any such amendment.

5.     MMAC's initial stockholders were comprised of: Lew Dickey ("Dickey"), MMAC's President, Chief Executive Officer, and Chairman; MMAC's sponsor, Modern Media Sponsor, LLC (the "Sponsor"), of which Dickey had a 50% indirect interest in, and; MMAC's directors: Blair Faulstich, George Brokaw, and John White.

6.     MMAC's initial stockholders held themselves out to investors as highly experienced businesspeople who had worked in finance and strategy, particularly in the media and communications arena, with successful track records in acquiring and growing businesses.

7.     MMAC's initial stockholders acquired a significant interest in MMAC prior to the IPO.  The initial stockholders issued themselves 5,175,000 shares for an aggregate price of $25,000, and the Sponsor purchased 7,320,000 warrants simultaneously with the IPO for an aggregate price of $7,320,000.  Such common stock and warrants had an aggregate market value of approximately $55,254,408 on the record date of August 9, 2019.  These initial stockholders agreed to waive their right to participate in a liquidation distribution with respect to their initial shares if MMAC did not complete a business combination by the deadline.  Thus, if MMAC did not meet its deadline, the initial stockholders' shares and warrant would be rendered worthless.

4

8. On November 8, 2018, shortly before MMAC's deadline, it announced it had entered a letter of intent to purchase a company, thus providing MMAC until February 17, 2019 to complete the business combination under the Second Amended and Restated Certificate of Incorporation.

9. On January 24, 2019, MMAC announced that it had reached a merger agreement with a company named Akazoo Limited ( "Old Akazoo"), a private company and "global music streaming platform" incorporated under the laws of Scotland (the "Merger" or "Merger Agreement"). MMAC touted Akazoo Limited as follows: "In its ninth year of operation, Akazoo is *a leading music streaming service specializing in emerging markets with 4.3 million premium subscribers in 25 countries throughout Europe, South East Asia, South America and Africa*."[1] In the press release announcing the Merger Agreement, Dickey further commented:

> We are excited to enter into this transaction with Akazoo. *It's a terrific company with strong management led by Founder & CEO, Apostolos Zervos.* As one of the pioneering companies in the space, they have spent the last decade *building a profitable business model with a strong competitive moat in emerging markets*.

10. The Merger Agreement provided that the parties would enter into a multi-step business combination, which would involve the following steps:

- *First*, MMAC would merge with and into PubCo, a Luxembourg public limited entity, with PubCo remaining as the surviving publicly traded entity;

- *Second*, LuxCo, a newly formed public limited company, would acquire the entire issued share capital of Akazoo Limited in consideration for issuing ordinary shares of LuxCo to the Akazoo Limited shareholders;

---

[1] All emphasis is added unless otherwise stated.

5

- *Third*, LuxCo would merge with and into PubCo, with PubCo remaining as the surviving publicly traded entity.

11.    MMAC was under immense pressure to quickly complete the business combination, as its deadline to complete the transaction before being required to offer shareholders a right of redemption was mere weeks away.  But, as time was running out, on February 8, 2019, MMAC held a special meeting in lieu of its 2018 annual stockholders meeting, where stockholders were asked to vote to extend the deadline for MMAC to complete a business combination from February 17, 2019 to June 17, 2019.  In connection with the first extension, public stockholders were given the option to redeem all or a portion of their public shares.  A total of nearly 6 million public shares were redeemed, leaving MMAC with about $152 million in cash remaining in trust.

12.    The first extension was not enough time.  Subsequently, at a June 14, 2019 special meeting of MMAC stockholders, a second extension to complete the business combination from June 17, 2019 to September 17, 2019 was approved.  In connection with the second extension, stockholders elected to redeem an aggregate of approximately 13.35 million public shares, leaving MMAC with only about $14.7 million in cash remaining in trust.

13.    Pursuant to the Merger Agreement, as a condition of closing, MMAC was to have no less than an aggregate of $53 million cash available in its trust account.  As a result of the multiple extensions to complete the business combination and the accompanying share redemptions, MMAC's trust account was largely depleted.  In order to meet this condition of closing, on July 29, 2019, the Merger Agreement was amended to provide for a private placement offering agreement ("PIPE Financing") whereby approximately 4.8 million PubCo ordinary shares would be sold at $8.00 per unit, with each subscriber to receive an incentive of 0.24 of PubCo

6

ordinary shares per share subscribed for in the PIPE Financing, which would convert to Akazoo shares upon the completion of the Merger.  In accordance with the PIPE Financing, MMAC's Sponsor would forfeit 2.6 million PubCo Ordinary Shares upon consummation of the business combination and 7.32 million PubCo warrants upon consummation of the PIPE Financing.

14.    At this point, MMAC was under incredible, ever-mounting pressure to complete the business combination by its twice-extended September 17, 2019 deadline.  In soliciting the requisite shareholder approval for the proposed transaction, MMAC and its Board of Directors aggressively touted Old Akazoo's profitable and scalable revenue model.  Investors were told that Akazoo Limited's subscribership and revenues had shown meteoric growth over the last three years, with revenue increasing each month of 2018, and that Akazoo Limited's annualized revenue was approximately €120 million.  Further, MMAC and its Board emphasized Akazoo Limited's strong, experienced management team, including the extensive, industry-specific background of its founder, Apostolos Zervos, Akazoo Limited's unique, "hyper-local" focus and abilities, which had garnered it 4.3 million subscribers and 37 million registered users across 25 countries and lucrative partnerships.

15.    MMAC and its Board of Directors further boasted to investors of their own professional and educational backgrounds; noting, for example, that Dickey had over thirty years in the media, entertainment and marketing services industries and had obtained a bachelor's and master's degree and that he would serve as Chairman of the Company if the Merger occurred. MMAC and its Board described to investors the extensive efforts they had put forth into due diligence and negotiations with Akazoo Limited which had started in June 2018 and included

numerous in-person visits, with Dickey even flying to Greece and London to meet with Akazoo Limited's team on-site.

16.     As described herein, certain defendants solicited votes from stockholders necessary to complete the business combination by means of: (1) the Company's Registration Statement ("Registration Statement"), which was declared effective on August 15, 2019; (2) the Company's Proxy/Prospectus Statement ("Proxy/Prospectus"), which was filed on August 15, 2019, and; (3) by other public statements that touted Old Akazoo's financial performance, operations, and the extensive due diligence MMAC purportedly conducted of Old Akazoo.  While the Registration Statement and Proxy/Prospectus recited potential risks that could arise in connection with the merger with Old Akazoo, it provided no reasons to suspect that MMAC had failed to reasonably investigate such risks or that many of these potential risks had already materialized in substantial part.    In short, MMAC's shareholders had no reason to doubt the Proxy/Prospectus's characterization of Old Akazoo as a profitable, rapidly growing, and valuable business with strong future potential.

17.     Finally, shortly before its twice-extended deadline, on September 11, 2019, MMAC announced that it had completed the business combination and acquired Old Akazoo (the "Business Combination" or the "Merger").  The Company announced the completion of the Merger in a press release that same day that stated, in relevant part:

> Akazoo S.A. (NASDAQ: SONG) ("SONG" or "Company") today announced the successful completion of the previously announced merger of Akazoo Ltd. with Modern Media Acquisition Corp., previously trading under the ticker symbol MMDM. Akazoo expects to begin trading today on the Nasdaq Stock Market under the ticker symbol "SONG," having raised around $55 million in new capital.
>
> The combined company, Akazoo S.A., is a leading global music streaming platform and technology company with a strong international market position focused on

8

emerging markets.  Both Akazoo Ltd.'s management and its shareholders rolled over their equity into $380 million of common shares of the combined Company. Additionally, the parties raised new capital of about $55 million to fund the Company's growth initiatives and for general corporate purposes.

*Akazoo S.A., SONG, operates in 25 countries, including emerging markets that represent the music streaming industry's fastest growing market opportunities.* Akazoo's platform boasts patented Sonic AI music recommendation and profiling technology, developed to support its hyper-local strategy.

*In the last 5 years, SONG's premium subscribers have grown from 1.1 million in 2014 to over 5.3 million today. In the first half of 2019, the Company's revenues grew 39% year-over-year.* Growth is expected to be driven by an array of existing and new partnerships that include mobile operators, handset manufacturers, media and partnering mobile applications and services, as well as growth in smartphone penetration in their core markets.

The Founder & CEO of Akazoo Ltd., Apostolos N. Zervos, will continue as the Founder & CEO of the combined company, Akazoo S.A. "We are excited to complete this transaction and transition to public company status and welcome our new shareholders. With the backing of strong strategic partners, favorable industry trends and a debt-free balance sheet, we are ready to accelerate our organic growth, further develop our Sonic AI technology and launch highly innovative growth initiatives. Additionally, our new public currency will allow us to grow through valuable industry acquisitions and consolidation," said Zervos.

Lew Dickey, who will serve as the combined entity's Chairman, said "Akazoo has created a high growth digital global music streaming platform that is well-positioned to benefit from secular shifts underway in the media industry. Its strong presence in emerging markets provides a foundation for sustained growth in revenues and profits and our strong balance sheet will be used to fund many growth initiatives."

18.     After the Merger, Defendants continued to present an optimistic picture about the Company's business, operations, and prospects.  In announcing the Company's 2Q 2019 financial results, Defendants stated that the Company's registered users and subscribers had continued to grow, to 43.3 million and 5.3 million respectively, and that the Company's revenues had shown corresponding growth.  When reporting the Company's 3Q 2019 financial results, Defendants noted that the Company's registered users had grown even more, to 44.4 million and 5.5 million

respectively, and that revenues had increased 24% to €35.0 million compared to €28.1 million in the third quarter of 2018.

19.     But, the truth came to light on April 19, 2020, when Quintessential Capital Management ("QCM"), a global asset management firm, released an analyst report after conducting an investigation into the Company (the "QCM Report"), which revealed among other things that: (1) Akazoo had grossly overstated its users, subscribers, revenue and profit; for example, despite claiming millions in profits, the Company had paid *zero taxes* for the last four years; (2) Akazoo had greatly overstated the size of the of the Company and its services; (3) Akazoo had overstated where its services were actually available; for example, despite claiming its services were available in 25 countries, Akazoo's services were only available in *five countries*; (4) Akazoo was and had been closing offices and losing employees for quite some time despite claiming it had multiple offices located around the world, and; (5) Akazoo did not have lucrative deals with mobile operators in its markets.

20.     On this news, Akazoo's share price fell $0.53, or 20%, over two consecutive trading sessions to close at $1.99 per share on April 21, 2020, thereby injuring investors.

21.     On April 22, 2020, during market hours, the Company admitted the credibility of the QCM Report's allegations, announcing in a press release that it had formed an independent special committee to investigate the issues raised by the QCM Report.

22.     On this news, Akazoo's share price fell over 16% to close at $1.66 per share on April 22, 2020, further injuring investors.  Over the next two days, Akazoo's share price continued to drop, to close at $1.16 per share on April 24, 2020.

23.    On April 24, 2020, the Company disclosed that two of its directors and members of its Audit Committee, Alexander Macridis and David Bryan Roche had resigned.  Macridis and Roche stated the following with respect to their resignations:

> With regard to the QCM allegations, we are encouraged that the board has adopted our initial position to form a special committee to investigate the extremely serious accusations contained in the QCM report….***We have been clear with the rest of the board from the outset that an independent, forensic and thorough investigation, with complete transparency of results to shareholders, is in the best interests of the Company.***

24.    On May 1, 2020, the Company effectively admitted that QCM's allegations were correct and announced that in connection with an investigation by its special independent committee, it had concluded that the consolidated financial statements of Old Akazoo at all relevant times, and those of the Company, were materially false and misleading.  The Company further announced that its CEO and founder of Old Akazoo, Apostolos Zervos had been terminated for cause from his position as Chief Executive Officer and had been asked to resign from the Board.  The Company further admitted that it had been unable to verify certain operational and financial information.

25.    On this news, Akazoo's share price fell $0.04 before NASDAQ halted trading on May 1, 2020.

26.    Then, on May 21, 2020, the Company announced that it would seek to unwind the Business Combination as the independent special committee had further concluded that: "members of Akazoo's management team and associates defrauded investors . . . by materially misrepresenting Akazoo's business, operations, and financial results as part of a multi-year fraud."

27.     Since the Business Combination, Akazoo's stock price has traded as low as $1.16 per share, or approximately 78% below the $5.27 price upon the closing of the Business Combination.

28.     On June 2, 2020, Akazoo's stock was delisted from the NASDAQ exchange, rendering the stock effectively worthless.

29.     As a result of Defendants' wrongful conduct, Plaintiffs and other Class members have suffered significant losses and damages.

## II.      JURISDICTION AND VENUE

30.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5), Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a) and Rule 14a-9 promulgated thereunder (17 C.F.R. § 240.14a-9), and Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o).

31.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331, §22 of the Securities Act, and §27 of the Exchange Act.

32.     Venue is proper in this judicial district pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the alleged misstatements entered and subsequent damages took place within this judicial district.

33.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## III.      PARTIES

34.     Plaintiffs, as previously set forth in their Certifications (Dkt. No. 7-3), suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein, because they: (1) purchased or otherwise acquired the Company's securities at artificially inflated prices during the Class Period, including, but not limited to purchases or acquisitions pursuant to the private placement offering agreement ("PIPE Financing"), and/or; (2) held common stock of MMAC as of August 9, 2019 and were eligible to vote at MMAC's August 28, 2019 special meeting, and/or; (3) purchased or otherwise acquired Akazoo common stock pursuant or traceable to the Company's registration statement and prospectus ("Registration Statement") issued in connection with the September 2019 Merger.

35.     Defendant Akazoo purports to be a global on-demand music, audio streaming, media, and A.I. technology company with a focus on emerging markets and a presence in 25 countries.  The Company was previously known as Akazoo Limited, Modern Media Acquisition Corp., and Modern Media Acquisition Corp. S.A., and is incorporated in Luxembourg.  According to its March 25, 2020 Form F-3 filed with the SEC (the "F-3"), the Company maintains its principal executive offices at One Heddon Street, W1B 4BD, London, UK. Prior to delisting, Akazoo shares were listed on the NASDAQ under the ticker symbol "SONG" and formerly traded under the ticker symbol "MMDM."  The Company's agent for service in the United States, as stated in the F-3, is CT Corporation System, located at 28 Liberty Street, New York, New York 10005.

36.     Defendant Apostolos N. Zervos ("Zervos") was, at all relevant times, the Chief Executive Officer ("CEO") and a director of the Company.  Zervos founded Akazoo Limited in 2010 and served as its CEO until the Business Combination.  Prior to founding Akazoo Limited, from 2008-2010, Zervos was Senior Manager, Innovation for Velti Plc, a Greek company which

filed for bankruptcy and collapsed in 2013 amidst allegations of fraud.  Zervos also served as Chief Strategy Officer at InternetQ, Akazoo Limited's parent company, from October 2010 until July 2015.

37.     Defendant Pierre Schreuder ("Schreuder") was, at all relevant times, the Chief Financial Officer ("CFO") of the Company.  Prior to the Business Combination, Schreuder was the CFO of Akazoo Limited since 2018 and was a consultant for Akazoo Limited since 2017.

38.     Defendant Panagiotis Dimitropoulos ("Dimitropoulos") was, at all relevant times, a director of the Company since the close of the Business Combination.  Dimitropoulos was named as an incoming director in the Registration Statement.  Prior to the Business Combination, Dimitropoulos was a non-executive director of Akazoo Limited since 2015.  Dimitropoulos founded a company named InternetQ Group Ltd. ("InternetQ") in 2000 and was its CEO since November 2012.  InternetQ was the ultimate parent and controlling party of Akazoo Limited.

39.     Defendant Lewis W. Dickey, Jr. was, at all relevant times, President, Chief Executive Officer, Chairman of the Board of MMAC, and a director of both MMAC and PubCo until the Business Combination.  Since the close of the Business Combination, Dickey was at all relevant times, Chairman of the Board of the Company.  Dickey has over thirty years of experience in the media, entertainment and marketing services industries.

40.     Defendant Maja Lapcevic ("Lapcevic") was, at all relevant times, a director at the Company and a member of the Company's Audit Committee since the closing of the Business Combination.  Further, on December 18, 2019, the Company approved the terms and conditions of an independent directorship agreement with Lapcevic.  Lapcevic previously worked at InternetQ.

14

41.    Defendant Athan Stephanopoulos ("Stephanopoulos") was, at all relevant times, a director at the Company and a member of the Company's Audit Committee since the closing of the Business Combination.

42.    Defendant Alexander Macridis ("Macridis") was, at all relevant times, a director at the Company and a member of the Company's Audit Committee since the closing of the Business Combination.

43.    Defendant David Bryan Roche ("Roche"), was, at all relevant times, a director at the Company and a member of the Company's Audit Committee since the closing of the Business Combination.

44.    Defendants Lapcevic, Stephanopoulos, Roche, and Macridis (collectively, the "Akazoo Director Defendants"), became directors and members of the Audit Committee of the Company upon the completion of the Merger, and participated in Akazoo's board meetings as well as its day-to-day operations.  The Akazoo Director Defendants signed or authorized the signing of Akazoo's Registration Statement and Proxy/Prospectus Statements of Akazoo following the Merger, which incorporated by reference the Proxy/Prospectus of August 15, 2019.  By virtue of their high-ranking positions, the Akazoo Director Defendants possessed the power and authority to control the contents of Akazoo's post-merger statements, including the Company's press releases, investor and media presentations, and other SEC filings.

45.    Defendants Zervos, Schreuder, and Dimitropoulos (collectively, the "Old Akazoo Defendants"), Dickey, and the Akazoo Director Defendants each:

(a)    directly participated in the management of the Company;

15

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

46.     The Company is liable for the acts of the Old Akazoo Defendants, Dickey, and the Akazoo Director Defendants under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

47.     The scienter of the Old Akazoo Defendants, Dickey, and the Akazoo Director Defendants and other agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

48.     Defendant Crowe U.K. LLP ("Crowe") is a certified public accounting firm and was the auditor for Old Akazoo's consolidated financial statements for the years ended December 31, 2017, 2016, and 2015 and the related consolidated statements of profit or loss and other comprehensive income, changes in equity and cash flows and the related notes for each of those

16

three years.  Crowe attested to the adequacy and accuracy of Old Akazoo's historical financial statements and information contained therein.  These audit reports were included in the Registration Statement.  After the Merger, Crowe was appointed as the certified public accountant and auditor for the Company.

49.     Defendant William Drewry ("Drewry") was, at all relevant times, Chief Financial Officer ("CFO"), Principal Accounting Officer and a manager of MMAC, and a director of PubCo until the Business Combination.  Drewry signed or authorized the signing of the Registration Statement and Proxy Statement.  Drewry is a founder of Pursuit Advisory LP, a transaction and strategic advisory services provider which launched in 2015.  Prior to founding Pursuit Advisory LP, Drewry was a Managing Director at RBC Capital Markets, where he helped lead the media and entertainment practice.  Prior to RBC, Drewry was Chairman of a private equity firm; Managing Director at UBS Investment Bank, and; head of the Global Media Research team at Credit Suisse.  Drewry began his career in 1992 as a research analyst with Paine Webber/Kidder Peabody.

50.     Defendant Adam Kagan ("Kagan") was, at all relevant times, General Counsel, Assistant Secretary, and a manager of MMAC, and a director of PubCo until the Business Combination.  Kagan signed or authorized the signing of the Proxy Statement and Registration Statement.  Kagan also serves as the associate general counsel for business affairs of Hearts & Science, LLC, a marketing agency, where he advises global advertisers.  Prior to joining Hearts & Science, Kagan served as the head of business and legal affairs and production of Ora Media L.L.C., the owner of a television production studio and an on-demand digital television network. Kagan also served as international counsel from January 2007 to May 2014 for Viacom

17

International Media Networks, a group within Viacom Inc. that offers brands, content, products and services to individuals around the world.  Kagan obtained a bachelor's degree from the Tisch School of the Arts and a J.D. from Pace University School of Law.

51.     Defendant Véronique Marty ("Marty") was, at all relevant times, a director of PubCo until the Business Combination.  Marty signed or authorized the signing of the Proxy Statement and Registration Statement.  Marty serves as Head of Corporate Services, Director, and Member of the management committee at Arendt Services in Luxembourg.  Marty specializes in corporate administration and has a background in practicing corporate law.

52.     Defendant Blair Faulstich ("Faulstich") was, at all relevant times, a director and Audit Committee member of MMAC until the Business Combination and voted to approve the Business Combination.  Faulstich has a professional and educational background in finance and strategy, particularly in the media and communications area.  Since 2011, Faulstich has served as a managing director of Benefit Street Partners L.L.C., a multi-strategy credit manager; prior to that, Faulstich was a managing director and co-head of media and communications investment banking at Citadel Securities, LLC and was a managing director in the media and communications investment banking group at Merrill Lynch & Co. Inc. ("Merrill Lynch") from 2004 to 2009.  Prior to Merrill Lynch, Faulstich held various positions at the brokerage and investment bank of Deutsche Bank, AG, and at Arthur Andersen LLP.  Faulstich obtained a bachelor's degree from Principia College and an M.B.A. from Cornell University.

53.     Defendant George Brokaw ("Brokaw") was, at all relevant times, a director and Audit Committee member of MMAC until the Business Combination and voted to approve the Business Combination.  Brokaw has extensive experience in finance and strategy, as well as his

experience with blank check companies. Brokaw has served as a Managing Partner since 2013, at Trafelet Brokaw & Co., an investment firm. Prior to that, Brokaw was a Managing Director of the Highbridge Growth Equity Fund, held senior positions at hedge fund Perry Capital, LLC, and financial advisory and asset management firm Lazard Frères & Co. LLC. Brokaw has served on the board of directors for numerous companies, including DISH Network Corporation, Alico, Inc., North American Energy Partners Inc., and Terrapin 3 Acquisition Corporation, a special purpose acquisition company, until the consummation of its business combination.

54.     Defendant John White ("White") was, at all relevant times, a director and Audit Committee member of MMAC until the Business Combination and voted to approve the Business Combination. In 2010, White founded Moorgate Capital Partners LLC ("Moorgate"), an independent merchant bank, advisory firm and broker dealer, and has served as a partner at Moorgate since then. Prior to founding Moorgate, White served as the head of the technology, media and telecommunications investment banking group of Wachovia Securities from 2006 to 2009. White previously worked in the media and communications investment banking group at JP Morgan Chase & Co. in both the U.S. and England, and was head of their media and communications investment banking group. White has served as a member of the board of directors of Telescope, Inc., since December 2012 and ITC Service Group, Inc., since June 2016.

55.     Defendants Drewry, Kagan, Faulstich, Brokaw, White, and Marty (collectively, the "MMAC Director Defendants"), participated in Board meetings and conference calls, voted to approve the merger, signed and/or authorized the signing of the Registration Statement, Proxy, approved the Proxy, solicited approval of the Merger through the Board's recommendation that MMAC shareholders vote in favor the merger with Akazoo, which appeared in the Proxy, and

permitted the use of their names in connection with the solicitation of proxies from the shareholders. In their capacities as signatories of documents set forth below, as well as by virtue of their authority to approve the Merger, the MMAC Director Defendants possessed the power and authority to control the contents of the Registration Statement, Proxy/Prospectus, as well as MMAC's and the Company's press releases, investor and media presentations, and other SEC filings.

56.     The Old Akazoo Defendants, Dickey, the MMAC Director Defendants, and the Akazoo Director Defendants are referred to herein, collectively, as the "Individual Defendants."

57.     The Company, the Old Akazoo Defendants, Dickey, the MMAC Director Defendants, Crowe, and the Akazoo Director Defendants are referred to herein, collectively, as the "Defendants."

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Background of Akazoo Limited

58.     Akazoo Limited purports to be a global on-demand music, audio streaming, media, and A.I. technology company with a focus on emerging markets and a presence in 25 countries. Akazoo Limited is incorporated under the laws of Scotland and claims to be based in Luxembourg and London, United Kingdom.

59.     Akazoo Limited was founded in 2010 by Zervos, who graduated from college in 2002.  The ultimate parent and controlling party of Akazoo Limited was a Greek company named InternetQ Group Ltd. ("InternetQ").

60.     As disclosed in the QCM Report, InternetQ was founded by Dimitropolous in 2000 and was listed on the London AIM market until about early 2016 when it was taken private amidst

allegations of fraud.   Thereafter, InternetQ spun off Akazoo Limited and listed it on the U.S. market through a reverse merger with a cash shell.

### B.    Background of MMAC

61.    Modern Media Acquisition Corp. ("MMAC" or "MMDM"), a "blank check" company, was formed in 2014 for the purpose of entering into a merger, share exchange, asset acquisition, stock purchase, recapitalization, reorganization or other similar business combination with one or more business entities or entities in the media, entertainment or marketing services industries.

62.    On May 17, 2017, MMAC completed its initial public offering ("IPO") from which it derived approximately $209 million total of net proceeds, which were placed into a trust account.

63.    The prospectus for MMAC's IPO identified MMAC's general criteria for prospective target businesses, including a focus on "media, entertainment, and marketing services companies positioned to compete in the new modern media ecosystem" and a "market-leading participant with experienced and motivated management teams."

64.    MMAC had considerable discretion in identifying and consummating a business combination, however, there were three general limitations imposed by its Second Amended and Restated Certificate of Incorporation.

- *First*, the target business that MMAC acquired or merged with had to have a fair market value equal to at least 80% of MMAC's net assets (excluding deferred underwriting discounts and commissions) at the time of such acquisition/merger, determined by the MMAC Board based on standards generally accepted by the financial community.

21

- *Second*, MMAC only had eighteen months to complete a business combination from the closing date of the IPO (or 21 months from the closing date of the IPO if it had executed a letter of intent, agreement in principle, or definitive agreement for the business combination within 18 months from the closing date of the IPO but had not yet completed the business combination).  If MMAC had not completed a business combination in time (*i.e.,* by November 17, 2018 or February 17, 2019), its corporate existence would cease, except for purposes of winding up its affairs and liquidating.  As such, MMAC was required to hold the approximately $209 million of proceeds from its IPO in a trust account, which were to be released only upon the consummation of a business combination or liquidation.

- *Third*, if MMAC's stockholders approved an amendment to the Certificate of Incorporation that would affect the substance or timing of MMAC's obligation to redeem 100% of the public shares if MMAC did not complete a business combination on time, MMAC was required to provide the holders of its public shares with the opportunity to redeem all or a portion of their public shares upon approval of any such amendment.

**C.    MMAC Faces Pressure to Complete the Business Combination on Time**

65.    MMAC's initial stockholders were comprised of: Dickey, MMAC's sponsor—of which Dickey had a 50% indirect interest in, and; MMAC's independent directors and Audit Committee members: Faulstich, Brokaw, and White.

66.    The initial stockholders issued themselves 5,175,000 shares for an aggregate price of $25,000, and the Sponsor purchased 7,320,000 warrants simultaneously with the IPO for an

aggregate price of $7,320,000.  Such common stock and warrants had an aggregate market value of approximately $55,254,408 on the record date of August 9, 2019.  These initial stockholders agreed to waive their right to participate in a liquidation distribution with respect to their initial shares if MMAC did not complete a business combination by the deadline.  ***Thus, if MMAC did not meet its deadline, the initial stockholders' shares and warrants would be rendered worthless.***

67.     On November 8, 2018, shortly before MMAC's deadline, it announced it had entered a letter of intent, thus providing MMAC until February 17, 2019 to complete the business combination.

68.     On January 24, 2019, MMAC announced that it had reached a merger agreement with Akazoo Limited, stating in a press release that MMAC was excited to enter this agreement with "a leading music streaming service specializing in emerging markets with 4.3 million premium subscribers in 25 countries throughout Europe, South East Asia, South America and Africa."  One of the closing conditions of the Merger Agreement was that MMAC was to have no less than an aggregate of $53 million in its trust account.

69.     The Merger Agreement provided that the parties would enter into a three-step business combination (the "Business Combination"), which would involve the following steps: (1) MMAC would merge with and into PubCo, a Luxembourg public limited entity, with PubCo remaining as the surviving publicly traded entity; (2) LuxCo, a newly formed public limited company, would acquire the entire issued share capital of Akazoo Limited in consideration for issuing ordinary shares of LuxCo to the Akazoo Limited shareholders, and; (3) LuxCo would merge with and into PubCo, with PubCo remaining as the surviving publicly traded entity.

70.     On February 8, 2019, MMAC held a special meeting in lieu of its 2018 annual stockholders meeting, where stockholders were asked to vote to extend the deadline for MMAC to complete a business combination from February 17, 2019 to June 17, 2019.  In connection with the first extension, public stockholders were given the option to redeem all or a portion of their public shares.  A total of nearly 6 million public shares were redeemed, leaving MMAC with about $152 million in cash remaining in trust.

71.     Then, at a June 14, 2019 special meeting of MMAC stockholders, a second extension to complete the business combination from June 17, 2019 to September 17, 2019 was approved.  In connection with the second extension, stockholders elected to redeem an aggregate of approximately 13.35 million public shares, leaving MMAC with a mere $14.7 million in cash remaining in trust.

72.     In order for MMAC to meet its closing requirement that it would have no less than $53 million in its trust account, on July 29, 2019, the parties to the Merger Agreement agreed to the PIPE Financing whereby approximately 4.8 million PubCo ordinary shares would be sold at $8.00 per unit, with each subscriber to receive an incentive of 0.24 of PubCo ordinary shares per share subscribed for in the PIPE Financing which would convert to Akazoo shares upon the completion of the Merger.  In accordance with the PIPE Financing, MMAC's Sponsor would forfeit 2.6 million PubCo Ordinary Shares upon consummation of the business combination and 7.32 million PubCo warrants upon consummation of the PIPE Financing.

73.     MMAC's Sponsor would forfeit 2.6 million PubCo Ordinary Shares upon consummation of the business combination and 7.32 million PubCo warrants upon consummation of the PIPE Financing.

24

**D.     MMAC's Efforts to Solicit Votes from Stockholders Needed to Complete the Business Combination on Time**

74.     MMAC solicited votes from its stockholders through the  Registration Statement, which was declared effective on August 15, 2019; (2) the Company's Proxy/Prospectus, which was filed on August 15, 2019, and; (3) by other public statements that touted Old Akazoo's financial performance, operations, and the extensive due diligence MMAC purportedly conducted of Old Akazoo.

75.     The Registration Statement and the Proxy/Prospectus stated that the extensive due diligence efforts regarding Akazoo Limited as a potential merger candidate for MMAC began in June 2018.  MMAC's due diligence efforts were carried out by Dickey and the MMAC Director Defendants.

76.     As to the matters considered and the due diligence process, the Registration Statement and Proxy/Prospectus stated:

> On June 22, 2018, Mr. Dickey and representatives of Macquarie, on behalf of the sponsor, held a conference call with representatives from Akazoo — including Mr. Zervos —to engage in a financial due diligence discussion and to discuss the merits of Akazoo as a potential merger candidate for MMAC. Considerations included Akazoo's rapid historic and projected growth, its potential attractiveness as a public company and the favorable demographic and economic trends in Akazoo's target markets. MMAC also began to undertake a more detailed analysis, and began to conduct due diligence on Akazoo, including conducting research on emerging markets' music industries, reviewing materials provided by Akazoo, evaluating Akazoo's competitive positioning and assessing general economic and demographic trends. MMAC's due diligence included consultation with independent experts as well as a review of various research reports and studies on the music streaming market.
>
> In July 2018, MMAC and Akazoo began discussing potential transaction terms and reached a preliminary agreement on the terms and conditions of a potential transaction between the parties.

*Throughout July 2018, MMAC continued to conduct its ongoing due diligence on Akazoo.* Several teleconferences were held between representatives of Akazoo, including Messrs. Zervos and Schreuder, and representatives of MMAC, including Mr. Dickey and Macquarie, on behalf of the sponsor, to *review Akazoo's strategic, marketing and operations plans, and management forecasts. During this time, Akazoo also shared various materials with MMAC, and MMAC and its advisors reviewed such materials, including certain material contracts of Akazoo.*

On August 2 and 3, 2018, Messrs. Zervos and Schreuder met with Mr. Dickey and representatives of Macquarie, on behalf of the sponsor, at Macquarie's offices in New York City. *The meetings included a detailed review of Akazoo's operations, business plan and financial model, the music streaming market, and a discussion about the potential structure and process for a possible transaction….*

Between August 3 and October 25, 2018, MMAC and Akazoo were in frequent communication, through email and teleconferences. Topics and matters discussed were *focused primarily on MMAC's ongoing due diligence, including with respect to Akazoo's business plan and management forecasts*.

\*        \*        \*

From November 5 through November 7, 2018, Mr. Dickey and a representative of Macquarie, on behalf o[f] the sponsor, *travelled to Greece and London to conduct on-site due diligence and to meet with other members of Akazoo 's management team, employees and other stakeholders.*

On November 9, 2018, at the end of a regularly scheduled meeting of the MMAC Board's Audit Committee, Mr. Dickey updated the members of the Audit Committee (who constituted the remaining three members of the Board) on the status of the negotiations with Akazoo, the status of previous discussions with certain of the other potential transaction partners that had been terminated or abandoned, an assessment of Akazoo based on the business and legal due diligence conducted to date, and the proposed structure and timing for a potential transaction with Akazoo.

\*        \*        \*

From November 26 through December 4, 2018, Messrs. Zervos and Schreuder held various meetings with MMAC and its advisors at Macquarie's offices in New York to finalize MMAC's due diligence, to develop an investor presentation, and to prepare for potential meetings with potential investors.

On December 6, 7 and 10, 2018, Messrs. Dickey, Zervos and Schreuder, together with representatives of Macquarie, engaged in discussions with certain institutional investors on a confidential basis pursuant to non-disclosure agreements to discuss

26

potential interest by prospective investors and financing sources in the potential transaction.

On December 14, 2018, the Board held a meeting by teleconference. At this meeting, ***Mr. Dickey and representatives of Macquarie updated the Board on the negotiations with Akazoo, on the continuing due diligence process***, and on the proposed structure, valuation and timing for the potential business combination with Akazoo.

From December 24, 2018 until January 24, 2019, MMAC and its counsel continued to work closely with Akazoo and its U.S. and U.K. legal counsel, including holding conference calls to update the parties on progress with respect to draft transaction documents, MMAC's due diligence and other outstanding issues. In addition, Mr. Dickey and Mr. Zervos engaged in negotiations of the terms of a proposed shareholders agreement…. On January 3, 2019, the Board held a telephone board meeting, with all board members present[.]  The purpose of the meeting was to review the status  of the discussions with Akazoo and the latest drafts of the documents and agreements concerning the Akazoo transaction, including the Business Transaction Agreement and related documents, to review and discuss Akazoo's financial models and forecasts, and to discuss timing of the Business Combination. . . .

***On January 7, 2019, the Board met again by teleconference, with all board members present***, along with representatives of Macquarie, on behalf of the sponsor, and Jones Day. ***Mr. Dickey and the representatives of Macquarie reviewed the financial and business due diligence reports prepared by management and their advisors, and updated the Board on the prospective transaction, its structure (including the redomiciliation of MMAC as a Luxembourg corporation in the Business Combination), and prospects.*** They also reviewed estimated valuation ranges for Akazoo based upon various approaches and analyses. ***After considerable review and discussion, the Business Transaction Agreement and related documents and agreements were unanimously approved by all directors,*** subject to final negotiations and modifications of the documents, and the Board determined to recommend the approval of the Business Transaction Agreement to MMAC's stockholders. . . .

On January 22, 2019, the board of directors of Akazoo met by teleconference with all board members present, including Mr. Zervos and two directors representing the two major shareholders of Akazoo. Mr. Schreuder was also invited to the meeting…. Finally, the board of directors of Akazoo approved the publication of a press release jointly with MMAC in relation to the execution of the Business Transaction Agreement, and the investor presentation and authorized Mr. Zervos to finalize the documents.

77.     The Registration Statement and Proxy/Prospectus also detailed the matters considered by the Board and management of MMAC before voting to approve the Business Combination. It stated:

> *Before reaching its decision, the Board considered the results of management's due diligence*, which included:
>
> - *Research on comparable companies* including publicly-traded Spotify Technology SA (SPOT), Pandora Media Inc. (P), SiriusXM Holdings Inc. (SIRI), Tencent Music Entertainment Group (TME), as well as a number of companies in the border internet/eCommerce, online marketplace and subscription-based business totaling 40 companies…;
>
> - *Extensive meetings and calls with Akazoo's management team regarding operations and projections;*
>
> - *Research on the global music streaming industry, including historical growth trends, market share information and market size projections;*
>
> - *Review of Akazoo's material contracts, intellectual property matters, labor matters, and financial, tax, legal, and accounting diligence;*
>
> - Creation of a financial model with Akazoo's management team; and
>
> - *Reports relating to financial, accounting, tax, and legal diligence.*

78.     The Registration Statement and Proxy/Prospectus confirmed that as a result of MMAC's Board of Directors' extensive due diligence, MMAC's Board of Directors had "determined that *the fair market value of Akazoo is equal to or greater than 80% of the value of the net assets of MMAC."* The Registration Statement and Proxy/Prospectus further stated that:

> The terms of the Business Combination were determined based upon arms-length negotiations between MMAC and Akazoo. . . *In light of the financial background and experience of several members of MMAC's management and Board, the Board also believes it is qualified to determine whether the Business Combination meets this requirement.*

28

E.       **The Merger of MMAC and Akazoo Limited**

79.     On September 11, 2019, MMAC announced that it had completed the business combination and acquired Akazoo Limited (the "Business Combination" or the "Merger").  The Company announced the completion of the Merger in a press release that same day that stated, in relevant part:

> ***Akazoo S.A., SONG, operates in 25 countries, including emerging markets that represent the music streaming industry's fastest growing market opportunities.*** Akazoo's platform boasts patented Sonic AI music recommendation and profiling technology, developed to support its hyper-local strategy.
>
> ***In the last 5 years, SONG's premium subscribers have grown from 1.1 million in 2014 to over 5.3 million today. In the first half of 2019, the Company's revenues grew 39% year-over-year.***

80.     The September 11, 2019 press release quoted Dickey as follows: "Akazoo has created a high growth digital global music streaming platform that is well-positioned to benefit from secular shifts underway in the media industry. Its strong presence in emerging markets provides a foundation for sustained growth in revenues and profits and our strong balance sheet will be used to fund many growth initiatives."

81.     Upon the completion of the Merger, Zervos was to continue as CEO, Dickey would serve as Chairman, Dimitropolous would become a director, and Schreuder would continue as CFO.  Upon the closing of the Business Combination, Stephanopoulos, Lapcevic, Macridis, and Roche were appointed as the remaining directors of the Company's Board of Directors and as its Audit Committee.

82.     Upon the closing of the Business Combination, Zervos received a €1 million bonus. Additionally, as a result of the combination, Zervos beneficially owned 506,751 shares, Dimitropoulos beneficially owned 24,514,662 shares (50.0%), and Schreuder beneficially owned

approximately 354,725 shares of the Company.  Schreuder also entered a lucrative employment contract with Akazoo S.A. upon the completion of the transaction.

**F.      After the Merger, Defendants Tout the Success of the Company**

83.     After the Merger, Defendants continued to present an optimistic picture about the Company's business, operations, and prospects.

84.     For example, the Company filed a Form 20-F on September 17, 2019 which claimed that the Company had ample capitalization following the Business Combination, and announced ever-increasing amounts of revenue, as well as numbers of subscribers and registered users when Defendants provided the Company's 2Q 2019 and 3Q 2019 financial results to investors.  When reporting the Company's 3Q 2019 financial results, Defendants likewise noted that the Company's registered users and subscribers had grown to 44.4 million and 5.5 million respectively, and that revenues had increased 24% to €35.0 million compared to €28.1 million in the third quarter of 2018.

**G.      The Truth Emerges**

85.     On April 19, 2020, Quintessential Capital Management ("QCM") released an analyst report (the "QCM Report") detailing, among other things, how Akazoo misled investors and failed to disclose pertinent information, including: (i) Akazoo massively overstated its users, subscribers, revenue and profit; (ii) Akazoo overstated the size of the of the Company and its services; (iii) Akazoo overstated where the Company's service is actually available; (iv) Akazoo had been closing offices and losing employees for years; (v) Akazoo did not specialize in "hyper-local" content; and (vi) Akazoo did not have lucrative deals with mobile operators in its markets.

86.     The Report stated the following, in pertinent part, about the Company's finances:

. . . what we see at Akazoo, with large discrepancies between earnings and cash flow, sizeable investments in IP and a level of account receivables grossly out of line with its peer group. ***We also observe with great concern, that Akazoo has paid zero taxes for at least the past four years, despite claiming $21.7m of accounting "profit".***

\*     \*     \*

**The curious case of Solutions System Touchmedia a.k.a Veoo Malaysia**

\*     \*     \*

InternetQ [Akazoo's former parent company] was then [2013] doing business with a Malaysian company (Touchmedia) "related to the Group's CEO Panagiotis Dimitropoulos" for the provision of the following services:

• Monthly billing of Malaysia operators
• Collection of Revenue from Malaysian operators

We find it disturbing that a company whose accounts have been questioned as suspicious, was using for its billing and revenue collection a payment processing firm that is "related" to its CEO. ***Clearly, the control of a payment processor could enable a dishonest management to alter the accounts and provide a less than truthful picture of the financial situation of the company.*** Although, this situation relates to InternetQ, not necessarily Akazoo, given the close ties between the two companies we cannot ignore it.

\*     \*     \*

***Similarly, the Company might hide any cash shortfall by inflating costs, especially cost of goods sold ($100m in 2019) and investments in intangible assets ($11m in 2019).*** The former consists primarily in royalties paid to music label companies. ***We hypothesize that Akazoo might have either colluded with, or outright fabricated, small music label companies that generate fictitious cost invoices for non-existing music streams.***

87.     The Report stated the following, in pertinent part, about the Company's music distribution rights:

**Alleged copyrights violations**

Music streaming companies typically purchase music (along with territorial copyrights) from large music distributors. ***We checked with Sony Music, from***

31

*which Akazoo has purchased the full catalog for redistribution. Surprisingly, despite claiming to be active in 25 countries, Akazoo has purchased from Sony copyrights valid for only five countries, namely Greece, Cyprus, Poland, Ghana and Malaysia.* Obviously, this creates some worrying question marks: has Akazoo exaggerated the number of countries from where it is operating? Has the Greek company been distributing music in certain countries in breach of copyrights (a breach that typically carries very expensive fines)?

For example, we know that Akazoo's service is currently active (if barely used) in Indonesia and has been active in Singapore, Thailand. According to our investigation, Akazoo has no rights to distribute Sony music in these territories and hence may be exposed to serious repercussions.

88.     The Report stated the following, in pertinent part, about the Company's global reach, business-to-business deals, and "hyper-local" focus and ability:

**Doubts on geographic reach**

In its official filings and presentation to investors, Akazoo claims to be active in 25 countries[.] [Image omitted.]

Being a music-streaming business, the map above presumably indicates that Akazoo is actively selling music in the countries appearing on the map. In its 2019 SEC filings Akazoo highlights:

*"Akazoo's revenue is derived primarily in emerging markets (including **Poland, Russia, Malaysia, Thailand, Indonesia, Ecuador, Brazil and Mexico**, among others). The success of the business is largely dependent on the continued demand for music streaming services in these regions".*

QCM's investigation, however, suggests otherwise. First of all, using local contacts in key markets as well as a VPN, we attempted opening accounts in dozens of countries (including many of those in the list above), but in most cases, we received the following message from Akazoo:

"We would really like to be here. For now, our service is not available in your country. Please check back, you never know."

*The only countries where we did manage to open an account were Greece, Cyprus, Poland, Malaysia and Indonesia.* It is apparently *not possible to become an Akazoo client in either Russia or Brazil, two of the largest markets that Akazoo claims to be operating in*. This is in line with the options on the app itself which

only has these five countries as possible choices of residence (and this stage is only accessible if you are located in one of those five countries).



\*       \*       \*

**Key Market Poland**

Starting in late 2014 Akazoo did have a partnership with Orange Polska SA, providing them a white-label streaming service called *Muzyka-Tu-i-Tam*. . . . Former clients of *Muzyka-Tu-i-Tam* were migrated onto Spotify by Orange with a three-month free Premium subscription. ***The Tu-i-Tam service does not appear to exist since mid- 2016. Currently all Polish operators have streaming music partnerships that they actively promote on their websites – none involving Akazoo***[.] . . .

***On the Polish Google Play app store the most recent reviews as of February 2020 are two from 2018, one from 2017*** and a few complaints from 2016. Some older reviews hint that the  reviewers were only downloading it in order to earn credits on a third-party app. However, a grand total of three reviews (!) over the past three years is a clear sign that there is practically no usage. ***For comparison, Spotify has 20-25 reviews per day from Polish Google App store users.*** Spotify does not disclose its subscriber numbers in Poland but the annualized ratio of its reviews to Akazoo's suggests 7,300 : 1. ***Even with an optimistic assumption that Spotify has 19m subscribers (50% of the Population), we would therefore estimate Akazoo to have around 2,000 subscribers in this "key market"*** – even with a margin of error of a factor of 10, this is an insignificant number.

\*       \*       \*

33

**Key Market Russia**

*The Akazoo Music app has been available on the app store since at least 2017. However, in all that time it seemingly was not possible for Russian users to register or log in* as evidenced by the sporadic commentary of users who seem to have stumbled on it. *It has also never been translated into Russian* (a frequent complaint below from people who didn't even manage to get to the point where they are told the service is not available in their country) and *remains unavailable for registration today.* [Image omitted.]

**Key Market Brazil**

*The service is not available in Brazil.* It is possible to download the app and there is a Portuguese language page that confirms the service is not available. It is not permitted to open an account or log in with an existing account. This has been tested on multiple local mobile phones and networks. Judging by the comments on the Google App store, this has been the case since at least May 2019 (comments saying it is not possible to log in). [Image omitted.]

In prior years there was some modest commentary activity with a small number of people evidently trying the service out. The vast majority of the reviews were negative with one star. Having taken the time to count them individually, it looks like momentum faded after 2016 – not that 81 reviews per year indicates a popular app. [Chart omitted.]

It is not that Brazilians are shy about commenting Spotify gets hundreds, if not thousands of reviews every single day in Brazil, mostly five stars (it's quite hard work just to scroll down to get to the previous day). . . .

**Key Market Indonesia**

It is still possible to subscribe to Akazoo in Indonesia at time of writing. And yes, there was a stream of comments (often even multiple comments on the same day) on the Play Store during 2016 and 2017, carrying into the first months of 2018 when clearly there was some attempt to promote the service in the country. Since then things have clearly tapered off – *the last comment dates back to 27th May 2019, being the final of only five comments that year.* [Image omitted.]

*While much of this historic activity was likely paid for (the comments rarely say anything useful – typically 5\* and "OK good"), this suggests that, unlike in all the other "key" markets, genuine attempts were made to establish the service in Indonesia.* It is also worth noting that the Spotify app continues getting approximately 100 comments every single day on the Indonesian store (less than in

Brazil but still many multiples of Akazoo at its peak activity in 2016). Unfortunately, these attempts have been abandoned over a year ago and the resulting drop in activity suggests that they were ultimately unsuccessful in building any sort of brand or growing user base.

*      *      *

## Key Market Malaysia

Akazoo did claim a partnership with Sony Ericsson in Malaysia in 2015, whereby the manufacturer preloaded its phones with Akazoo Music software. This would not have been relevant as even then Sony's market share would have been miniscule and has declined further since.

***Although Malaysia is one of the handful of markets where it is actually possible to sign up for the service, activity on the Google Play Store is negligible. The latest comment dates back to July 2017*** and there is only around a dozen comments in total. Clearly Malaysians are not engaging with Akazoo via the flagship app and it cannot account for any significant number of subscribers.

*      *      *

## Key Market Thailand

***It is seemingly not possible to subscribe to Akazoo in Thailand even though the website has been translated into Thai.*** The Thai Play store shows minimal activity over the past years so ***it is safe to say this was never an active market***.

## Key Market Mexico

***It is seemingly not possible to subscribe to Akazoo in Mexico even though the website has been translated into Spanish.*** The Mexican Play store shows minimal activity post 2014 (with just a handful of reviews in that year), so ***it is safe to say this was never an active market.*** Confirmation also from the year 2020 that it is not possible to register.

*      *      *

## Knowledge of Emerging Markets?

A claimed advantage of Akazoo is an intimate knowledge and AI processing of local music tastes. This ostensibly allows them to stream local artists who let them do it at lower cost than global artists. To illustrate this, they present the following:

35



Let's pause for a minute on the ***"Top 5 Artists on Akazoo in Brazil", which is an example of a huge potential market with a dynamic local music scene – and the fastest growing for Akazoo according to this presentation***.

Anyone with a modicum of music history knowledge will recognize the top two artists in the list as giants of the Bossa Nova movement which was huge during the 50s and 60s. This music went global with Frank Sinatra and Stan Getz among many others to record their songs. We hear it in various forms to this day in elevators and chill-out bars around the world. ***To suggest that young Brazilians primarily stream Bossa Nova on their phones today is akin to saying Americans mainly listen to Elvis and Frank Sinatra*** while the British primarily stream Beatles classics. To summarize these top 5:

| | | | |
|---|---|---|---|
| 1 | Antonio Carlos Jobim | Bossa Nova, Big in 60s | Died 1994 |
| 2 | Vinicius de Moraes | Bossa Nova, Big in 60s | Died 1980 |
| 3 | Elis Regina | Bossa Nova, Big in 60s | Died 1982 |
| 4 | Gilberto Gil | Big in 70s - 80s | 77 yrs old |
| 5 | Marisa Monte | Big in 90s | 52 yrs old |

Brazil does have a huge music market today with young artists and music styles. It is absolutely impossible that a representative sample of the Brazilian online population would stream primarily these relics of history. It is also impossible that anyone with even a bit of local music knowledge would guess that any of these were anywhere near the top streamed artists between 2015 and 2018 in Brazil.

A brief look at the other "markets" top artists shows somewhat more plausible results although again, ***Russian top stream, the band TaTu was dissolved in 2011***

*and was largely famous internationally for risqué videos: they definitely would not have been the top streamed artist between 2015-2018 in Russia.*

It appears therefore that these lists have been compiled without any access to local knowledge or information as would be expected from a popular music platform.

89.     The Report stated the following, in pertinent part, about the Company's user base:

**Search volume for Akazoo is negligible**, especially if compared with competitors claiming similar user bases. For example, Pandora has some 80m users and Deezer 14m (vs 44m claimed by Akazoo). Yet, the search volume for the Greek company is almost trivial compared to both firms.

*              *              *

Because Akazoo's business model is similar to that of many competing apps in the market (e.g. Pandora, Spotify, Tidal, TuneIn, etc.), one would expect it to score comparably in basic industry ratios. For example, a selection of Akazoo's competitors shows that there is on average 1 app review for every 31 registered users on Google Play (the Android app store). Other ratios we checked include revenue/employee, subscribers/employee and others. ***While its competitors exhibit ratios which are similar to one another, Akazoo's figures tend to be an extreme outlier. For example, Akazoo claims to have over 500 users per review while its competitors on average have about 31.*** So, either Akazoo's users are far more reluctant to write reviews or the Company's user base is a lot smaller than what management has been telling investors. Similar anomalies show up also in the number of likes/followers on social media and in revenue/employee ratio.

*. . . **By extrapolating the average figures and applying them to Akazoo, we estimate that its users base may be inflated by at least a factor of 10.*** [Images omitted.]

**Trends analysis: Akazoo's visibility is negligible**

*              *              *

On an absolute basis, search volume for Akazoo appears to have peaked somewhere around 2011-2012 and has since shrunk to almost zero. This fact obviously clashes with growth rates and trajectory claimed by the Company.

The near totality of web searches originates in Cyprus and Greece, rather than in the emerging countries where Akazoo claims to be so popular.

37

\* \* \*

**Data from third-party apps confirms: Akazoo app number of downloads is minimal**

\* \* \*

Akazoo scores pitifully on both platforms. ***For Sensor Tower, Akazoo was below the minimum threshold for detection (<5000 downloads). Worse still, Mobile Action seems to estimate the number of Akazoo downloads at about 40/month (December 2019). Obviously, such dismal data is impossible to reconcile with the 44m of registered users growing at double-digit rates claimed by management.*** Should anyone doubt the accuracy of the software we used, we performed the same analysis on several competitors of Akazoo's and the findings were consistent with the official figures reported by these companies. [Image omitted.]

**The app reviews: few and shameless**

Opening the Akazoo page on Google Play (the Android app store) something odd immediately jumps to the eye: the most relevant text reviews date as far back as January 2019 (15 months ago) and, perhaps surprisingly for an app that claims to cater mostly emerging markets, are signed by three Greek-sounding names. The authors of these reviews are: Chris Spiliotopoulos, Yiannis Karalis and George Zervos. As you can readily verify clicking on the hyperlinks, these characters are all Akazoo's senior employees and the latter, George Zervos, may be the brother of the company's CEO. A quick glance of the remaining reviews shows that many of them look fake or complain about the app being either unusable, disappointing or claim having downloaded it to get credits elsewhere.

90.    The Report stated the following, in pertinent part, about the Company's offices and

staffing:

**The incredible shrinking Akazoo**

***According to Akazoo's official filings, the Company's headcount decreased by 17% per year from 45 to 26 in 2016-2018 (we estimate the current number to be even lower). One has difficulty reconciling these figures with the claimed revenue growth rate of 24%***: why would a company claiming to grow at that rate *halve* its workforce in three years starting from an already impossibly low base?

***The very low number of employees (26 or less) on $145m of sales implies a most unlikely $5.5m of sales/employee.*** This ratio is 8x times higher than the ratio for

its peer group and for companies such as Facebook or Apple (which have industry-leading ratios).

***Consistent with the significant shrinking headcount, we noticed that Akazoo seems to have closed most (or perhaps all) of their offices outside of Greece, including its headquarters in London.*** We visited recently Akazoo's London headquarters at the Pavillon Center at 96 Kensington High Street, in London UK. The facility is a co-working space akin to WeWork. After speaking with the receptionist, we learned that Akazoo left the premises a long time ago. Even at its peak, the office was apparently manned by only four people: Pablo, George, Neilah and Pierre. We believe these names may correspond to Pablo Monstrous, Nailah Peeroo, George Zervos and Pierre Schroeder (CFO): ***the former three have left the UK office in February 2019, while Pierre lingered until December then closed down the office permanently***. We also visited other addresses in London, including the ones of their subsidiary R&R, and found them either closed or belonging to Akazoo's legal advisors rather than to Akazoo proper.

The office in the Ukraine is also either closed or in the process of being closed as Tatiana Ostapenko, Akazoo's Chief Accountant, is *"open for offers"* on her LinkedIn page and cites as a reason "***[Akazoo's] HQ is currently closing business in Ukraine***".

We also visited the Luxembourg address in Rue de Bitbourg and failed to find any trace of Akazoo whatsoever (we presume that this address belongs to Akazoo's legal advisors). Similarly, our field sources claim that Akazoo has no proper office in Cyprus and may be using an accountant's address or similar. So, where in fact is Akazoo? The company may be operating from some other unknown location, but ***QCM did find an Akazoo's office inside the headquarters of its former parent company InternetQ in Athens***, at 340 Kifissias Ave, Neo Psychiko. The (barely readable) sign on the doorbell simply says "*InternetQ*".

91.    Also, on April 20, 2020, QCM released a slideshow (the "Slideshow") supplementing the Report.

92.    The Slideshow noted the following, in pertinent part, regarding Akazoo's finances:

• Suspicious signs of accounting manipulation:

• Cash inconsistencies; total lack of taxes.

*      *      *

**WHY AREN'T SALES TRANSLATING INTO CASH? WE SEE LARGE AND GROWING ACCOUNT RECEIVABLES…**

**Akazoo sales don't translate in cash, but in unexplained, increasing account receivables…** [Image omitted.]

**…OUT OF LINE WITH INDUSTRY PEERS: AKAZOO DSO [Days Sales Outstanding] ARE A SUSPICIOUS OUTLIER…**



**WHY DOES AKAZOO PAY ZERO TAXES DESPITE CLAIMING $22M IN PROFIT FOR THE LAST FOUR YEARS???**



93.    The Slideshow stated the following regarding Akazoo's music distribution rights:

QCM CHECK: MUSIC DISTRIBUTORS


• We checked with Sony Music, a major music distributor to Akazoo.
• *Akazoo has purchased distribution rights for only 5 (five) countries*, namely:
• Greece, Cyprus, Poland, Ghana and Malaysia.
• *We fear that either Akazoo is lying about its geographic reach (25 countries claimed) or may be breaching music copyrights.*

94.    The Slideshow stated the following, in pertinent part, about Akazoo's global reach:

• App unavailable in many core countries.


*      *      *


• QCM has attempted to open an [Akazoo] account in dozens of countries.
• We succeeded in opening an account (using a VPN) only in Poland, Malaysia, Indonesia, Greece, Cyprus.

41

*• For other countries we tried, including those where Akazoo claims to be active in, we received the following message: "We would really like to be here. For now, our service is not available in your country. Please check back, you never know."*



95.     The Slideshow stated the following, in pertinent part, about Akazoo's user base:

We use three third party tools to estimate the number of downloads of Akazoo app and traffic on its websites.

**(a)     The Evidence: numerical analysis**

Akazoo's operating metrics are indicative of a far smaller company

AKAZOO CLAIMS SUBSCRIBERS AND REVENUE COMPARABLE TO ITS COMPETITORS… [Image omitted.]

NUMBER OF USERS PER REVIEW: AKAZOO RATIO IS 17 TIMES HIGHER THAN AVERAGE…

42



REVENUE PER EMPLOYEE: AKAZOO RATIO IS 8X HIGHER THAN AVERAGE…



OTHER STATISTICS TELL A SIMILAR STORY…



PANDORA HAS 1500 TIMES (!) MORE INSTAGRAM FOLLOWERS THAN AKAZOO (DESPITE COMPARABLE NUMBER OF CLAIMED SUBSCRIBERS) [Image omitted.]

PANDORA HAS 370 TIMES (!) MORE FACEBOOK FOLLOWERS THAN AKAZOO (DESPITE COMPARABLE NUMBER OF CLAIMED SUBSCRIBERS) [Image omitted.]

EXTRAPOLATING FROM PEER AVERAGES: AKAZOO MAY HAVE LESS THAN 400K SUBSCRIBERS (VS 5.5M CLAIMED)[] [Image omitted.]

GOOGLE TRENDS SUGGEST THAT BARELY ANYONE SEARCHES FOR «AKAZOO» ANYMORE…



GOOGLE TRENDS: AKAZOO IS VIRTUALLY UNDETECTABLE VS. PEERS CLAIMING COMPARABLE SUBSCRIBER BASES [Image omitted.]

\*　　\*　　\*

MOBILE ACTION: ONLY 40 DOWNLOADS, UNDETECTABLE REVENUE (DEC 2019)

\*　　\*　　\*

**The Evidence: app reviews**

A large portion of the (very few) reviews appearing on Google apps store, have been written by Akazoo's employees, including senior management



96. The Slideshow stated the following, in pertinent part, regarding Akazoo's closing offices and staffing:

• Disappearing infrastructure
    • (undisclosed) closed offices
    • Disappearing workforce

*     *     *

**The Evidence: infrastructure**

*Despite claiming multiple offices around the world, our field due diligence revealed that Akazoo has closed offices in most of its locations.*



AKAZOO'S MAIN OFFICE IS IN 96 KENSINGTON, LONDON. REALLY???

QCM FIELD CHECK IN LONDON AT 96 KENSINGTON PAVILLION CENTER

Receptionist: «Akazoo left several months ago!» [Images omitted.]

*     *     *

AKAZOO BUSINESS IN UKRAINE…CLOSING UP!

• Akazoo's Chief Accountant in her LinkedIn profile is open for offers since Akazoo is closing business in Ukraine!

• According to our sources Akazoo/R&R has shut down business in both the UK and Ukraine.

97.     On this news, Akazoo shares fell $0.53 per share over the rest of the trading day and the next trading day, or over 20%, to close at $1.99 per share on April 21, 2020, damaging investors.

98.     On April 22, 2020, during market hours, the Company admitted the credibility of the QCM Report's allegations, announcing in a press release that it had formed an independent special committee to investigate the issues raised by the QCM Report.

99.     On this news, Akazoo's share price fell over 16% to close at $1.66 per share on April 22, 2020, further injuring investors.  Over the next two days, Akazoo's share price continued to drop, closing at $1.16 per share on April 24, 2020.

100.     On April 24, 2020, the Company disclosed that Macridis and Roche had resigned. Macridis and Roche further confirmed the credibility of the QCM Report, stating the following:

> With regard to the QCM allegations, we are encouraged that the board has adopted our initial position to form a special committee to investigate the extremely serious accusations contained in the QCM report….***We have been clear with the rest of the board from the outset that an independent, forensic and thorough investigation, with complete transparency of results to shareholders, is in the best interests of the Company.***

101.     On May 1, 2020, Akazoo filed with the SEC a Form 6-K which announced the termination of Defendant Zervos, the Company's CEO, "for cause" and that investors could not rely on previously issued financial statements. The 6-K provided the following, in pertinent part:

> ***Appointment of Interim CEO; Termination of Chief Executive Officer***
>
> On May 1, 2020, the Board of Directors (the "Board") of Akazoo S.A. (the "Company") announced the appointment of Michael Knott as interim Chief Executive Officer, effective immediately. This ***followed the decision by the Board to terminate Apostolos N. Zervos as Chief Executive Officer for cause***. The Board has also requested that Mr. Zervos resign as a member of the Board.
>
> *          *          *
>
> ***The Special Committee has nonetheless been unable to verify certain operational and financial information previously reported by the Company. Accordingly, the Special Committee has concluded that the consolidated financial statements (i) of Akazoo Limited for the years ended December 31, 2018, 2017 and 2016 (and any interim periods therein) audited by the Company's former independent***

*registered public accounting firm and included or incorporated by reference in the Company's Shell Company Report on Form 20-F filed with the U.S. Securities and Exchange Commission (the "SEC") on September 17, 2019; (ii) of Akazoo Limited for the three- and six-month periods ended June 30, 2019 and 2018 included in the Company's Report on Form 6-K furnished to the SEC on September 27, 2019; and (iii) of the Company for the three- and nine-month periods ended September 30, 2019 and 2018 included in the Company's Report on Form 6-K furnished to the SEC on December 9, 2019 should no longer be relied upon due to the possibility that such financial statements contain material errors.*

102.    On this news, Akazoo shares fell 3% to close at $1.163 per share, further damaging investors, before trading was halted at 9:30 am on May 1, 2020.

103.    On May 21, 2020, Akazoo issued a press release announcing that the special committee investigation had further determined that former Akazoo management and associates participated in a "multi-year fraud."  The press release stated, in pertinent part:

NEW YORK and LONDON, May 21, 2020 /PRNewswire/ -- Akazoo S.A. ("Akazoo") today announced that the special committee of independent directors (the "Special Committee") has substantially completed its investigation and determined that *former members of Akazoo's management team and associates defrauded Akazoo's investors, including the predecessor SPAC acquiring entity Modern Media Acquisition Corp. ("MMAC"), by materially misrepresenting Akazoo's business, operations, and financial results as part of a multi-year fraud*.

*In particular, the Special Committee has determined, among other things, that (i) Akazoo's historical financial statements, which have been audited by multiple, experienced global accounting firms for years, were materially false and misleading; (ii) Akazoo, in fact, has had only negligible actual revenue and subscribers for years; and (iii) former members of Akazoo management and associates participated in a sophisticated scheme to falsify Akazoo's books and records, including due diligence materials provided to MMAC and its legal, financial, and other advisors in connection with the Akazoo business combination in 2019*.

As previously disclosed on April 22, 2020, Akazoo's board of directors formed the Special Committee to investigate allegations in a report released by Quintessential Capital Management on April 20, 2020. The Special Committee took immediate action. On May 1, 2020, Akazoo announced it had terminated Apostolos N. Zervos as Chief Executive Officer for cause, following a recommendation by the Special

Committee based on evidence of conduct inconsistent with the Company's policies, including a lack of cooperation in the Special Committee's investigation. The termination of Mr. Zervos for cause was followed by the May 1, 2020 appointment of Michael Knott, a Senior Managing Director at FTI, as interim Chief Executive Officer. The appointment of Mr. Knott significantly expedited the Special Committee's investigation and exposure of the multi-year fraud.

The Company intends to take all available steps to maximize recovery for defrauded investors, including by seeking to unwind the original business combination between MMAC and Akazoo. The Special Committee has also directed its advisors to make referrals to, and cooperate with, appropriate regulators.

Akazoo also announced today that it has received an anticipated letter of delisting from The Nasdaq Stock Market LLC. The Company does not intend to appeal the decision, and as a result, the Company's securities will be suspended from trading on Nasdaq at the opening of business on May 27, 2020.

## V.  DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

### A.  Materially False and Misleading Statements Prior to the Merger

#### 1.  The Announcement of the Merger Agreement

104.  On January 24, 2019, MMAC filed with the SEC a Form 8-K announcing the

Merger Agreement with Akazoo (the "January 2019 8-K"). The January 2019 8-K was signed by

Defendant Dickey. Attached to the January 2019 8-K was the press release issued by MMAC on

January 24, 2019 entitled "Modern Media Acquisition Corp. Enters into Merger Agreement with

Akazoo Ltd., a global music streaming platform" which touted Akazoo Limited as follows:

> In its ninth year of operation, Akazoo is *a leading music streaming service specializing in emerging markets with 4.3 million premium subscribers in 25 countries throughout Europe, South East Asia, South America and Africa.*
>
> \*       \*       \*
>
> The combined company will continue to be led by Akazoo's experienced management team under the leadership of Apostolos N. Zervos, Akazoo's Founder

and Chief Executive Officer. Lew Dickey will serve as Chairman of the combined company.

*     *     *

**Akazoo Investment Highlights**

- Leading music streaming service with a ***customer base of 4.3 million premium subscribers across 25 different countries*** with a focus on emerging markets

- Positioned to benefit from rapid-growth of music streaming industry

- ***Successful hyper-local strategy for content curation and cultural relevance with first mover advantage***

- ***Key partnerships with regional and local telecom services and mobile messaging companies***

- Patented Music AI technology for real-time music recommendations, sonic analysis and automatic playlisting, fully integrated into core platform

- ***Compelling financial profile***, with expected growth from further penetration of existing markets, and expansion into new territories

- ***Multi-year track record of profitability***

- ***Experienced management team with deep industry and market knowledge well-positioned to oversee organic growth*** and expansion into new territories

- Active M&A pipeline

MMDM Chairman & CEO Lew Dickey commented, "We are excited to enter into this transaction with Akazoo. ***It's a terrific company with strong management led by Founder & CEO, Apostolos Zervos.*** As one of the pioneering companies in the space, they have spent the last decade ***building a profitable business model with a strong competitive moat in emerging markets.*** Music streaming is one of the best secular growth stories in global media and entertainment, and Akazoo is a top global platform that we expect will benefit tremendously from an infusion of growth equity and a public currency to participate in further industry consolidation."

Apostolos N. Zervos, Founder and CEO of Akazoo, remarked: "This transaction marks the beginning of a new phase of growth for Akazoo. ***Our goal has always***

*been to provide our customers with the most relevant and engaging user experience through deep knowledge of local tastes and an expansive library of music content. We have successfully executed on this mission since our inception in 2010 and have done so while obtaining profitability. We are now serving over 4.3 million premium subscribers*, and, as we look to our next phase of growth, we could not be happier to partner with Lew and MMDM. As our Chairman, Lew will bring extensive media industry, public company and M&A experience to the Akazoo team. With a public currency and an infusion of capital, Akazoo will be positioned to expand more rapidly and efficiently than ever before."

David Dorfman, Head of Technology, Media & Telecom – Americas, Europe & Asia of Macquarie Capital, said: "The announced transaction between Akazoo and MMDM is an exciting opportunity for shareholders and customers. *Akazoo is a fast-growing and profitable business that is poised to benefit from the continued adoption of music streaming across mobile devices. We believe the proposed transaction will enable the company to continue to build on its presence in 25 countries and growing.*"

105.    The foregoing statements were materially false and/or misleading, lacked a reasonable basis, and/or failed to disclose material adverse facts pertaining to the Company's business, operations, and prospects, because, as the Company has admitted: (1) Old Akazoo materially overstated its revenue, profits, and cash holdings; (2) Old Akazoo did not operate in 25 countries; (3) Old Akazoo did not have a strong or experienced management team that was "well-positioned to oversee organic growth and expansion"; (4) Old Akazoo materially overstated its user base; (5) Old Akazoo did not have a "hyper-local" focus or abilities that allowed it to cater its services to emerging markets; (6) Old Akazoo vastly overstated its claimed size, growth rate, and geographical reach; (7) Old Akazoo held significantly fewer distribution rights than it claimed; (8) Old Akazoo had had negligible revenue and subscribers for years; (9) Old Akazoo had been continuously losing employees and closing offices for years; (10) Old Akazoo's value was not equal to at least 80% of the value of MMAC's net assets; and (11) MMAC had not conducted proper due diligence of Old Akazoo.

106.    Also attached to the January 2019 8-K was an investor presentation (the "January 2019 Investor Presentation") which included the following slides touting Akazoo's finances, distribution rights, geographic reach, "hyper-local" focus, and user base:









## Akazoo is Local



**Akazoo is a leading service in Emerging Markets due to its unique local strategy**

### Local Content



🎵 **25+ million** songs by local artists

🌐 **Territory specific Top 20** updated weekly

⚙️ **Contextual / statistic-based** playlists

### Culturally Relevant Interface



◎ **New local releases** prominently featured on home page

🖥 **Banners** customized to promote local content

📱 **Push notifications** delivered upon release of new content

◉ **Localized search** with results based on local language preference

STRICTLY CONFIDENTIAL                                                                 PAGE 15

56



## The Opportunity

Our path to 20 million subscribers and ~€500 million of revenue

**Market Opportunity Illustration (Existing Markets)**

|  | Today | Long Range Target |
|---|---|---|
| Covered Population[1] | **1.4 billion** | 1.5 billion+ |
| Smartphone Penetration[2] | **50%** | ~70% |
| Addressable Streaming Market (ASM) | **700 million** | 1,050 million |
| Subscribers | **4.3 million**[3] | 20 million |
| Implied Penetration Rate | **0.6%** | 1.9% |

**Revenue and EBITDA Opportunity Illustration (Existing Markets)**

|  | Today | Long Range Target |
|---|---|---|
| Monthly ARPU[4] | **~€2.10** | ~€2.10 |
| Subscription Revenue | **~€100 million** | ~€500 million |
| EBITDA Margin | **10%** | ~15 – 20% |
| Subscription EBITDA | **~€10 million** | ~€75 – €100 million |

(1) Source: www.worldometers.info
(2) Source: www.newzoo.com, Forrester
(3) As of September 30, 2018
(4) Monthly ARPU reflects the average monthly revenue per premium subscriber

**Strong Tailwinds Driving Growth**

✓ 1.4 billion (and growing) population in our markets, with favorable demographics

✓ Increasing smartphone penetration

✓ Growing adoption and importance of music streaming

✓ Potential upside in entering new markets, price increases and M&A

STRICTLY CONFIDENTIAL

PAGE 19



**Akazoo Compares Favorably to Global Players**

Akazoo's valuation per subscriber compares especially favorably to Developing / Emerging Market players, who are similarly profitable unlike most global players

| | akazoo | TME TENCENT MUSIC ENTERTAINMENT(1) | Spotify | TIDAL | PANDORA | DEEZER |
|---|---|---|---|---|---|---|
| Premium Subs (Latest Available, mm)(2) | **4.3** | 23 | 87 | 2.1 | 6.8 | 9.0 |
| 2019E Revenue (€mm)(3) | **€134** | €3,383 | €6,711 | €103 | €1,567 | €300 |
| Valuation (€mm)(4) | **€413** | €20,488 | €18,670 | €528 | €2,563 | >€995 |
| Implied Valuation / Premium Sub | **€96** | €879 | €215 | €252 | €377 | >€111 |
| Developing / Emerging Markets Presence | 3 | 3 | 1 | 1 | 0 | 1 |
| Profitable | ✓ | ✓ | ✗ | ✗ | ✗ | ✗ |

(1) TME's share price as of January 22, 2019 was $14.80, up ~14% since pricing at $13.00 on December 11, 2018
(2) Akazoo subscribers as of September 30, 2018; Tidal subscribers based on median of range from 1.2 million per *Dagens Naeringsliv* to 3.0 million per Company press releases; Deezer subscribers per *The Independent*; Pandora, Tencent Music and Spotify subscribers based on latest available public filings as of January 22, 2019
(3) Assumes EUR/USD FX rate of 1.14 and EUR/RMB FX rate of 7.73 as of January 22, 2019; Pandora, Spotify revenue per FactSet consensus estimates; Tencent Music estimates per Wall Street research; Tidal revenue reflects 2017 per *Music Business Worldwide*; Deezer revenue per *Reuters*, year not explicitly stated
(4) Public company valuations based on enterprise values as of January 22, 2019 (FactSet); Tidal valuation per *Quartz* as of January 2017, Deezer valuation per *Digital Music News* as of August 2018

STRICTLY CONFIDENTIAL                                                                                     PAGE 25

107.    The foregoing statements were materially false and/or misleading, lacked a reasonable basis, and/or failed to disclose material adverse facts pertaining to the Company's business, operations, and prospects, because, as the Company has admitted: (1) Old Akazoo materially overstated its revenue, profits, and cash holdings; (2) Old Akazoo did not operate in 25 countries; (3) Old Akazoo materially overstated its user base; (4) Old Akazoo did not have a "hyper-local" focus or abilities that allowed it to cater its services to emerging markets; (5) Old Akazoo vastly overstated its claimed size, growth rate, and geographical reach; (6) Old Akazoo held significantly fewer distribution rights than it claimed; (7) Old Akazoo had had negligible revenue and subscribers for years; and (8) Old Akazoo had been continuously losing employees and closing offices for years.

108.   On that same day, Zervos, Schreuder and Dickey participated in a conference call with investors about the Merger Agreement where they further touted the success and potential of Akazoo.  Specifically, Dickey stated:

> [W]e expect that Akazoo will make a strong public company. ***It is an established, profitable, high-growth technology firm, which has the ability to efficiently utilize capital investment to achieve sustained growth in subscribers, revenue and EBITDA***…. we believe the company has been successful in building a defensible competitive mode in emerging markets. ***Akazoo's hyper-local focus on content curation and a culturally-relevant user experience is best-in -class.***  Moreover, Akazoo's established and growing distribution relationships with leading regional telco operators further cement the company's market position and profitable business model….***We are taking Akazoo to the public markets at a valuation of $469 million or 3.1 times 2019 expected revenues and 7.5 times 2019 expected adjusted gross profit. Akazoo's unique model and emerging markets focus has resulted in positive EBITDA in each of its nine years of operation, while most of its competitors still remain unprofitable on an EBITDA basis.***

109.   The foregoing statement was materially false and/or misleading, lacked a reasonable basis, and/or failed to disclose material adverse facts pertaining to the Company's business, operations, and prospects, because, as the Company has admitted: (1) Old Akazoo materially overstated its revenue, profits, and cash holdings; (2) Old Akazoo was not successful in "emerging markets," nor did Old Akazoo even operate in all of the markets it claimed to; (3) Old Akazoo did not have a "hyper-local" focus or abilities that allowed it to cater its services to emerging markets; (4) Old Akazoo vastly overstated its claimed size, growth rate, and geographical reach; (5) Old Akazoo held significantly fewer distribution rights than it claimed; (6) Old Akazoo had had negligible revenue and subscribers for years; (7) Old Akazoo had been continuously losing employees and closing offices for years; (8) Old Akazoo was not "established, profitable" or "high-growth"; (9) Old Akazoo's value was not equal to at least 80% of the value of MMAC's net assets; and (10) MMAC had not conducted proper due diligence of Old Akazoo.

110.   On that same call, Zervos stated:

Our premium service offers users access to a catalogue of 45 million songs and represents approximately 98% of our revenue and EBITDA. *Our proprietary music Al recommendation engine enables our listeners to find new music tailored to their tastes and preferences, allowing them to experience a custom-curated musical journey from our 45 million tracks….*

*We currently operate in 25 countries where we have 37 million registered users and over 4.3 million premium subscribers as of September 30, 2018. There are various mobile telco and messaging partnerships we are able to rapidly penetrate new markets and acquire new consumers.* Our established and growing platform is extremely well -positioned to capitalize on the music streaming wave that is revolutionizing the way people curate and listen to music . . . . Finally, our partnerships with local telco operators including our tariff bundling models help reduce churn as well. By pursuing these strategies, we are confident that our business will continue to experience profitable and sustainable growth. *Our hyper-localized platform and strategy allow us to uniquely cater our service to markets we serve. We do this to placing an emphasis on maintaining and promoting local content through our partnerships. We maintain a robust library of music content created by local artists.* The top 20 songs and other playlists seen by our users are territory specific and are updated weekly to reflect the latest trends.

111.    The foregoing statement was materially false and/or misleading, lacked a reasonable basis, and/or failed to disclose material adverse facts pertaining to the Company's business, operations, and prospects, because, as the Company has admitted: (1) Old Akazoo materially overstated its revenue, profits, and cash holdings; (2) Old Akazoo did not operate in 25 countries; (3) Old Akazoo did not have a "hyper-local" focus or abilities that allowed it to cater its services to emerging markets; (4) Old Akazoo vastly overstated its claimed size, growth rate, and geographical reach; (5) Old Akazoo held significantly fewer distribution rights than it claimed; (6) Old Akazoo had had negligible revenue and subscribers for years; (7) Old Akazoo had been continuously losing employees and closing offices for years; and (8) Old Akazoo was not "established" or "growing."

112.    Additionally, Schrueder stated on the merger call that:

*[Y]ou can see that we have had strong growth in revenue and EBITDA over the past three years, driven by an increased subscriber base which was over €4.4 million at year-end.* With Modern Media's growth capital, we believe that we will grow this number to over 10 million subscribers by 2021. Currently, revenues are generated almost entirely by our paid ad free subscription service…. we continue to build on our existing revenue base throughout 2018 creating tremendous momentum leading into 2019. *We increase revenue over the prior month in every month during 2018. In the second half of 2018 alone, we increased revenues by over 20% compared to the first half. Based on our fourth quarter 2018 unaudited results, our annualized revenue is approximately €120 million, which is circa 90% of our 2019 revenue targets*…. As you can see, we have already reached the scale of several global competitors and we believe we would be valued as the most attractive on a per-subscriber basis when compared to the likes of Tencent, Spotify, Tidal, Melon, Pandora, and Deezer by a substantial margin.

113.    The foregoing statements about Old Akazoo's financial results and the Company's financial projections were materially false and misleading because, as the Company has admitted: (1) as reflected in the Company's May 1, 2020 Form 6-K, the consolidated financial statements of Old Akazoo for the years ended December 31, 2018, 2017 and 2016 and any interim periods therein, and for the three and six-month periods ended June 30, 2019 and 2018, included in the Company's September 2019 6-K were materially false and misleading; (2) the Company's consolidated financial statements for the three and nine-month periods ending September 30, 2019 and 2018, included in the Company's December 9, 2019 6-K were materially false and misleading; and (3) as reflected in the Company's May 21, 2020 press release, Akazoo had had negligible actual revenue and subscribers for years.

## 2.    The March 2019 Investor Presentation

114.    On March 4, 2019, MMAC filed a Form 8-K with the SEC (the "March 2019 8-K"), signed by Dickey.  Also attached to the March 2019 8-K was an investor presentation (the "March 2019 Investor Presentation") which included many of the same and substantially similar slides from the January 2019 Investor Presentation touting Old Akazoo's finances, distribution

rights, geographic reach, "hyper-local" focus, and user base. For example, the March 2019 Investor Presentation showed that the number of Akazoo Limited's subscribers had increased from 4 to 4.4 million, and that Akazoo Ltd. was on the path to achieve its long-range target of 20 million subscribers. Further, the presentation showed that Akazoo Limited's subscription revenue was currently generating about €100 million, and was poised to achieve its long-range target of about €500 million.

115. The foregoing statements were materially false and/or misleading, lacked a reasonable basis, and/or failed to disclose material adverse facts pertaining to the Company's business, operations, and prospects, because, as the Company has admitted: (1) Old Akazoo materially overstated its revenue, profits, and cash holdings; (2) Old Akazoo did not operate in 25 countries; (3) Old Akazoo did not have a strong or experienced management team; (4) Old Akazoo materially overstated its user base; (5) Old Akazoo did not have a "hyper-local" focus or abilities that allowed it to cater its services to emerging markets; (6) Old Akazoo vastly overstated its claimed size, growth rate, and geographical reach; (7) Old Akazoo held significantly fewer distribution rights than it claimed; (8) Old Akazoo had had negligible revenue and subscribers for years; (9) Old Akazoo had been continuously losing employees and closing offices for years; (10) Old Akazoo's value was not equal to at least 80% of the value of MMAC's net assets; and (11) MMAC had not conducted proper due diligence of Old Akazoo.

116. Further, the March 2019 Investor Presentation represented that Akazoo Ltd.'s revenue had increased every month in 2018, and that the Company was poised to continue that upward trend throughout 2019:



117.    The foregoing statements about Old Akazoo's financial results and the Company's financial projections were materially false and misleading because, as the Company has admitted: (1) as reflected in the Company's May 1, 2020 Form 6-K, the consolidated financial statements of Old Akazoo for the years ended December 31, 2018, 2017 and 2016 and any interim periods therein, and for the three and six-month periods ended June 30, 2019 and 2018, included in the Company's September 2019 6-K were materially false and misleading; (2) the Company's consolidated financial statements for the three and nine-month periods ending September 30, 2019 and 2018, included in the Company's December 9, 2019 6-K were materially false and misleading;

and (3) as reflected in the Company's May 21, 2020 press release, Akazoo had had negligible actual revenue and subscribers for years.

### 3.     The Registration Statement and Proxy/Prospectus

118.    The Registration Statement was first filed with the SEC on Form F-4 on February 11, 2019 and was signed by Dickey, Drewry, Kagan and Marty.  On March 29, 2019, June 11, 2019, July 30, 2019, August 12, 2019, and August 14, 2019, the Company filed amended versions of the registration statement for the merger on Forms F-4/A with the SEC.  Amendment No. 5, filed with the SEC on Form F-4/A on August 14, 2019, was declared effective by the SEC on August 15, 2019.  On August 15, 2019, MMAC issued the Proxy Statement with the SEC on Form 424(B)(3) which was signed by Defendants Dickey and Zervos.  The prospectus was filed with the SEC on Form 424B3 on August 15, 2019.  The original Form F-4 and its amendments are collectively referred to herein as the "Registration Statement" and the Form 424(B)(3) is referred to hereinafter as the "Proxy/Prospectus" or the "Proxy Statement."

119.    In a section entitled "Selected Historical Financial Data of Akazoo," the Registration Statement and Proxy/Prospectus highlighted certain financial metrics, including revenue and profit, as to Akazoo Limited's purported growth. Specifically, the Registration Statement and the Proxy/Prospectus presented the following table:

| in thousands, except for per share values | Year Ended December 31, | | |
|---|---|---|---|
| | 2018 | 2017 | 2016 |
| **Statement of Operations Information:** | | | |
| **Revenues** | € 104,837 | € 90,015 | € 68,448 |
| Cost of revenue: | | | |
| Media Costs | (19,138) | (15,378) | (10,960) |
| Other Direct Costs | (62,316) | (53,869) | (41,874) |
| Cost of revenue | (81,454) | (69,247) | (52,834) |
| **Gross profit** | 23,383 | 20,768 | 15,614 |
| Operating expenses | (12,687) | (10,645) | (7,487) |
| Other operating income | 8 | 4 | — |
| Depreciation and amortization | (5,464) | (4,021) | (2,997) |
| **Operating income** | 5,240 | 6,106 | 5,129 |
| Finance cost | (383) | (51) | (352) |
| Finance income | 21 | 171 | 15 |
| **Profit before income tax** | 4,878 | 6,226 | 4,792 |
| Income tax | (10) | (9) | 23 |
| **Net Income** | 4,868 | 6,217 | 4,815 |
| Less: Net loss attributable to non-controlling interest | (1) | (1) | (3) |
| **Net income attributable to common shareholders** | 4,867 | 6,216 | 4,812 |
| Weighted average shares outstanding | | | |
| Basic and diluted | 4,105,706 | 4,105,706 | 4,105,706 |
| Net income per share available to common shareholders (1) | € 1.19 | € 1.51 | € 1.17 |

(1)  LuxCo will acquire the entire issued share capital of Akazoo in consideration for issuing on a 100-for-1 basis ordinary shares of LuxCo to Akazoo shareholders in the Share Exchange. The net income per LuxCo share after giving effect to the Share Exchange for 2018 would have been € 0.0119.

120.    The Registration Statement and Proxy/Prospectus specifically highlighted Old

Akazoo's purported revenue and EBITDA, stating:

> *For the years ended December 31, 2018 and 2017, Akazoo generated revenues of approximately €104.8 million and €90.0 million, respectively.* For the years ended December 31, 2018 and 2017, Akazoo generated EBITDA of €10.7 million and €10.1 million, respectively. *Since 2010, Akazoo has expanded in a profitable manner to 25 markets to date without offering a "freemium" model but by adapting its services for local tastes and consumption.*

121.    As to Old Akazoo's revenue growth and gross profit, the Registration Statement

and Proxy/Prospectus stated, in relevant part:

> *For the year ended December 31, 2018 as compared to 2017, Revenue increased €14.8 million, or 16%, driven by an increase in Subscribers and a slight increase in overall ARPU* [Average Revenue Per User]. The Company managed its growth in 2018, as a result of limited access to growth capital.
>
> *For the year ended December 31, 2017 as compared to 2016, Revenue increased €21.6 million or 32%, driven primarily by an increase in Subscribers, partly offset*

*by a decrease in ARPU.* In addition, the Radio Service delivered its first, although minor, revenues in 2017.

*      *      *

**Gross Profit and Gross Margin**

*For the year ended December 31, 2018 as compared to 2017, gross profit increased €2.6 million, or 13%,* and gross margin decreased slightly from 23% to 22% due to increased spending for customer acquisition.

*For the year ended December 31, 2017 as compared to 2016, gross profit increased €5.2 million, or 33%,* and gross margin remained constant at 23%. . . .

122.   The foregoing statements were materially false and/or misleading, lacked a reasonable basis, and/or failed to disclose material adverse facts pertaining to the Company's business, operations, and prospects, because, as the Company has admitted: (1) Old Akazoo materially overstated its revenue, profits, and cash holdings; (2) Old Akazoo did not operate in 25 countries; (3) Old Akazoo was not "profitable"; (4) Old Akazoo materially overstated its user base; (5) Old Akazoo did not have a "hyper-local" focus or abilities that allowed it to cater its services to emerging markets; (6) Old Akazoo vastly overstated its claimed size, growth rate, and geographical reach; (7) Old Akazoo held significantly fewer distribution rights than it claimed; (8) Old Akazoo had had negligible revenue and subscribers for years; (9) Old Akazoo had been continuously losing employees and closing offices for years; (10) Old Akazoo's value was not equal to at least 80% of the value of MMAC's net assets; and (11) MMAC had not conducted proper due diligence of Old Akazoo.

123.   The Registration Statement and Proxy/Prospectus included a quarterly update from Old Akazoo, with preliminary financial results for its quarter ended March 31, 2019.  Additionally, the Registration Statement and Proxy/Prospectus included the following chart of Old Akazoo's

67

revenue forecast, which had been provided to MMAC's Board of Directors, MMAC's financial advisors, and MMAC's management in connection with the business combination:

| (€ in millions) | 2016A | 2017A | 2018A | 2019E | 2020E | 2021E | 16A -'18E CAGR | 18E - '21E CAGR |
|---|---|---|---|---|---|---|---|---|
| **Total Revenues** | **68** | **90** | **105** | **134** | **203** | **285** | *24 %* | *40 %* |
| *% Growth* | | *32 %* | *16 %* | *28 %* | *51 %* | *40 %* | | |

124.    The foregoing statements about Old Akazoo's financial results and the Company's financial projections were materially false and misleading because, as the Company has admitted: (1) as reflected in the Company's May 1, 2020 Form 6-K, the consolidated financial statements of Old Akazoo for the years ended December 31, 2018, 2017 and 2016 and any interim periods therein, and for the three and six-month periods ended June 30, 2019 and 2018, included in the Company's September 2019 6-K were materially false and misleading; (2) the Company's consolidated financial statements for the three and nine-month periods ending September 30, 2019 and 2018, included in the Company's December 9, 2019 6-K were materially false and misleading; and (3) as reflected in the Company's May 21, 2020 press release, Akazoo had had negligible actual revenue and subscribers for years.

125.    The Registration Statement and the Proxy/Prospectus claimed that Old Akazoo's "hyper-local strategy" had contributed to its great success and the service's availability in 25 different countries and boasted of Old Akazoo's millions of users and subscribers.  Specifically, the Registration Statement and Proxy/Prospectus described Old Akazoo's business, in relevant part:

**Business Overview**

Founded in 2010, Akazoo is a global, on-demand music streaming subscription company ***with a focus on emerging markets and a hyper-local strategy. . . . Akazoo's music streaming service is offered in 25 countries, while its platforms***

**currently include 38.2 million Registered Users and 4.6 million Subscribers** as of December 31, 2018. . . . [Image omitted.]

\*      \*      \*

While competition is significant, Akazoo differentiates itself in a number of unique ways. **First and foremost, its "hyper-local" business model focuses on delivering a user experience adapted to local consumption patterns and behavior, through true localization of service language**, pricing and billing methods. Second, Akazoo focuses on offering the most relevant music catalogue content to local listeners as most emerging market listeners consume mostly local language and local artist content. Akazoo's data and third party research empirically demonstrates that every region and territory has its own unique tastes and preferences. Akazoo's platform is designed to deliver content to dynamically satisfy personal user tastes within a local and regional context, using sophisticated AI algorithms and machine enhanced catalogue curation. Finally, by targeting emerging markets with niche listening habits, Akazoo delivers music content catered to a large, growing, and underserved population of the world.

Akazoo's belief is that music is not "one size fits all," and as such, the data shows that the majority of the content consumed in emerging markets is "local," as opposed to "global." **By developing deep relationships with local labels, telecommunications operators, brands and device manufacturing OEMs, as well as music content producers, Akazoo has established itself as the trusted streaming service in its existing markets. In addition to its focus on local music, Akazoo also licenses content from substantially all the major labels and independent consortiums and offers streaming of the world's top artists and songs, which transcend local tastes and national borders**. However, **Akazoo's core value proposition lies in being able to connect with local listeners in a culturally relevant manner, curating playlists that prominently feature the local music they love.**

Relatedly, **Akazoo has achieved success in growing its total user and Subscriber base by partnering with relevant, popular and trusted telecom operators, mobile application providers, original equipment manufacturers (OEMs) and other brands.** These companies possess vast user bases and robust delivery infrastructures to help raise Akazoo brand awareness and build upon Akazoo's user base. Akazoo has enjoyed success employing this strategy throughout the world as up to an estimated 20% of its total user and subscriber base is derived from these partnerships.

\*      \*      \*

**Hyper-Local Platform**

69

*Akazoo's hyper-localized platform and strategy allow it to uniquely cater its service to the markets Akazoo serves.*

*Local Content.* Akazoo maintains a robust library of music content created by local artists in its target regions, which is constantly being updated and expanded. *The "Top 20" and other playlists seen by Akazoo's users are territory-specific and updated weekly to reflect the latest trends.* Akazoo's playlists cover all music genres and styles, various contexts, brands and themes. *Akazoo curates its playlists meticulously based on local trends, user input and sonic similarity as determined by Akazoo's patented recommendation engine. Akazoo procures content from about 400,000 labels, including major, independent labels as well as local labels and content providers. Akazoo's strong relationships with these providers allow it to have access to the most popular content when it becomes available*, and, in turn, Akazoo's users see new releases featured prominently on its platform. Akazoo's content marketing team creates advertising assets customized to promote local content, including display advertising and messaging campaigns delivered to their mobile devices when new content is released.

*Akazoo's technology stack uniquely allows it to serve this local content to emerging markets* and deliver a high quality user experience in varying network environments. Akazoo's low data streaming technology enables it to serve regions covered by 2G, 3G, 4G and 5G wireless networks without diminished quality or excessive data usage with a high-quality user experience. In many of the regions Akazoo serves, Akazoo has been the first music streaming service to enter the market and reach scale, and thus owns a significant "first-mover advantage."

*Local Partnerships. Akazoo gains access to millions of potential users worldwide through its relationships with local blue-chip telecommunications, mobile messaging and OEM providers* . . . . These partnerships are especially impactful in Akazoo's target regions given the decidedly "mobile-first" nature of emerging markets.

*     *     *

**Business Model**

Akazoo offers a subscription based music streaming service and a free, ad-based Radio Service. Akazoo's Radio Service achieves a funnel effect for user to subscriber conversion without the losses associated with content costs of a free on-demand streaming service. Akazoo's radio proposition adds high value to Akazoo's product mix as it offers revenues streams from passive listeners unwilling to commit to a premium subscription initially. *Akazoo's commitment to delivering hyper-local music to customers has allowed it to significantly grow its business in emerging markets, as many other players in the industry tend to focus on*

*globally popular content, ignoring a subset of the music that is especially popular in emerging markets. Akazoo has grown its Subscriber base from 1.8 million in 2015 to 4.6 million as of December 31, 2018.*

*       *       *

***De-risked customer acquisition through partnerships.*** Akazoo has historically entered into partnership agreements with telecommunications providers, messaging platforms, OEMs and brands to help grow its Subscriber base while maintaining low variable costs….Through these partnerships, Akazoo has direct access to consumers and is able to maintain low sales and marketing costs.

***Profitability****. . . .* The licensing costs of local repertoire can be lower than for global or international releases or catalogues. Due to Akazoo's focus on locally relevant music, Akazoo is able to efficiently manage its content costs. ***Additionally, Akazoo's partnerships contribute to customer acquisition cost reduction (CAC), facilitating robust margins and profitability that Akazoo expects to continue as it penetrates its existing markets and expands into additional markets****. . . .*

***Partner Campaigns. By partnering with regional and local telecommunications services, mobile messaging companies and device manufacturers and OEMs, Akazoo is able to quickly and efficiently access a wide swath of its target customers. Akazoo has built and expects to continue to build relationships with these companies in every market where Akazoo currently has a presence, and plans to continue to do so as Akazoo enters new markets.*** These efforts with telecommunications services are generally referred to as "bundling," as the Akazoo app is included ("bundled") with the phone or mobile plan when purchased. In addition, certain partnerships allow Akazoo to have the Akazoo mobile app loaded onto the mobile phones of their customers. For Akazoo, such an initiative reduces the costs required to build brand awareness and removes customer friction in discovering and downloading the app. Akazoo is able to execute bespoke agreements with multiple local telecom carriers, which facilitates a low-cost method of expanding its customer base in its markets.

126.   The foregoing statements were materially false and/or misleading, lacked a reasonable basis, and/or failed to disclose material adverse facts pertaining to the Company's business, operations, and prospects, because, as the Company has admitted: (1) Old Akazoo materially overstated its revenue, profits, and cash holdings; (2) Old Akazoo did not operate in 25 countries; (3) Old Akazoo materially overstated its user base; (4) Old Akazoo did not have a

"hyper-local" focus or abilities that allowed it to cater its services to emerging markets; (5) Old Akazoo vastly overstated its claimed size, growth rate, and geographical reach; (6) Old Akazoo held significantly fewer distribution rights than it claimed; (7) Old Akazoo had had negligible revenue and subscribers for years, and; (8) Old Akazoo had been continuously losing employees and closing offices for years; (9) Old Akazoo's value was not equal to at least 80% of the value of MMAC's net assets; and (10) MMAC had not conducted proper due diligence of Old Akazoo.

127.    Moreover, the Registration Statement and Proxy/Prospectus provided the following graph to depict Old Akazoo's purported growth in premium subscribers from fiscal 2016 through fiscal 2018:



128.    Similarly, the Registration Statement and Proxy/Prospectus claimed that Old Akazoo's radio users and registered users grew at similar rates. Specifically, the Registration Statement and Proxy/Prospectus stated:

> *As of December 31, 2018, we had 2.6 million Radio Users which grew fast in its first full year of operation. As of December 31, 2018, we had approximately 4.6 million Subscribers, more than 150% growth since December 31, 2015 when we had 1.8 million Subscribers. Our Registered Users have grown more than 180%*

*over the same period, from 13.4 million to 38.2 million. In line with our growth in Subscribers and Registered Users, our revenues have shown strong growth as well.*

\*  \*  \*

Subscription Revenue is a direct function of the number of Subscribers who use the service. ***As of December 31, 2016, 2017 and 2018, we had approximately 3.3 million, 3.7 million and 4.6 million Subscribers, respectively.***

129. The Registration Statement and Proxy/Prospectus highlighted Old Akazoo's

number of subscribers and registered users, stating:

**Subscribers**

***. . . For 2018 as compared to 2017, Subscribers increased by 0.8 million or 22%, and for 2017 as compared to 2016, Subscribers increased 0.5 million or 14%. Subscriber growth has been driven largely by our in-house marketing efforts and paid acquisitions in this period.***

**Registered Users**

Registered Users are defined as users that have registered for the Service, are currently a Subscriber, have been a Subscriber historically or are currently signed up for a free trial. . . . ***Our Registered Users have increased over time in line with our Subscribers and reached 38.2 million Users as of December 31, 2018*** . . . .

130. The foregoing statements were materially false and/or misleading, lacked a

reasonable basis, and/or failed to disclose material adverse facts pertaining to the Company's

business, operations, and prospects, because, as the Company has admitted: (1) Old Akazoo

materially overstated its revenue, profits, and cash holdings; (2) Old Akazoo materially overstated

its user base; (3) Old Akazoo vastly overstated its claimed size, growth rate, and geographical

reach, and; (4) Old Akazoo had had negligible revenue and subscribers for years.

131. Regarding Old Akazoo's music catalogue, the Registration Statement claimed that

"Akazoo licenses its music catalogue from approximately 40 main content partners and sources,

representing thousands of labels."  It also stated that "Akazoo procures content from about 400,000

labels, including major, independent labels as well as local labels and content providers." Furthermore, the Registration Statement claimed: "In addition to its focus on local music, Akazoo also *licenses content from substantially all the major labels and independent consortiums* and offers streaming of the world's top artists and songs, which transcend local tastes and national borders."

132. Specifically, as to the license agreements, the Registration Statement and Proxy/Prospectus stated:

**Licensing Agreements**

In order to stream music to its users, Akazoo generally secures rights to both the sound recordings and musical compositions. . . . *Akazoo has license agreements with record label affiliates of the three largest music companies – Universal Music Group, Sony Music Entertainment, and Warner Music Group – as well as numerous independent record labels.* These agreements require Akazoo to pay royalties, usually on a subscriber or subscription basis, make minimum guarantee payments, and commit marketing placements to labels for their catalogue. . . .

133. The foregoing statements referenced were materially false and/or misleading, lacked a reasonable basis, and/or failed to disclose material adverse facts pertaining to the Company's business, operations, and prospects, because, as the Company has admitted: (1) Old Akazoo did not have a "hyper-local" focus or abilities that allowed it to cater its services to emerging markets; (2) Old Akazoo vastly overstated its claimed size, growth rate, and geographical reach; (3) Old Akazoo did not have the licensing agreements and rights to distribute music in all of the countries it claimed to be able to; for example, Old Akazoo had purchased copyrights from Sony that were only valid in five countries; and (4) MMAC had not conducted proper due diligence of Old Akazoo.

134.    The Registration Statement and Proxy/Prospectus also identified certain factors that purportedly met the criteria for MMAC's Business Combination.  Specifically, the Registration Statement and Proxy/Prospectus both stated, in relevant part:

- *Hyper-Local Strategy.* ***Akazoo has built a competitive advantage with its focus on local content sourced from local providers in a culturally relevant interface designed to cater to specific tastes of target audiences and drive customer acquisition and retention. Additionally, Akazoo utilizes local content and partnerships with local telecom services to seek to drive profitability and reduce costs.***

- *Compelling Financial Profile.* Akazoo demonstrates a strong growth profile with diversified revenue. ***Akazoo's 2018E-2021E revenue compound annual growth rate of approximately 40% is expected to be driven by further penetration of its target user base within current markets, with additional growth potential through market expansion. Akazoo's business model has generated positive EBITDA each year since inception***, driven by disciplined sales and marketing expenses and low content costs.

- *Experienced Management Team.* ***Executive leadership team with deep industry and market knowledge that is well-positioned to oversee organic growth and expansion.*** Akazoo's team would be bolstered by the public company experience, executive leadership and acquisition track record of Lew Dickey.

135.    The foregoing statements were materially false and/or misleading, lacked a reasonable basis, and/or failed to disclose material adverse facts pertaining to the Company's business, operations, and prospects, because, as the Company has admitted: (1) Old Akazoo materially overstated its revenue, profits, and cash holdings; (2) Old Akazoo did not have an "experienced management team" that was "well-positioned to oversee organic growth and expansion"; (3) Old Akazoo materially overstated its user base; (4) Old Akazoo did not have a "hyper-local" focus or abilities that allowed it to cater its services to emerging markets; (5) Old Akazoo vastly overstated its claimed size, growth rate, and geographical reach; (6) Old Akazoo held significantly fewer distribution rights than it claimed; (7) Old Akazoo had had negligible

revenue and subscribers for years; (8) Old Akazoo had been continuously losing employees and closing offices for years; (9) Old Akazoo's value was not equal to at least 80% of the value of MMAC's net assets; and (10) MMAC had not conducted proper due diligence of Old Akazoo.

136.    The Registration Statement and Proxy/Prospectus warned that the Company may be unable to "maintain the rate of growth Akazoo has experienced in the past."  Both the Registration Statement and Proxy/Prospectus further stated that "Akazoo's rapid growth has placed, and will continue to place, significant demands on PubCo's management and its operational and financial infrastructure."

137.    The foregoing statement was materially false and/or misleading, lacked a reasonable basis, and/or failed to disclose material adverse facts pertaining to the Company's business, operations, and prospects, because, as the Company has admitted: (1) Old Akazoo vastly overstated its claimed size, growth rate, and geographical reach; (2) Old Akazoo had had negligible revenue and subscribers for years; (3) Old Akazoo had been continuously losing employees and closing offices for years; (4) Old Akazoo's value was not equal to at least 80% of the value of MMAC's net assets; (5) Old Akazoo had not experienced "rapid growth" in the past; (6) MMAC had not conducted proper due diligence of Old Akazoo; and, therefore, the conditions underlying these hypothetical risks had already materialized in substantial part.

138.    The Registration Statement and Proxy/Prospectus identified certain risks concerning the Business Combination, including:

- ***Demand for Music Consumption in Emerging Markets. Akazoo's revenue is derived primarily in emerging markets (including Poland, Russia, Malaysia, Thailand, Indonesia, Ecuador, Brazil and Mexico, among others). The success of the business is largely dependent on the continued demand for music streaming services in these regions[.]***

- *Accessibility of Growth Channels.* Akazoo's business model depends upon ***continued accessibility to customer acquisition channels including paid / affiliate services and telecommunications/messaging partnerships.*** Expansion into new markets could require more capital than expected and acquisition targets are uncertain.

- *Customer Acquisition Costs.* Akazoo projections assume relatively flat customer acquisition costs, which is dependent upon stable rates with distribution channel providers and ***Akazoo's continued effectiveness of its sales and marketing spends.***

- *Content Costs.* Contracts with content providers could materially change, which would impact related costs and potentially sustained profitability.

139.    The foregoing statement was materially false and/or misleading, lacked a reasonable basis, and/or failed to disclose material adverse facts pertaining to the Company's business, operations, and prospects, because, as the Company has admitted: (1) Old Akazoo materially overstated its revenue, profits, and cash holdings; (2) Old Akazoo did not derive its revenue primarily from "emerging markets" including Poland, Russia, Malaysia, Thailand, Indonesia, Ecuador, Brazil and Mexico, nor did Old Akazoo even operate in all of the markets it claimed to; (3) Old Akazoo did not have a "hyper-local" focus or abilities that allowed it to cater its services to emerging markets; (4) Old Akazoo vastly overstated its claimed size, growth rate, and geographical reach; (5) Old Akazoo held significantly fewer distribution rights than it claimed; (6) Old Akazoo had had negligible revenue and subscribers for years; (7) Old Akazoo had been continuously losing employees and closing offices for years; (8) Old Akazoo's value was not equal to at least 80% of the value of MMAC's net assets; and (9) MMAC had not conducted proper due diligence of Old Akazoo, and; therefore, the conditions underlying these hypothetical risks had already materialized in substantial part.

140.    MMAC shareholders consented to the Merger on the basis of, *inter alia,* the materially misleading Proxy/Prospectus, Old Akazoo's materially false and misleading financial statements and operational results contained in the Proxy/Prospectus, and statements made to shareholders and investors in the Company's press releases and other public statements related to the Merger.  Specifically, MMAC shareholders were denied their right to cast an informed vote on the Merger because, as the Company has admitted: (1) Old Akazoo materially overstated its revenue, profits, and cash holdings; (2) Old Akazoo did not operate in 25 countries; (3) Old Akazoo did not have a strong or experienced management team; (4) Old Akazoo materially overstated its user base; (5) Old Akazoo did not have a "hyper-local" focus or abilities that allowed it to cater its services to emerging markets; (6) Old Akazoo vastly overstated its claimed size, growth rate, and geographical reach; (7) Old Akazoo held significantly fewer distribution rights than it claimed; (8) Old Akazoo had had negligible revenue and subscribers for years; (9) Old Akazoo had been continuously losing employees and closing offices for years; (10) Old Akazoo's value was not equal to at least 80% of the value of MMAC's net assets; and (11) MMAC had not conducted proper due diligence of Old Akazoo.

141.    Had MMAC shareholders known the truth regarding Old Akazoo's financial results, the true value of Old Akazoo's business, or any indicia of the accounting or operational fraud on the part of Old Akazoo's management and/or shareholders, MMAC shareholders would either have exercised their conversion rights or voted against the Merger, or at least not approved the transaction according to those values and/or terms.  Given the proximity of the shareholder vote to the September 17, 2019 liquidation deadline, if the transaction had not been approved, MMAC would have lacked sufficient time to complete another business combination and each

shareholder of MMAC would have received approximately $10.35 in cash per share of MMAC common stock.

### 4. Crowe Falsely Certified the Accuracy of Old Akazoo's Financial Statements Contained in the Registration Statement

142.   In connection with the Business Combination, Crowe U.K. LLP certified the accuracy of the information in Old Akazoo's financial statements, including Old Akazoo's financial statements for the periods ended December 31, 2018, 2017 and 2016 and any interim periods therein.  These financial statements were included and incorporated by reference into the Registration Statement.

143.   Specifically, the Registration Statement contained a report from Crowe, as Old Akazoo's independent registered accounting firm, which stated in relevant part:

**Opinion on the Financial Statements**

We have audited the accompanying consolidated statement of financial position of Akazoo Limited (the "Company") and its subsidiaries (together with the Company, the "Group") as of December 31, 2018, 2017 and 2016 and the related consolidated statements of profit or loss and other comprehensive income, changes in equity and cash flows for each of the three years in the period ended December 31, 2018, 2017 and 2016 and the related notes numbered 1 to 21 (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the consolidated financial position of the Group as at December 31, 2018, 2017 and 2016 and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2018, 2017 and 2016 in conformity with International Financial Reporting Standards, as adopted in the European Union.

**Basis of Opinion**

*        *        *

Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the

financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

We have served as the Company's auditor since 2015.

144.    The Registration Statement also stated:

## EXPERTS

The balance sheet of Akazoo and its subsidiaries as of December 31, 2018, 2017 and 2016 and the related consolidated statements of profit or loss and other comprehensive income, changes in equity and cash flows for each of the three years in the period ended December 31, 2018, 2017 and 2016 included in this proxy statement/prospectus has been audited by Crowe U.K. LLP, an independent registered public accounting firm as stated in their report appearing herein and is included upon reliance of the report of such firm given upon their authority as experts in accounting and auditing.

145.    The foregoing audit opinion was materially false and misleading because Crowe certified Old Akazoo's financial statements as materially accurate notwithstanding that, as the Company admitted, Old Akazoo had materially overstated its financial results, including its profits, revenues, and cash holdings; as reflected in the Company's May 1, 2020 6-K and May 21, 2020 press release, Akazoo had had negligible actual revenue for years; the consolidated financial statements of Old Akazoo for the years ended December 31, 2018, 2017 and 2016 and any interim periods therein were materially false and misleading and could not be relied upon.

**B.    Materially False and Misleading Statements Post-Merger**

      **1.    The Completion of the Merger**

146.    On September 11, 2019, Akazoo issued a press release announcing the completion of its reverse merger with MMAC and the beginning of its shares trading on the NASDAQ under

the symbol "SONG" (the "September Press Release"). The September Press Release also stated the following regarding the Company's revenue growth:

> In the first half of 2019, the Company's revenues grew 39% year-over-year. Growth is expected to be driven by an array of existing and new partnerships that include mobile operators, handset manufacturers, media and partnering mobile applications and services, as well as growth in smartphone penetration in their core markets.

147.    The foregoing statement was materially false and misleading because Akazoo had materially overstated its revenue, profits, and cash holdings.  As reflected in the Company's May 1, 2020 Form 6-K, the consolidated financial statements of Old Akazoo for the years ended December 31, 2018, 2017 and 2016 and any interim periods therein, and for the three and six month periods ended June 30, 2019 and 2018, included in the Company's September 2019 6-K were materially false and misleading; and as reflected in the Company's May 21, 2020 press release, Akazoo had had negligible actual revenue and subscribers for years.

148.    The September Press Release touted the Company's global positioning, stating: "***Akazoo S.A., SONG, operates in 25 countries***, including emerging markets that represent the music streaming industry's fastest growing market opportunities. Akazoo's platform boasts patented Sonic AI music recommendation and profiling technology, ***developed to support its hyper-local strategy***."

149.    The September Press Release also touted the Company's subscriber growth, stating: "In the last 5 years, SONG's premium subscribers have grown from 1.1 million in 2014 to over 5.3 million today."

150.    The foregoing statements were materially false and/or misleading, lacked a reasonable basis, and/or failed to disclose material adverse facts pertaining to the Company's business, operations, and prospects, because, as the Company has admitted: (1) Akazoo materially

81

overstated its revenue, profits, and cash holdings; (2) Akazoo did not operate in 25 countries; (3) Akazoo materially overstated its user base; (4) Akazoo did not have a "hyper-local" focus or abilities that allowed it to cater its services to emerging markets; (5) Akazoo vastly overstated its claimed size, growth rate, and geographical reach; (6) Akazoo held significantly fewer distribution rights than it claimed; (7) Akazoo had had negligible revenue and subscribers for years; and (8) Akazoo had been continuously losing employees and closing offices for years.

### 2.    Akazoo's September 2019 Form 20-F

151.    On September 17, 2019, Akazoo filed with the SEC a Form 20-F (the "September 2019 20-F") signed by Zervos.   The September 2019 20-F incorporated by reference the disclosures, risk factors, and financial statements included in the Proxy/Prospectus dated August 15, 2019.

152.    In addition to the risk factors and disclosures incorporated by reference from the Proxy/Prospectus, the Form 20-F listed additional risks and uncertainties, including but not limited to the following:

· expectations regarding our strategies and future financial performance, including our future business plans or objectives, prospective performance and opportunities, and competitors, revenues, customer acquisition and retention, products and services, pricing, marketing plans, operating expenses, market trends, liquidity, cash flows and uses of cash, capital expenditures, and our ability to maintain access to content and manage license relationships, and to invest in growth initiatives and pursue acquisition opportunities;

· the possibility that we may be adversely affected by other economic, business, and/or competitive factors;

· financial performance;

· operational risk

153.    The foregoing statement was materially false and/or misleading, lacked a reasonable basis, and/or failed to disclose material adverse facts pertaining to the Company's business, operations, and prospects, because, as the Company has admitted: (1) Akazoo had materially overstated its revenue, profits, and cash holdings; (2) Akazoo vastly overstated its claimed size, growth rate, and geographical reach; (3) Akazoo had had negligible revenue and subscribers for years; (4) Akazoo materially overstated its user base; (5) Akazoo did not have a "hyper-local" focus or abilities that allowed it to cater its services to emerging markets; (6) Akazoo had been continuously losing employees and closing offices for years; (7) Akazoo held significantly fewer distribution rights than it claimed; and, therefore, the conditions underlying these hypothetical risks had already materialized in substantial part.

154.    The 20-F further showed the capitalization of Akazoo as of December 31, 2018, taking into effect the adjustments to reflect the Merger as of September 11, 2019:

| Capitalization & Indebtedness as at 12/31/2018 reflecting Business Combination as at 09/11/2019 (€ thousand) | Actual 12/31/2018 (Audited) | Adjustments | As adjusted |
|---|---|---|---|
| Non-current assets | 28,882 | 10 | 28,892 |
| Cash and cash equivalents | 501 | (1) 42,739 | 43,240 |
| Total current assets | 35,184 | 42,739 | 77,923 |
| **Total assets** | **64,066** | **42,749** | **106,815** |
| Common stock | 57 | (7) | 50 |
| Other equity items | 46,765 | 45,073 | 91,838 |
| Accumulated other comprehensive income | (1,413) | - | (1,413) |
| Retained earnings (accumulated deficit) | 312 | - | 312 |
| Non-controlling interest | (9) | | (9) |
| **Total shareholders' equity** | **45,712** | **45,066** | **90,778** |
| Non-current liabilities | 32 | | 32 |
| Loan and interest payable | 2,317 | (2) (2,317) | - |
| Total current liabilities | 18,322 | (2,317) | 16,005 |
| **Total liabilities** | **18,354** | **(2,317)** | **16,037** |
| **Total liabilities and shareholders' equity** | **64,066** | **42,749** | **106,815** |

The equity adjustments above include:

(1)  The liquidation of investments held in the trust account by MMAC of $14.2 million (approximately €12.6 million)
(1)  PIPE financing of $40.6 million (approximately €35.5 million)
(1)  Payment of cash fees of $6.2 million (approximately €5.4 million) related to the Business Combination
(1)  Funding by MMAC of $2.0 million (approximately €1.7 million) in order to extend the date by which MMAC has to consummate a Business Combination
(2)  Conversion into equity of Old Akazoo convertible loan note of €2.3 million

155.    The foregoing statements were materially false and misleading because Akazoo had materially overstated its revenue, profits, and cash holdings.  As reflected in the Company's May 1, 2020 Form 6-K, the consolidated financial statements of Old Akazoo for the years ended December 31, 2018, 2017 and 2016 and any interim periods therein, and for the three and six month periods ended June 30, 2019 and 2018, included in the Company's September 2019 6-K were materially false and misleading; and as reflected in the Company's May 21, 2020 press release, Akazoo had had negligible actual revenue and subscribers for years.

156.    The September 2019 20-F additionally touted Akazoo's proven track record of success and assured investors that such success would continue:

*Akazoo operates in 25 countries, including emerging markets that represent some of the music streaming industry's fastest growing market opportunities. Akazoo's*

*platform boasts patented Sonic AI music recommendation and profiling technology, developed to support its hyper-local strategy.*

*In the last 5 years, Akazoo's premium subscribers have grown from 1.1 million in 2014 to over 5.3 million today. In the first half of 2019, the Company's revenues grew 39% year-over-year.*

Growth is expected to be driven by an array of existing and new partnerships that include mobile operators, handset manufacturers, media and partnering mobile applications and services, as well as growth in smartphone penetration in their core markets. In this regard the company will pursue commercial agreements with among others, international social networking services, transportation companies and mobile operators, the customers of each of which are interested in consuming music.

157. Also attached to the 20-F was an investor presentation (the "August 2019 Investor Presentation") which included slides touting Akazoo's finances, distribution rights, geographic reach, "hyper-local" focus, and user base similar to those included in the January 2019 Investor Presentation.

158. The August 2019 Investor Presentation claimed that Akazoo had garnered even more registered users and subscribers since the January 2019 Investor Presentation. Indeed, the August 2019 Investor Presentation claimed that Akazoo now had 41 million registered users and 5.3 million subscribers.

159. The August 2019 Investor Presentation also displayed Old Akazoo's historical financial results, with revenue increasing rapidly and significantly over the years from 2015-2018, and its projected financial results.

160. The foregoing statements about Akazoo's financial results and the Company's financial projections were materially false and misleading because, as the Company has admitted, Akazoo had materially overstated its revenue, profits, and cash holdings. As reflected in the Company's May 1, 2020 Form 6-K, the consolidated financial statements of Old Akazoo for the

years ended December 31, 2018, 2017 and 2016 and any interim periods therein, and for the three and six month periods ended June 30, 2019 and 2018, included in the Company's September 2019 6-K were materially false and misleading; and as reflected in the Company's May 21, 2020 press release, Akazoo had had negligible actual revenue and subscribers for years.

161.    Further, the foregoing statements were materially false and/or misleading, lacked a reasonable basis, and/or failed to disclose material adverse facts pertaining to the Company's business, operations, and prospect, because, as the Company has admitted: (1) Akazoo did not operate in 25 countries; (2) Akazoo materially overstated its user base; (3) Akazoo did not have a "hyper-local" focus or abilities that allowed it to cater its services to emerging markets; (4) Akazoo vastly overstated its claimed size, growth rate, and geographical reach; (5) Akazoo held significantly fewer distribution rights than it claimed; (6) Akazoo had had negligible revenue and subscribers for years; and (7) Akazoo had been continuously losing employees and closing offices for years.

### 3.    Akazoo's September 18, 2019 Form F-3 Registration Statement

162.    On September 18, 2019, Akazoo filed a Form F-3 Registration Statement ("F-3") with the SEC, in connection with an offering of the shares purchased in the PIPE Financing agreement.   The F-3 was signed by Zervos, Schreuder, Dickey, Dimitropoulos, Lapcevic, Stephanopoulos, Roche, and Macridis.

163.    The F-3 incorporated by reference Akazoo's 20-F, filed on September 17, 2019, and as such, incorporated by reference the false and misleading statements made in the Proxy/Prospectus, and Akazoo's 20-F.

### 4.    Akazoo's 2Q 2019 Financial Results

86

164.    On September 27, 2019, Akazoo filed with the SEC a Form 6-K, signed by Defendant Zervos, which provided the financial statements of Akazoo and MMAC before the merger (the "September 2019 6-K") and announced Akazoo's 2Q 2019 financial results. The September 2019 6-K provided the following regarding Akazoo's finances:

**Financial Statements**

**Interim Condensed Consolidated Statement of Operations**

*(Unaudited)*

*(in € thousands, except share and per share data)*

| | Notes | Three months ended June 30, | | Six months ended June 30, | |
|---|---|---|---|---|---|
| | | 2019 | 2018 | 2019 | 2018 |
| Revenues | | 33,804 | 24,627 | 64,521 | 46,455 |
| | * | * | * | | |
| **Gross profit** | | **8,268** | **5,384** | **15,689** | **10,432** |
| | * | * | * | | |
| **Profit attributable to Akazoo Limited** | | 1,308 | 1,362 | 3,108 | 2,808 |

165.    The foregoing statements about Akazoo's financial results and the Company's financial projections were materially false and misleading because, as the Company has admitted, Akazoo materially overstated its revenue, profits, and cash holdings.  As reflected in the Company's May 1, 2020 Form 6-K, the consolidated financial statements of Old Akazoo for the

years ended December 31, 2018, 2017 and 2016 and any interim periods therein, and for the three

and six month periods ended June 30, 2019 and 2018, included in the Company's September 2019

6-K were materially false and misleading; and as reflected in the Company's May 21, 2020 press

release, Akazoo had had negligible actual revenue and subscribers for years.

166.    The September 6-K further stated:

As of June 30, 2019, *we operated in 25 separate markets*, providing our
Subscribers over 45 million unique musical tracks….At the moment, we are present
in Eastern Europe, South-East Asia, Latin America and Africa.

*       *       *

*As of June 30, 2019, we had approximately 5.3 million Subscribers, 32% growth
year-over-year. Our Registered Users have grown 38% over the same period,
from 31.4 million to 43.3 million. In line with our growth in Subscribers and
Registered Users, our revenues have shown strong growth as well.* Gross margin
has shown an upward trend in this period with our EBITDA increasing over time
as well. We intend to continue to invest in adding Subscribers and Registered Users
to increase our revenues and operating profits over time while remaining EBITDA
positive. *Our profitability has been partly due to our strong focus on emerging
markets where we can offer a high quality service of global standards while using
a hyper-local strategy. The localized strategy includes adapting our user
interface, content, billing options and price levels to local standards….As of June
30, 2019 and 2018, we had approximately 5.3 million and 4.0 million Subscribers,
respectively.*

167.    The foregoing statements were materially false and/or misleading, lacked a

reasonable basis, and/or failed to disclose material adverse facts pertaining to the Company's

business, operations, and prospects, because, as the Company has admitted: (1) Akazoo materially

overstated its revenue, profits, and cash holdings; (2) Akazoo did not operate in 25 countries; (3)

Akazoo was not "profitable"; (4) Akazoo materially overstated its user base; (5) Akazoo did not

have a "hyper-local" focus or abilities that allowed it to cater its services to emerging markets; (6)

Akazoo vastly overstated its claimed size, growth rate, and geographical reach; (7) Akazoo held

significantly fewer distribution rights than it claimed; (8) Akazoo had had negligible revenue and

88

subscribers for years; and (9) Akazoo had been continuously losing employees and closing offices for years.

168.     Further, the September 6-K identified potential risk factors that could adversely impact the Company's results, including:

- our ability to attract prospective Subscribers (as defined herein) and to retain existing Subscribers;

- our dependence upon third-party label licenses for musical compositions;

- our ability to comply with the many complex, international license agreements to which we are a party;

- our lack of control over the providers of our content and their effect on our access to their music and other content;

- our ability to generate sufficient revenue to be profitable or to generate positive cash flow on a sustained basis;

- risk associated with market fluctuations and potential downturns.

169.     The foregoing statements were materially false and/or misleading, lacked a reasonable basis, and/or failed to disclose material adverse facts pertaining to the Company's business, operations, and prospects, because, as the Company has admitted: (1) Akazoo materially overstated its revenue, profits, and cash holdings; (2) Akazoo did not operate in 25 countries; (3) Akazoo was not "profitable"; (4) Akazoo materially overstated its user base; (5) Akazoo did not have a "hyper-local" focus or abilities that allowed it to cater its services to emerging markets; (6) Akazoo vastly overstated its claimed size, growth rate, and geographical reach; (7) Akazoo held significantly fewer distribution rights than it claimed; (8) Akazoo had had negligible revenue and subscribers for years; (9) Akazoo had been continuously losing employees and closing offices for

years; and, therefore, the conditions underlying these hypothetical risks had already materialized in substantial part.

### 5.  Akazoo's 3Q 2019 Financial Results

170.  On December 9, 2019, Akazoo filed a Form 6-K with the SEC, signed by Zervos, and issued a press release entitled "Akazoo Reports Third Quarter 2019 Results" (the "3Q 19 Results"). The 3Q 19 Results stated the following regarding the Company's revenue and cash:

- ***Q3 Revenue of €35.0 Million, Up 24% YoY***

- Nine Month 2019 Adjusted EBITDA of €11.3 Million – Ahead of FY 2019 Guidance of €11m

- Raising FY 2019 Revenue Guidance from €134 Million to €136.5 Million - up 30% YoY with QoQ revenue growth accelerating in Q4

*      *      *

***Revenues increased 24% to €35.0 compared to €28.1 million in the third quarter of 2018, driven principally by ongoing user acquisition spending with Eastern European and select LATAM territories leading growth trends.***

*      *      *

***Interim Condensed Consolidated Statement of Operations***

*(Unaudited)*

*(in € thousands, except share and per share data)*

| | Three months ended September 30, | | Nine months ended September 30, | |
|---|---|---|---|---|
| | **2019** | **2018** | **2019** | **2018** |

| Revenues | 34,959 | 28,095 | 99,480 | 74,550 |

171.    The foregoing statements about Akazoo's financial results and the Company's financial projections were materially false and misleading because, as the Company has admitted: (1) as reflected in the Company's May 1, 2020 Form 6-K, the consolidated financial statements of Old Akazoo for the years ended December 31, 2018, 2017 and 2016 and any interim periods therein, and for the three and six-month periods ended June 30, 2019 and 2018, included in the Company's September 2019 6-K were materially false and misleading; (2) the Company's consolidated financial statements for the three and nine-month periods ending September 30, 2019 and 2018, included in the Company's December 9, 2019 6-K were materially false and misleading; and (3) as reflected in the Company's May 21, 2020 press release, Akazoo had had negligible actual revenue and subscribers for years.

172.    The 3Q 19 Results provided that subscribers increased from 4.3 million to 5.5 million from the third quarter 2018 to the third quarter 2019, a 28% increase. The 3Q 19 Results also provided that registered users increased from 37.8 million to 44.4 million from the third quarter 2018 to the third quarter 2019, an 18% increase.

173.    The 3Q 19 Results quoted Zervos as follows:

We are pleased with the solid revenue and subscriber growth in the third quarter and first nine months of the year. Additionally, we are excited about being well capitalised following the closing of the equity financing late in Q3. As we deploy new growth proceeds, our quarter-over-quarter revenue growth has accelerated in the fourth quarter. In 2020, we expect to see the initial benefits from increased user acquisition initiatives and spending and new partnerships such as our recently announced Rakuten Viber global strategic partnership.

174.   The foregoing statements were materially false and/or misleading, lacked a reasonable basis, and/or failed to disclose material adverse facts pertaining to the Company's business, operations, and prospects, because, as the Company has admitted: (1) Akazoo materially overstated its revenue, profits, and cash holdings; (2) Akazoo was not "well capitalized"; (3) Akazoo materially overstated its user base; (4) Akazoo did not have a "hyper-local" focus or abilities that allowed it to cater its services to emerging markets; (5) Akazoo vastly overstated its claimed size, growth rate, and geographical reach; (6) Akazoo held significantly fewer distribution rights than it claimed; (8) Akazoo had had negligible revenue and subscribers for years; and (9) Akazoo had been continuously losing employees and closing offices for years.

### 6.   The March 19, 2020 Investor Presentation

175.   On March 19, 2020, Akazoo released an investor presentation (the "Presentation"). The Presentation touted the Company's financial position:





176.    The Presentation also touted the Company's global reach, music distribution rights, and deep local knowledge and abilities with substantially the same slides as the Company's January 2019 Investor Presentation cited above and the following, in pertinent part:



177.    The foregoing statements were materially false and/or misleading, lacked a reasonable basis, and/or failed to disclose material adverse facts pertaining to the Company's business, operations, and prospects, because, as the Company has admitted: (1) Akazoo materially overstated its revenue, profits, and cash holdings; (2) Akazoo was not "well positioned for continued growth" nor was it "profitable"; (3) Akazoo materially overstated its user base; (4) Akazoo did not have a "hyper-local" focus or abilities that allowed it to cater its services to emerging markets; (5) Akazoo vastly overstated its claimed size, growth rate, and geographical reach; (6) Akazoo held significantly fewer distribution rights than it claimed; (8) Akazoo had had

negligible revenue and subscribers for years; and; (9) Akazoo had been continuously losing employees and closing offices for years.

### 7.    The Company Partially Discloses the Truth

178.    On April 22, 2020, the Company issued a press release entitled, "Akazoo Announces Formation of Independent Special Committee" and filed a Form 6-K with the SEC on April 23, 2020, signed by Zervos, including the press release.  The press release announced the formation of an independent special committee to investigate the issues raised by the QCM Report, which had alleged, among other things, that: (1) Akazoo had lied about its revenue, profits, cash holdings, and other financial results; (2) Akazoo had been losing employees and closing offices; (3) Akazoo did not operate in 25 countries; (4) Akazoo did not have the licensing and distribution agreements it claimed to have; and (5) Akazoo did not have a "hyper-local" focus or abilities that enabled it to uniquely cater to its target markets.

179.    The press release stated: "Akazoo has no reason to believe the accuracy of this [QCM] Report, which the Company believes QCM issued in order to cause a decline in Akazoo's stock price and profit at the expense of the Company's shareholders….The Company cautions that Akazoo shareholders should exercise caution in relying on the information contained in this Report[.]"

180.    The foregoing statement was materially false and misleading because, as disclosed by the Company in a Form 6-K filed with the SEC on May 1, 2020 and the Company's press release dated May 21, 2020, as a result of Akazoo's investigation by its independent special committee: (1) Zervos was terminated for cause and asked to resign from the Board; (2) certain of the Company's financial and operational information previously reported could not be verified;

(3) the consolidated financial statements of: (i) Old Akazoo for the years ended December 31, 2018, 2017 and 2016 and any interim periods therein, and for the three and six-month periods ended June 30, 2019 and 2018, included in the Company's September 2019 6-K were materially false and misleading; (ii) the Company's consolidated financial statements for the three and nine-month periods ending September 30, 2019 and 2018, included in the Company's December 9, 2019 6-K were materially false and misleading; (4) Akazoo had had negligible actual revenue and subscribers for years; and (5) former members of Akazoo's management and associates had participated in a scheme to falsify its books and records.

181.    The press release further stated, in part:

Akazoo is a global on-demand music and audio streaming and media and A.I. technology company, founded in 2010, ***with a focus on emerging markets and a presence in 25 countries***….Akazoo is equipped with a world-class mobile application and user experience which works seamlessly across a multitude of mobile devices and provides a high-quality user experience across a range of mobile networks[.]

182.    The foregoing statement was materially false and/or misleading, lacked a reasonable basis, and/or failed to disclose material adverse facts pertaining to the Company's business, operations, and prospects, because, as the Company has admitted: (1) Akazoo did not operate in 25 countries; (2) Akazoo did not have a "hyper-local" focus or abilities that allowed it to cater its services to emerging markets; (3) Akazoo vastly overstated its claimed size, growth rate, and geographical reach; (4) Akazoo held significantly fewer distribution rights than it claimed; and (5) Akazoo had had negligible revenue and subscribers for years.

## VI.    ADDITIONAL SCIENTER ALLEGATIONS

a.

97

A.      **The Old Akazoo Defendants' Scienter**

1.      **The Company Admitted the Old Akazoo Defendants Defrauded Investors**

183.    On May 1, 2020, and May 21, 2020, the Company acknowledged and conceded that the Old Akazoo Defendants acted with scienter.

184.    On May 1, 2020, Akazoo filed with the SEC a Form 6-K which announced that the Company had terminated Zervos as CEO "for cause" and that Zervos had been asked to resign as a member of the Board.  The 6-K further stated that the Company was unable to verify "certain operational and financial information" and that investors could no longer rely upon the Company's previously issued financial statements.  The 6-K provided the following, in pertinent part:

> *Appointment of Interim CEO; Termination of Chief Executive Officer*
>
> On May 1, 2020, the Board of Directors (the "Board") of Akazoo S.A. (the "Company") announced the appointment of Michael Knott as interim Chief Executive Officer, effective immediately. This ***followed the decision by the Board to terminate Apostolos N. Zervos as Chief Executive Officer for cause***. ***The Board has also requested that Mr. Zervos resign as a member of the Board.***
>
> *           *           *
>
> ***The Special Committee has nonetheless been unable to verify certain operational and financial information previously reported by the Company. Accordingly, the Special Committee has concluded that the consolidated financial statements (i) of Akazoo Limited for the years ended December 31, 2018, 2017 and 2016 (and any interim periods therein) audited by the Company's former independent registered public accounting firm and included or incorporated by reference in the Company's Shell Company Report on Form 20-F filed with the U.S. Securities and Exchange Commission (the "SEC") on September 17, 2019; (ii) of Akazoo Limited for the three- and six-month periods ended June 30, 2019 and 2018 included in the Company's Report on Form 6-K furnished to the SEC on September 27, 2019; and (iii) of the Company for the three- and nine-month periods ended September 30, 2019 and 2018 included in the Company's Report on Form 6-K furnished to the SEC on December 9, 2019 should no longer be***

*relied upon due to the possibility that such financial statements contain material errors.*

185.   Further, on May 21, 2020, the Company issued a press release, which disclosed that the Old Akazoo Defendants had defrauded investors by materially misrepresenting the business, operations and financial results of the Company, including the due diligence materials that had been provided to MMAC in connection with the Merger.  Specifically, the Company stated:

> The Special Committee, with the assistance of outside counsel and advisors, has substantially completed the Investigation and *determined that former members of Akazoo's management team and associates defrauded Akazoo's investors*, including the predecessor SPAC acquiring entity Modern Media Acquisition Corp. ("MMAC"), *by materially misrepresenting Akazoo's business, operations, and financial results as part of a multi-year fraud*.

> . . . Subsequently, the Special Committee has determined, among other things, that Akazoo's historical financial statements were materially false and misleading, that Akazoo has had only negligible actual revenue and subscribers for years and that *former members of Akazoo management and associates participated in a sophisticated scheme to falsify Akazoo's books and records*, *including due diligence materials provided to MMAC and its legal, financial, and other advisors in connection with the Akazoo business combination in 2019.*

186.   As a result, the Company has sought to unwind the original Business Combination between MMAC and Akazoo.  In so doing, the Company has admitted that the Old Akazoo Defendants, who were high-ranking, managerial executives and officers of Old Akazoo—a company that only had 26 employees as of the Merger—and who were responsible for providing MMAC with Old Akazoo's due diligence materials, knowingly and intentionally falsified Old Akazoo's books and records and defrauded investors.

## 2.   The Old Akazoo Defendants had a Financial Motive to Conceal Material Facts

187.     The Old Akazoo Defendants were highly motivated to misrepresent the financial results and operations of Akazoo Limited in order to complete the Business Combination, as each of them was to receive significant financial benefits.

188.     Upon the closing of the Business Combination, Zervos would receive a €1 million bonus and would beneficially own 506,751 shares of the Company; Dimitropoulos would beneficially own 24,514,662 shares, or 50.0% of the Company; and Schreuder would have a lucrative employment arrangement whereby he would receive a base salary of $450,000 per year, and be eligible to receive a bonus in the amount of up to 60% of his base salary each year depending upon the Company achieving its revenue and subscriber goals; additionally, Schreuder would beneficially own approximately 354,725 shares of the Company.

189.     Based on the $5.27 trading price of Akazoo shares upon the closing of the Business Combination, the Old Akazoo Defendants held an aggregate value of approximately $133.7 million worth of Akazoo shares.

### B.     Dickey and the MMAC Director Defendants' Scienter

#### 1.     Dickey and the MMAC Director Defendants had a Financial Motive to Proceed with the Merger

190.     MMAC's IPO, which was completed on May 17, 2017, generated $209 million in net proceeds.  MMAC's original deadline to complete a business transaction was 18 months after the IPO, or 21 months, if MMAC had reached an agreement in principle, letter of intent or definitive agreement with a target business.  In other words, MMAC had until either November 17, 2018, or February 17, 2019 to complete a business combination. If MMAC had not completed a business combination in time, its corporate existence would cease, except for purposes of winding up its affairs and liquidating.  As such, MMAC was required to hold the approximately

$209 million of proceeds from its IPO in a trust account, which were to be released only upon the consummation of a business combination or liquidation.

191.    In connection with MMAC's IPO, the initial stockholders, Dickey, Faulstich, Brokaw, and White, issued themselves 5,175,000 shares for an aggregate price of $25,000, and the Sponsor (which Dickey had a 50% indirect interest in) purchased 7,320,000 warrants simultaneously with the IPO for an aggregate price of $7,320,000.   Such common stock and warrants had an aggregate market value of approximately $55,254,408 on the record date of August 9, 2019.  These initial stockholders agreed to waive their right to participate in a liquidation distribution with respect to their initial shares if MMAC did not complete a business combination by the deadline.   Thus, if MMAC did not meet its deadline to complete a business combination, the initial stockholders' shares and warrant would be rendered worthless.

192.    MMAC announced that it had entered a letter of intent with a target business on November 8, 2018, giving it until February 17, 2019 to complete the business combination.  But as the February 17, 2019 was looming, it became apparent to MMAC that it would be unable to make the deadline and in February 2019, MMAC held a vote which approved the extension of the deadline from February 17, 2019 to June 17, 2019.

193.    Pursuant to MMAC's Second and Amended Restated Certificate of Incorporation, MMAC was required to give stockholders the option to redeem all or a portion of their public shares upon approval of any amendment to its Certificate of Incorporation, including any amendment that would change MMAC's deadline to complete a business combination.   In connection with MMAC's extension until June 17, 2019 to complete a business combination,

nearly 6 million public shares were redeemed, leaving MMAC with $152 million in its trust account.

194.    As the June 17, 2019 was looming, it became apparent yet again to MMAC that it would be unable to make its deadline. MMAC was forced to hold another vote in June 2019 to extend the deadline a second time to September 17, 2019, which was approved.  However, in connection with MMAC's second extension, nearly 13.35 public shares were redeemed, leaving MMAC with only approximately $14.7 million remaining in its trust account.

195.    MMAC was under immense pressure upon its IPO to complete a business combination by its deadline.  As the original deadline loomed and passed, MMAC faced increasing pressure to complete the business combination by its first extended deadline, which had depleted $57 million from its trust account.  By the time of MMAC's vote to extend the deadline a second time, which left MMAC with a mere $14.7 million in trust, Dickey and the MMAC Directors were facing a real risk that their business venture would fail.  As such, Dickey and the MMAC Director Defendants had a financial motive to rush the completion of the Merger with Akazoo Limited, and to either conduct their due diligence with severely reckless disregard, or to knowingly conceal material adverse facts about Akazoo Limited's business, finances, operations and prospects.

### 2.    Dickey and the MMAC Director Defendants Claimed to have Conducted Extensive Due Diligence

196.    If in fact Dickey and the MMAC Director Defendants had been conducting proper due diligence, and conducted the substantial review starting in June 2018 that they claimed to have performed, they would have uncovered that Akazoo Limited: had negligible amounts of revenue and subscribers; did not operate in 25 countries; did not have a "hyper-local" focus or abilities that allowed it to cater to emerging markets, nor did Akazoo Limited even operate in all of the emerging

markets it claimed to; did not have the licensing agreements it claimed to have; did not have strong and experienced management; had been losing employees and closing offices for years; and was not growing or profitable.  Thus, Dickey and the MMAC Director Defendants were severely reckless in their due diligence, or, they conducted proper due diligence and knowingly concealed material adverse information from investors.

197.    Moreover, it is implausible that Dickey and the MMAC Directors Defendants' due diligence, which purportedly included: research on comparable companies; research on the global music streaming industry; review of Old Akazoo's reports relating to financial, accounting, tax and legal diligence; review of Old Akazoo's material contracts, intellectual property matters, labor matters, and financial, tax, legal, and accounting diligence; and,  even included Dickey visiting Old Akazoo's London and Greece locations to conduct on-site due diligence, would not have uncovered this information, as was disclosed after the Merger.

198.    Further, both Zervos, Dimitropoulos and Akazoo Limited's parent company had previously been associated with accusations of fraud.  Before founding Akazoo Limited, Zervos had previously worked as a Senior Manager at Velti Plc, a Greek company which filed for bankruptcy in the U.S. and collapsed in 2013 amidst allegations of fraud, and has had a number of securities class actions brought against it.  Zervos then served as Chief Strategy Officer at InternetQ from October 2010 until July 2015.

199.    Dimitropoulos was the founder and CEO of InternetQ, which was listed on the London AIM market until about early 2016 when it was taken private amidst allegations of fraud. Thereafter, InternetQ spun off Akazoo Limited and listed it on the U.S. market through a reverse

merger with a cash shell.  InternetQ was the ultimate parent company of Akazoo Limited and would have a 41.2% beneficial interest in Akazoo upon the Merger.

200.    If Dickey and the MMAC Director Defendants had conducted proper due diligence as they claimed to have, they would have discovered that the parent company of their target business had been embroiled in allegations of fraud, and that the CEO and founder of their target business had previously been a senior manager of a company that had collapsed amidst allegations of fraud.  The only reasonable inference is that Dickey and the MMAC Director Defendants had knowledge of, or were reckless in not knowing that Akazoo Limited's founder/CEO and director who would serve in executive capacities at Akazoo upon the Merger, were not strong and experienced managers that were capable of growing the Company, and that they had previously defrauded countless investors.

201.    Additionally, Roche and Macridis in announcing their resignations from Akazoo, confirmed that the serious problems identified by the QCM Report had been apparent to them from the outset, stating:

> *We have been clear with the rest of the board from the outset that an independent, forensic and thorough investigation, with complete transparency of results to shareholders, is in the best interests of the Company.*

202.    That Roche and Macridis had identified serious problems with the Company from the outset of their tenure with the Company further supports the inference that Dickey and the MMAC Director  Defendants had knowledge of, or were reckless in not knowing the material adverse facts about the Company that came to light in the QCM Report.

203.    Accordingly, the only reasonable inference that can be made from Dickey and the MMAC Director Defendants' representations as to their extensive due diligence efforts, is that

these defendants had knowledge of, or were reckless in not knowing that Old Akazoo: had negligible amounts of revenue and subscribers; did not operate in 25 countries; did not have a "hyper-local" focus or abilities that allowed it to cater to emerging markets, nor did Akazoo Limited even operate in all of the emerging markets it claimed to; did not have the licensing agreements it claimed to have; did not have strong and experienced management; had been losing employees and closing offices for years; and was not growing or profitable.

### 3. The Magnitude of Akazoo's Fraud Supports a Strong Inference of Scienter

204.    The sheer magnitude of the fraud, as admitted by the Company, supports a strong inference of scienter.  As the Company admitted on May 1, 2020 and May 21, 2020, the information that Dickey and the MMAC Directors relied upon, incorporated by reference, and based their representations about Akazoo's business, operations, and prospects on, ***"could not be verified,"*** and Akazoo "***has had only negligible actual revenue and subscribers for years.***"

205.    Despite Akazoo's repeated claims to the contrary: Akazoo did not operate in 25 countries, it only operated in five countries; Akazoo did not have functioning offices in London and Luxembourg; Akazoo did not have over five million subscribers, it had a "negligible" number of them; Akazoo was not generating increasing amounts of millions in revenue each year, it had only "negligible" actual revenue and had paid zero taxes for the last four years; Akazoo was not growing or profitable, it had been losing employees and closing offices for years, going from 45 employees as of December 31, 2016, to just 26 employees as of December 31, 2018.  The magnitude of the discrepancies between the truth and what was presented to investors is such that it is implausible that Dickey and the MMAC Director Defendants did not know the truth.

206.    Moreover, if Old Akazoo's operational and financial information could not be verified as of May 1, 2020, the only reasonable inference is that this same information was not verifiable before the Merger either.  Thus, the only reasonable inference is that Dickey and the MMAC Director Defendants knew, or recklessly disregarded, and failed to disclose material adverse facts about Old Akazoo's business, financial results, operations and prospects before the Merger, and Dickey, who continued as Akazoo's Chairman after the Merger, continued to conceal these material adverse facts from investors after the Merger as well.

### 4.    Dickey and the MMAC Director Defendants Held Themselves Out as Experienced Businesspeople with Particular Expertise

207.    Dickey and the MMAC Director Defendants were charged with one basic goal: acquire a company with the funds raised by MMAC's IPO.  The reason why investors were willing to fund them with $209 million was because of Dickey and the MMAC Director Defendants' financial sophistication, experience in the media and entertainment industry, experience finding target companies, negotiating transactions, and completing acquisitions.

208.    In connection with MMAC's IPO, Dickey and the MMAC Director Defendants held themselves out as sophisticated veterans in the arena of mergers and acquisitions and conducting due diligence and claimed that they had "extensive experience in both consummating media industry transactions and operating media companies" such that they had the sophistication and experience necessary to find a suitable business target, conduct due diligence, and negotiate and complete the acquisition.

209.    As evidence of their extensive experience and their abilities, Dickey and the MMAC Director Defendants did not obtain a fairness opinion as to the valuation of Akazoo

Limited.  The Proxy/Prospectus claimed "The officers and directors of MMAC have **substantial experience in evaluating the operating and financial merits of companies from a wide range of industries**, and in mergers and acquisitions. . . [which] enabled them to make the necessary evaluations and determinations regarding the Business Combination."

210.    After completing MMAC's IPO, and up until the Business Combination, Dickey and the MMAC Director Defendants held themselves out to investors as highly experienced businesspeople with extensive educational and professional qualifications.

211.    In light of Dickey and the MMAC Director Defendants' purported extensive qualifications, the only reasonable inference that can be made is that these defendants had knowledge of, or were reckless in not knowing that Old Akazoo: had negligible amounts of revenue and subscribers; did not operate in 25 countries; did not have a "hyper-local" focus or abilities that allowed it to cater to emerging markets, nor did Akazoo Limited even operate in all of the emerging markets it claimed to; did not have the licensing agreements it claimed to have; did not have strong and experienced management; had been losing employees and closing offices for years; and was not growing or profitable.

## C.      Crowe's Scienter

212.    Crowe, Old Akazoo's auditor of its financial statements for the years ended December 31, 2018, 2017, and 2016, and any interim periods therein, which were included with the Registration Statement, and who continued on as the Company's auditor after the Merger, gave Old Akazoo unqualified, clean audit opinions.  Crowe served as Old Akazoo's auditor since 2015.

213.    Crowe represented that:

Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and

performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

214.    However, as the Company admitted, after conducting an investigation that lasted about one week, all of the financial statements that Crowe had attested to the accuracy and adequacy of, and gave clean, unqualified audit opinions for, were materially false and misleading. Further, the Company admitted that it had *had negligible actual revenues for years.*

215.    The magnitude of the discrepancies in Old Akazoo's reported financial results and the truth, the fact that Crowe issued clean audit opinions for three fiscal years and had been Old Akazoo's auditor starting in 2015 and was to continue on as Akazoo's auditor post-Merger, and Macridis and Roche's disclosure that they had "from the outset" believed that an independent, thorough, forensic accounting was in the best interests of the Company's shareholders, support a strong inference of Crowe's scienter.

216.    Whether Crowe failed to evaluate and investigate Old Akazoo's financial results, including its revenues, or performed its evaluation and disregarded the results of its audit procedures indicating that Old Akazoo had materially misstated its financial results, including that Old Akazoo had virtually no revenue for years, its actions were knowing or reckless, and its audit opinions false.  Crowe's audit opinions amounted to no audit at all.

### D.    The Akazoo Director Defendants' Scienter

217.    Upon the completion of the Merger, the Akazoo Director Defendants were appointed as directors of the Company and the only members of its Audit Committee.  Further, in December 2019, each of the four Akazoo Director Defendants were appointed as independent

directors of the Company. The Akazoo Director Defendants signed the Company's proxy/prospectus filed with the SEC on September 18, 2019, which incorporated by reference the Company's September 2019 20-F, and the Proxy/Prospectus of August 15, 2019 and the false and/or misleading statements and omissions therein.

218.     Their duties and responsibilities as Audit Committee members, as stated in the Company's Form 20-F filed with the SEC on September 17, 2019, were as follows:

> The Audit Committee provides assistance to our board of directors in fulfilling their responsibilities to shareholders, and investment community relating to our corporate accounting, reporting practices, and the quality and integrity of our financial reports. The Audit Committee, among other duties, recommends the independent auditors to be selected to audit our consolidated financial statements, meets with our independent auditors and financial management to review the scope of the proposed audit for the current year and the audit procedures to be utilized, reviews with the independent auditors, and financial and accounting personnel, the adequacy and effectiveness of our accounting and financial controls, and reviews the consolidated financial statements contained in the annual report to shareholders with management and the independent auditors.

219.     As high-ranking directors and employees of the Company responsible for corporate accounting, reporting practices and the accuracy and adequacy of the Company's financial controls, who each had extensive professional and educational qualifications, the Akazoo Director Defendants directly participated in the management of the Company; were privy to confidential proprietary information concerning the Company and its business and operations; and, were directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein upon the completion of the Merger and thereafter.

220.     As the Company admitted on May 1, 2020 and May 21, 2020, Old Akazoo's financial results and the Company's post-Merger financial results were materially false and

misleading.  The only reasonable inference is that the Akazoo Director Defendants knew, or recklessly disregarded that Old Akazoo's financial results were materially false and misleading from the time of the Merger onwards, and that the Akazoo Director Defendants knew, or recklessly disregarded that the Company's post-Merger financial results were materially false and misleading.

221.    Moreover, on April 24, 2020, shortly after the QCM Report was issued, Macridis and Roche resigned from their positions.  Macridis and Roche's reasons for resigning were included in the Company's Form 6-K filed with the SEC on April 24, 2020, and stated as follows:

> With regard to the QCM allegations, we are encouraged that the board has adopted our initial position to form a special committee to investigate the extremely serious accusations contained in the QCM report….***We have been clear with the rest of the board from the outset that an independent, forensic and thorough investigation, with complete transparency of results to shareholders, is in the best interests of the Company.*** We also look forward to special committee counsel's imminent engagement of a well-qualified and reputable forensic accounting consultant to assist in the special committee's and its counsel's independent assessment of the QCM allegations, which should be accorded the highest priority by Company management and the board.

222.    As such, Macridis and Roche effectively conceded the Akazoo Director Defendants' actual knowledge and scienter with respect to the Company's fraud.

### E.    The Company's Scienter

#### 1.    The Company's Admissions

223.    The Company admitted on May 1, 2020 and on May 21, 2020 that its operational and financial results, including all of its consolidated financial statements relevant to this Complaint, and all of the due diligence materials provided to MMAC in connection with the Merger, were materially false and/or misleading, and that investors were defrauded as a result. Thus, the Company effectively admitted its actual knowledge of the fraud it had committed on

investors by confirming that its CEO, CFO, and one of its directors, who signed the Company's SEC filings and issued public statements after the Merger acted with scienter in defrauding investors and by seeking to unwind the Business Combination.

## 2. Core Operations

224.    Akazoo had one core product: global music streaming.  Thus, the numbers of users, subscribers, countries where Akazoo's services were available, and music licensing and distribution agreements were the most essential components of Akazoo's business.

225.    As alleged herein, upon the Merger and after, the Old Akazoo Defendants, Dickey, and the Akazoo Director Defendants, continuously updated investors as to the growing numbers of users and subscribers, and repeatedly informed investors that Akazoo's services were available in 25 countries, and that it had licensing agreements with major music distributors including Sony Music.  But as the Company eventually admitted, it had had negligible numbers of subscribers for years, it did not operate in 25 countries, and it did not have the licensing agreements that it claimed to have.

226.    Further, the Old Akazoo Defendants, Dickey, and the Akazoo Director Defendants, as high-ranking managerial officers and employees of the Company, which had under 35 employees after the Merger, were privy to material, non-public information and responsible for the accuracy of the information provided to investors.  Each of the forms filed with the SEC upon completion of the Merger were signed by the Old Akazoo Defendants, Dickey, and/or the Akazoo Director Defendants.

## 3. Corporate Scienter

227.    Each of the Old Akazoo Defendants, Dickey, and the Akazoo Director Defendants is or was a high-ranking management-level employee.  The scienter of each of these defendants and of all other management-level employees of Akazoo, including each high-ranking officer or director, is imputable to Akazoo.  The knowledge of each of these individuals should therefore be imputed to Akazoo for the purposes of assessing corporate scienter.

228.    Even aside from the scienter of these defendants, the facts alleged herein raise a strong inference of corporate scienter as to Akazoo as an entity.  Corporate scienter may be alleged independent of individual defendants where a statement would have been approved by corporate officials sufficiently knowledgeable about the company to know the statement was false.  Here, the statements alleged were made to the investing public regarding the Company's operations, finances, business practices—all important topics that would necessarily require approval by appropriate corporate officers who, as alleged, had very different information in their hands at the time from what was disclosed to investors.

229.    Moreover, the Company admitted the scienter of the Old Akazoo Defendants and its own scienter.  Each of the Old Akazoo Defendants was a high-ranking, managerial, executive and/or employee of Old Akazoo that participated in a fraudulent scheme by falsifying Old Akazoo's books and records and the due diligence materials provided to MMAC in connection with the Merger, all of which were included and incorporated by reference into all of the Company's post-Merger statements.  In addition, Macridis and Roche admitted their scienter and the Company's scienter, stating in their resignations that from the outset, they had been clear with the rest of the board that an independent, forensic, and thorough accounting was in the best interests

112

of the shareholders.  Thus, the scienter of the Old Akazoo Defendants, Dickey and the Akazoo Director Defendants is imputed to the Company.

## VII.    LOSS CAUSATION

230.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

### A.    Investors Suffered Significant Losses Due to the Materially Misleading Statements Issued During the Class Period

231.    Throughout the Class Period, as detailed herein, Defendants made materially false and/or misleading statements and/or omissions. This course of wrongful conduct caused the price of Akazoo securities to be artificially inflated. But for Defendants' misrepresentations and/or omissions, Plaintiffs and the other members of the Class would not have purchased Akazoo securities or would not have purchased such securities at artificially inflated prices. Later, when Defendants' prior misrepresentations and/or omissions were disclosed to the market, the price of Akazoo shares fell significantly as the prior artificial price inflation was dissipated. As a result of their purchases and/or acquisition of Akazoo securities during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.* damages, under the Exchange Act. The timing and magnitude of the decline in the prices of the Company's shares negates any inference that the economic losses and damages suffered by Plaintiffs and other members of the Class were caused by changed market conditions, macroeconomic factors, or Company-specific facts unrelated to defendants' wrongful conduct.

232.    The truth about the material misrepresentations and/or omissions was partially revealed to the public on or around: (i) April 20-21, 2020; (ii) April 22-24, 2020; (iii) May 1, 2020; and (iv) May 21, 2020.

233.    On April 19, 2020, Quintessential Capital Management released a report and corresponding presentation alleging that many of the Company's purported metrics and operations had been overstated.

234.    On this news, Akazoo's share price fell $0.53, or 20%, over two consecutive trading sessions to close at $1.99 per share on April 21, 2020, on unusually heavy trading volume.

235.    The price declines on April 20 and 21, 2020 were the result of the nature and extent of defendants' wrongful conduct being partially revealed to investors and the market. *Inter alia*, the disclosure revealed that Akazoo operated in only five countries, rather than the 25 countries that the Defendants had claimed, was closing offices and losing employees, had materially overstated its revenues, profits, cash holdings, subscriber and user numbers, and that as a result, the Company's financial metrics and subscriber count had been overstated.

236.    On April 22, 2020, during market hours, the Company acknowledged the credibility of the QCM Report's allegations, announcing that it had appointed an independent special committee to investigate the allegations.

237.    On this news, Akazoo's share price fell over 16%, to close at $1.66 on April 22, 2020.  Akazoo's share price fell over the next two days, to close at $1.16 per share on April 24, 2020, further injuring investors.

238.    The price declines between April 22, 2020 and April, 24, 2020 were the result of the nature and extent of defendants' wrongful conduct being partially revealed to investors and the market. *Inter alia*, the disclosure revealed that Akazoo operated in only five countries, rather than the 25 countries that the Defendants had claimed, was closing offices and losing employees, had

114

materially overstated its revenues, profits, cash holdings, subscriber and user numbers, and that as a result, the Company's financial metrics and subscriber count had been overstated.

239. On May 1, 2020, the Company announced that defendant Zervos was terminated for cause from his position as CEO and that certain financial statements should no longer be relied upon due to the possibility that they contained material errors.

240. On this news, Akazoo's share price fell $0.04 before NASDAQ halted trading on May 1, 2020.

241. The price decline on May 1, 2020 was the result of the nature and extent of Defendants' wrongful conduct being partially revealed to investors and the market. *Inter alia*, the disclosure revealed that Zervos had engaged in improper conduct as alleged in the QCM Report, leading to his termination, and simultaneously that the Company's financial statements were materially false and misleading.

242. On May 21, 2020, the Company announced that it would seek to unwind the Business Combination.  Specifically, the Company admitted that "Akazoo's historical financial statements were materially false and misleading [and] that Akazoo has had only negligible actual revenue and subscribers for years[,]" and that former members of Akazoo's management team had falsified its books and records, defrauding investors.

243. Trading for Akazoo stock remained halted until June 2, 2020 when Akazoo's stock was delisted from the NASDAQ exchange, rendering the stock effectively worthless.

B.      **MMAC Shareholders Who Were Eligible to Vote at the August 28, 2019 Special Meeting Suffered Damages**

1.      **MMAC Shareholders Would Not Have Approved the Business Combination and/or Exercised Conversion Rights**

244.    In addition to the decline in Akazoo securities caused by the corrective disclosures alleged in Section VII(A), *supra*, MMAC shareholders who were eligible to vote on the Business Combination and/or exercise their conversion rights have also been damaged as a result of the materially false and/or misleading statements about Akazoo's operations and financial results. Had the true financial condition and operations of Akazoo been known, members of the Class eligible to vote on the Business Combination would have voted against the Business Combination and/or exercised their conversion rights and received $10.35 in cash per share of MMAC stock.

245.    As a result, the Business Combination would not have been approved at the August 28, 2019 special meeting and more likely than not, there would have been insufficient time for MMAC to conduct another business transaction before September 17, 2019. As such, MMAC would have commenced liquidation, and Plaintiffs and other members of the Class that were holding MMAC stock would have received approximately $10.35 in cash for each share of MMAC common stock held. Instead, Plaintiffs and other members of the Class who would have received a pro rata distribution if MMAC liquidated retained their common stock which precipitously declined in value—and was ultimately delisted, rendering the stock effectively worthless—as the true financial condition and operations of Akazoo slowly became known.

246.    It was foreseeable to Akazoo, the Old Akazoo Defendants, Dickey, and the MMAC Director Defendants that the false and/or misleading statements about, among others, Akazoo's financial results, condition and value: (i) would cause those members of the Class that would have

116

received $10.35 in cash per share of MMAC stock upon exercising conversion rights and/or upon liquidation to keep their stock in lieu of receiving $10.35 in cash per share; and (ii) eventually the disclosure of the information about Akazoo's financial condition and operations would cause those members of the Class to instead receive either substantially less for each share sold after September 17, 2019, or hold those shares which would be essentially worthless.

247.    As a result, Akazoo, the Old Akazoo Defendants, Dickey, and the MMAC Director Defendants' conduct proximately caused foreseeable losses to those Plaintiffs and members of the Class.

> **2.    MMAC's Failure to Consummate a Qualifying Business Transaction and Failure to Properly Distribute the IPO Proceeds from the Trust Account**

248.    In addition, MMAC's shareholders who were eligible to vote on the Business Combination have also been damaged due to MMAC's failure to consummate a qualifying business combination within the prescribed time frame and MMAC's improper distribution and use of the IPO funds in the trust account.

249.    MMAC was formed specifically as a vehicle to effect a business combination with one or more businesses in the media, entertainment or marketing services industries with an aggregate fair market value of at least 80% of the value of the assets held in the trust account (excluding the deferred underwriting commissions and taxes payable on the interest earned on the trust account) at the time of signing a definitive agreement for the initial business combination. Further, under MMAC's certificate of incorporation and subsequent extensions, MMAC would continue in existence only until September 17, 2019, at which date, if MMAC had not yet completed a business combination, its corporate existence would cease, except for the purposes of

winding up its affairs and liquidating. As such, MMAC was required to hold the approximately $209 million from its IPO in a trust account, which were not to be released until the earlier of the consummation of a business combination or liquidation of MMAC.

250.    It was foreseeable that the false and/or misleading statements about Akazoo's financial condition and operations would cause losses to those Plaintiffs and members of the Class who were eligible to vote on the Business Combination because, had the true financial condition been known, Akazoo Limited's fair market value would have been less than 80% of the value of the assets held in the trust account. As such, MMAC would have failed to effect a business combination with a business in the media, entertainment, or marketing services industry by September 17, 2019. Thus, MMAC improperly removed the IPO proceeds from the trust account, which were not to be released until the earlier of the consummation of a business combination or liquidation after September 17, 2019.  As such, all Plaintiffs and members of the Class who held MMAC common stock on the record date of August 9, 2019 for the vote on the Business Combination and were eligible to vote thereon, are entitled to the return of their pro rata distribution of the IPO proceeds.

### C.    Investors Who Bought Akazoo Stock Pursuant and/or Traceable to the Registration Statement Suffered Substantial Losses

251.    Since the Business Combination, and as a result of the disclosures of material adverse facts omitted from the Registration Statement, Akazoo's stock price has traded as low as $1.16 per share, or approximately 78% below the $5.27 price upon the closing of the Business Combination.

252.    On June 2, 2020, Akazoo's stock was delisted from the NASDAQ exchange, rendering the stock effectively worthless.

## VIII.   PLAINTIFFS' CLASS ACTION ALLEGATIONS

253.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who: (1) purchased or otherwise acquired the publicly traded securities of Akazoo between January 24, 2019 and May 21, 2020, both dates inclusive (the "Class Period"), including but not limited to those who purchased or acquired Akazoo securities pursuant to the private placement offering agreement ("PIPE Financing"), seeking to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder; (2) held common stock of Modern Media Acquisition Corp. as of August 9, 2019, eligible to vote at MMAC's August 28, 2019 special meeting, seeking to pursue remedies under Section 14(a) of the Exchange Act, and/or; (3) purchased or otherwise acquired Akazoo common stock pursuant or traceable to the Company's registration statement and prospectus issued in connection with the September 2019 Merger, seeking to pursue remedies under Sections 11 and 15 of the Securities Act.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

254.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may

be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

255.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

256.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

257.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether Defendants' acts as alleged violated the federal securities laws;

(b)    whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(c)    whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(e)     whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(f)     whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

258.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

259.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     the Company's securities are traded in efficient markets;

(d)     the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e)     the Company traded on the NASDAQ, and was covered by market analysts;

(f)     the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

(g)     Plaintiffs and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(h)     Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

260.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

261.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## IX.    APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

262.    The market for Akazoo's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Akazoo's securities traded at artificially inflated prices during the Class Period.  On June 25, 2019, the Company's share price closed at a Class Period high of $13.68 per share.  Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Akazoo's securities and market information relating to Akazoo, and have been damaged thereby.

122

263.     During the Class Period, the artificial inflation of Akazoo's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Akazoo's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Akazoo and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company's shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

264.     At all relevant times, the market for Akazoo's securities was an efficient market for the following reasons, among others:

(a)     Akazoo shares met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, Akazoo filed periodic public reports with the SEC and/or the NASDAQ;

(c)     Akazoo regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     Akazoo was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

265.    As a result of the foregoing, the market for Akazoo's securities promptly digested current information regarding Akazoo from all publicly available sources and reflected such information in Akazoo's share price.  Under these circumstances, all purchasers of Akazoo's securities during the Class Period suffered similar injury through their purchase of Akazoo's securities at artificially inflated prices and a presumption of reliance applies.

266.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## X.     NO SAFE HARBOR

267.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

124

The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Akazoo who knew that the statement was false when made.

## XI.   CAUSES OF ACTION

### COUNT I
**Violation of Section 10(b) of The Exchange Act and Rule 10b-5**
**Against all Defendants**

268.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

269.   This Count is asserted against the Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

270.   During the Class Period, the Defendants, individually and in concert, at relevant times, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations

and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

271.   The Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they, at relevant times: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

272.   The Defendants acted with scienter at relevant times in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.  These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

273.   The Old Akazoo Defendants, Dickey, MMAC Director Defendants, and Akazoo Director Defendants, who were senior officers and directors of the Company and MMAC at relevant times, had actual knowledge of the material omissions and/or the falsity of the material

statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiffs and the Class.

274.    As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Defendants' false and misleading statements.

275.    Had Plaintiffs and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Defendants' misleading statements and by the material adverse information which the Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

276.    As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

277.    By reason of the foregoing, the Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

**Violation of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

278.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

279.    During the Class Period, the Individual Defendants, at relevant times, participated in the operation and management of Akazoo and MMAC, and conducted and participated, directly and indirectly, in the conduct of Akazoo's and MMAC's business affairs.  Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

280.    As officers and directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Akazoo's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

281.    Because of their positions of control and authority as senior officers and directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Akazoo and disseminated in the marketplace during the Class Period.  Throughout the Class Period, at relevant times, the Individual Defendants exercised their power and authority to cause Akazoo and MMAC to engage in the wrongful acts complained of herein.  The Individual Defendants therefore, were controlling persons of Akazoo and MMAC within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

282.    The Individual Defendants, therefore, acted as controlling persons of the Company and MMAC.  By reason of their senior management positions and positions as directors of Akazoo

and MMAC, the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Akazoo and MMAC to engage in the unlawful acts and conduct complained of herein. The Individual Defendants exercised control over the general operations of Akazoo and MMAC and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

283.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Akazoo and MMAC.

**COUNT III**
**Violation of Section 14(a) of the Exchange Act and Rule 14a-9**
**Against Akazoo, Old Akazoo Defendants, Dickey, and MMAC Director Defendants**

284.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

285.    The claims set forth herein do not sound in fraud and are based on negligent conduct by the Defendants named herein (the "Section 14 Defendants").

286.    The Defendants named herein violated Section 14(a) of the Exchange Act and Rule 14a-9 thereunder in that these Defendants solicited proxies from Plaintiffs and other members of the Class by means of a Proxy Statement that through Defendants' negligence contained statements which, at the time and in the light of the circumstances under which they were made, were false and misleading with respect to material facts, and omitted to state material facts necessary in order to make the statements therein not false or misleading.

287.    Plaintiffs and other members of the Class were misled by the Section 14 Defendants' false and misleading statements and omissions, were denied the opportunity to make an informed decision in voting on the merger, and approved the merger without having been

advised of material facts.  Accordingly, Plaintiffs and other members of the Class did not receive their fair share of the value of the assets and business of the combined entity, suffered damages when the Company's stock price decreased, and were prevented from benefitting from a value-maximizing transaction.

**COUNT IV**
**Violation of Section 20(a) of the Exchange Act**
**Against Old Akazoo Defendants, Dickey, MMAC Director Defendants**

288.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

289.    Dickey and the MMAC Director Defendants acted as controlling persons of MMAC as within the meaning of Section 20(a) of the Exchange Act as alleged herein and the Old Akazoo Defendants acted as controlling persons of Old Akazoo within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the companies' operations, these defendants had the power and authority to cause MMAC or Old Akazoo to engage in the wrongful conduct complained of herein.  These defendants were able to, and did, control directly and indirectly, the content of the Proxy/Prospectus and the other solicitations described herein made by MMAC or Old Akazoo, thereby causing the dissemination of the materially false and misleading statements and omissions as alleged herein.

290.    In particular, Dickey and the MMAC Director Defendants participated in meetings and conference calls, reviewed the Merger Agreement and all of the underlying due diligence materials, and voted to approve the Merger, signed the Proxy/Prospectus and solicited the approval of the Merger through the Board's and MMAC's management's recommendation to vote in favor

of the Merger, which appeared in the Proxy/Prospectus.  In particular, the Old Akazoo Defendants reviewed the Merger Agreement, reviewed and furnished information for inclusion in the Proxy/Prospectus, and solicited the approval of the Merger.

291.    As set forth above, in their capacities as officers and/or directors of MMAC or Old Akazoo, these defendants participated in the misstatements and omissions set forth above.  Indeed, each of these defendants had access to information regarding the circumstances surrounding the Merger and Old Akazoo, including the terms of the Merger, analysis of Old Akazoo's operating results and financial condition, the valuation of Old Akazoo, and the due diligence that had and had not been performed.  As a result, these defendants were individually and collectively control persons within the meaning of Section 20(a) of the Exchange Act.

292.    As set forth above, Akazoo, the MMAC Director Defendants, Dickey, and the Old Akazoo Defendants violated Section 14(a) of the Exchange Act by their acts and omissions as alleged above.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.  The MMAC Director Defendants, Dickey, and Old Akazoo Defendants were culpable participants in the violations of Section 14(a) alleged herein because they failed to make a reasonable investigation and did not possess reasonable grounds for the belief that the statements contained in Akazoo's proxy solicitations issued were true and free of any omissions of material fact.  As detailed above, during the respective times that these defendants served as officers and/or directors of MMAC and Old Akazoo, each is responsible for the material misstatements and omissions made in the Proxy/Prospectus.

293.    Plaintiffs and Class members eligible to vote on the Merger were denied the opportunity to make an informed decision in voting on the Merger and were damaged as a direct

and proximate cause of the untrue statements and omissions in the Proxy/Prospectus and other solicitations described herein.

## COUNT V
### Violation of Section 11 of the Securities Act
**Against Akazoo, Old Akazoo Defendants, Dickey, Crowe, and MMAC Director Defendants**

294.   Plaintiffs repeat and re-allege each and every allegation contained above.

295.   This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against Akazoo, the Old Akazoo Defendants, Dickey, Crowe, and the MMAC Director Defendants (the "Section 11 Defendants").

296.   The Registration Statement for the Business Combination was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

297.   Akazoo is the registrant for the Business Combination.  The Section 11 Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

298.   As issuer of the shares, Akazoo is strictly liable to Plaintiffs and the Class for the misstatements and omissions.

299.   None of the Section 11 Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

300.   Defendant Crowe was the auditor for Akazoo Limited. In the Registration Statement, Defendant Crowe affirmatively consented to being referenced under the "Experts" section, attesting to the adequacy and accuracy of Akazoo Limited's historical financial statements

and information contained therein. Defendant Crowe certified Akazoo Limited's false and/or misleading financial statements included or incorporated by reference in the Registration Statement, including the consolidated statement of financial position of Akazoo Limited and its subsidiaries as of December 31, 2018, 2017 and 2016 and the related consolidated statements of profit or loss and other comprehensive income, changes in equity and cash flows for each of the three years in the period ended December 31, 2018, 2017 and 2016 and the related notes (collectively, "Akazoo Limited's Financial Statements"). Additionally, in the Registration Statement, Defendant Crowe also falsely represented, among others: (1) that Akazoo Limited's Financial Statements were prepared in conformity with International Financial Reporting Standards; and (2) that Defendant Crowe had conducted its audits of Akazoo Limited in accordance with International Standards on Auditing (UK) (ISAs (UK)) and the standards of the Public Company Accounting Oversight Board (United States).

301.    By reasons of the conduct herein alleged, each Section 11 Defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.

302.    Plaintiffs acquired Akazoo shares pursuant and/or traceable to the Registration Statement for the Business Combination.

303.    Plaintiffs and the Class have sustained damages.  The value of Akazoo common stock has declined substantially subsequent to and due to Section 11 Defendants violations.

### COUNT VI
### Violation of Section 15 of The Securities Act
### Against Old Akazoo Defendants, Dickey, and MMAC Director Defendants

304.    Plaintiffs repeat and re-allege each and every allegation contained above.

305.    This count is asserted against the Old Akazoo Defendants, Dickey, and the MMAC Director Defendants (the "Section 15 Defendants") and is based upon Section 15 of the Securities Act.

306.    The Section 15 Defendants, by virtue of their offices, directorship and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Akazoo within the meaning of Section 15 of the Securities Act.  The Section 15 Defendants had the power and influence and exercised the same to cause Akazoo to engage in the acts described herein.

307.    The Section 15 Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiffs and the Class at relevant times.

308.    By virtue of the conduct alleged herein, the Section 15 Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiffs and the Class for damages suffered.

## XII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: September 8, 2020                    Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

<u>/s/Phillip Kim</u>
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Ave., 40th Floor
New York, NY 10016
Tel: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
Email: pkim@rosenlegal.com

*Lead Counsel for Lead Plaintiffs*

**LAW OFFICES OF HOWARD G. SMITH**
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem PA 19020
Telephone: (215) 638-4847
Facsimile: (215) 638-4867

*Additional Counsel for Lead Plaintiffs*

135