**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Ave., 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
        lrosen@rosenlegal.com

*Lead Counsel for Lead Plaintiffs*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE AKAZOO S.A. SECURITIES LITIGATION | Case No. 1:20-cv-01900-BMC<br><br>**SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br><u>JURY TRIAL DEMANDED</u><br><br><u>CLASS ACTION</u> |

Lead Plaintiffs Tim Caldwell, Sharon Caldwell, Nikolaos Poulakis, and John Pullen ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Akazoo, S.A. ("Akazoo, S.A." or the "Company"), as well as media and analyst reports about the Company and Company press releases. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein.

## I.      NATURE AND OVERVIEW OF THE ACTION

1.      This is a federal securities class action alleging violations of Sections 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, Section 11 of the Securities Act of 1933 (the "Securities Act"), Defendant Crowe U.K. LLP ("Crowe" or "Defendant"), arising out of Crowe's role in the massive securities fraud by a company known as Akazoo Limited ("Akazoo") in connection with its merger with special-purpose acquisition company  (a "SPAC"), Modern Media Acquisition Corp. ("MMAC" or "MMDM"), which subsequently became Akazoo, S.A. (the "Business Combination" or the "Merger").

2.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than the Defendant and other Excluded Parties (defined below) who: (1) purchased the publicly traded securities of Akazoo, S.A. between January 24, 2019 and May 21, 2020, both dates inclusive (the "Class Period"), including, but not limited to, those who purchased or acquired Akazoo, S.A. securities pursuant to the private placement offering agreement ("PIPE Financing"), seeking to recover compensable damages caused by Defendant's violations of the federal securities laws and to pursue remedies under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder; (2) held common stock of Modern Media Acquisition Corp. ("MMAC" or "MMDM") as of August 9, 2019, eligible to vote at MMAC's August 28, 2019 special meeting, , and/or; (3) purchased Akazoo, S.A. common stock pursuant or traceable to the Company's registration statement and prospectus issued in connection with the September 2019 Merger, seeking to pursue remedies under Section 11 of the Securities Act (hereinafter, the "Class").

3.      Throughout the Class Period, Defendant Crowe repeatedly violated its professional responsibilities, failed in its role of gatekeeper and deceived investors, enabled Akazoo's fraud upon the investors who bought $40.6 million worth of "units" in Akazoo, S.A. as part of a private investment in public equity offering ("PIPE Investors") and the public shareholders ("SPAC Investors") of MMAC who agreed to roll-over their roughly $14.2 million investment into Akazoo, S.A.. That fraud could not have happened without Crowe's active participation and professional negligence.

4.       Akazoo's management pulled off the fraud by claiming to have outsourced essentially all Akazoo's business—*e.g.*, marketing, acquiring customers, collecting revenues, and paying most of Akazoo's expenses—to three third-party "aggregators" but not allowing anyone to communicate with these aggregators other than Akazoo's CEO and CFO. The "aggregators" turned out to be fake; their existence turned out to be nothing more than a single (made-up) email address for each aggregator.

5.      Specifically, Crowe gave unqualified, "clean" audit opinions on Akazoo's financial statements, misleading investors into believing that Akazoo's reported financial results and projections were accurate and reasonable. Crowe did so despite utterly failing to conduct any reasonable inquiry concerning Akazoo's reported results.

6.      MMAC issued a February 12, 2019, Proxy and Registration Statement ("February Registration Statement") in connection with its merger with Akazoo. The February Registration Statement was required to obtain shareholder approval from MMAC's existing shareholders and to register the stock that investors would receive in Akazoo, S.A. The February Registration Statement contained Akazoo's 2017 audited financial statements along with Crowe's Report of Independent Registered Public Accounting Firm for those statements (the "2017 Audit Opinion").

3

Crowe not only consented to inclusion of its audit, but also Crowe (including partners it is US affiliate) reviewed and provided comment on the February Registration Statement.

7.      On June 7, 2019, Crowe completed the audit of Akazoo's 2018 financial statements and Report of Independent Registered Public Accounting Firm for those statements ("2018 Audit Opinion"). A few days later, Akazoo filed an amended Proxy and Registration Statement with the Securities Exchange Commission ("June Registration Statement") that included the 2018 Audit Opinion. The 2018 Audit Opinion was included in subsequent amended Proxy and Registration Statements with Securities Exchange Commission filed on July 30, 2019 ("July Registration Statement") and on August 12, 2019 and August 14, 2019 ("August Registration Statements") in advance of the merger closing on September 11, 2019. Crowe signed an express consent to inclusion of its 2017 Audit Opinion and 2018 Audit Opinion in the various public filings; Crowe consent itself was included in the filings. Crowe was given drafts of all these SEC filings. Crowe made comments and suggestions to each. Crowe UK also involved its United States affiliate, Crowe LLP ("Crowe US") in reviewing the SEC filings before they were made.

8.      As part of its audits of Akazoo's 2017 and 2018 financial statements, management had to provide Crowe with the underlying ledgers that supported the consolidated numbers reported in the financial statements. These detailed ledgers had to reflect the counterparties to the various transactions in detail, and thus management had to disclose the relationship with the aggregators to Crowe and Crowe was required to obtain such understanding. In other words, while Akazoo management could hide the aggregators from the investing public by citing consolidated financial metrics and discussing its business operations in general and misleading terms, there simply was no way to hide the details from Crowe.

4

9.      Yet Crowe did not ask even the most basic questions or conduct the most basic investigation—such as picking up the telephone to speak to someone allegedly working at aggregators—despite claiming to "audit" Akazoo's financial statements. Had Crowe preformed the most basic audit steps consistent with professional standards, Akazoo's management could not have continued with the fraud.

10.     Most significantly, because Akazoo's business was fake, it did not generate cash; despite claiming exponential growth in revenue, Akazoo's cash position was so poor that it was on the verge of insolvency at the end of 2018. Akazoo claimed that the revenues were generating huge receivables and being re-invested in the business, especially in the form of investments in software. Crowe did next to nothing to check the validity of any Akazoo's reported revenues, receivables, and investment in software.

11.     Ignoring clear professional standards, Crowe did nothing to confirm the validity of any of these transactions other than (at most) accepting (1) emails forwarded by Akazoo management from three mysterious people purportedly acting on behalf of the aggregators or (2) documents signed by these same individuals without any evidence of how the documents came into existence. As if reporting false numbers were not enough, Akazoo's financial statements made obviously misleading representations in the narrative notes. For example, the financial statements disclaimed any risk of collection of receivables, including incredibly denying any concentration risk even though 75% of the receivables were owed by two entities. Crowe's representations that (1) its audit was conducted pursuant to governing professional standards, and (2) the financial statements "fairly presented" the financial position, results of operations and cash flows of Akazoo were manifestly false.

12.     Additionally, Crowe knew that as MMAC and Akazoo attempted to raise money during 2019 to fund Akazoo, S.A., Akazoo, S.A. was misleading new investors by filing grossly misleading public filings with the Securities Exchange Commission describing Akazoo's business (which would become Akazoo, S.A.'s business). Those filings, which spanned hundreds of pages, made **no** mention of Akazoo's three principal aggregators, the portion of Azakoo's business concentrated in those three aggregators (approximately 90% of reported revenue at all relevant times) or the outsourced nature of Akazoo's business. To the contrary, the public filings repeatedly identified the key to Akazoo's success and its future growth as its ability to form and expand direct partnerships and relationships with telecommunications providers who bundled Akazoo's service with mobile phone service; no mention was made of the aggregators. This description did not even match Akazoo's internal "story" told to Crowe about how Akazoo operated—namely, that it was the *aggregators* who had all the alleged partnerships with telecommunications providers. Crowe actively assisted Akazoo by consenting to inclusion of its audit letter in these public filings, editing the filings, and directly engaging with potential investors to answer questions about Akazoo's finances and business.

13.     Defendant Crowe was aware of and chose to deliberately and recklessly ignore substantial and obvious red flags that would have prompted any competent financial auditor to further investigate, and which Crowe was, in fact, required to seek further independent confirmatory evidence to support under both the PCAOB auditing standards ("AS") and international standards on auditing in the United Kingdom ("ISAs (UK)") prevailing at the time. Crowe repeatedly accepted as exclusive evidence documentation that was facially suspicious at best, under circumstances that presented substantial and obvious risk of fraud, with respect to transactions and accounts that were clearly and indisputably material to the overall financial

6

statements under audit. Crowe accepted such evidence in direct violation of the applicable U.S. and international auditing standards under which it certified its audit had been conducted.

14.     Crowe's conduct of its putative audit was so utterly deficient, falling so far short of the applicable auditing guidance and of the expected standard of practice in the financial auditing profession, that it cannot plausibly be attributed to even gross incompetence alone. Crowe's conduct with respect to its purported audits of Akazoo was not merely reckless—it amounted to "no audit at all." Crowe's statement that it had conducted audits of Akazoo's financial statements in conformity with PCAOB and international auditing standards was itself recklessly (and likely knowingly) false when made.

15.     Therefore, Crowe's 2017 Audit Opinions and 2018 Audit Opinion (together, the "Audit Opinions")), as incorporated into the February Registration Statement, the July Registration Statement, and the August Registration Statement issued by Akazoo in connection with the Business Combination (together, the "Registration Statements")—each of which Crowe reviewed and approved—were materially false and misleading when issued. Crowe understood and intended that Plaintiffs would reasonably rely upon such statements in acquiring and holding Akazoo's securities, and Plaintiffs and the Class did so rely, to their detriment.

## II.     JURISDICTION AND VENUE

16.     The claims asserted herein arise under Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b) ) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5), , and Section 11 of the Securities Act (15 U.S.C. §77k).

17.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331, §1332(a)(2), §22 of the Securities Act, and §27 of the Exchange Act.

18.     Defendant Crowe U.K. LLP ("Crowe") purports to be a leading audit, assurance, tax, advisory, risk management, and consulting firm organized and existing under the laws of the United Kingdom, with its principal headquarters at 55 Ludgate Hill, London, EC4M 7JW, England, United Kingdom. It is an affiliated entity of Crowe Global, formerly known as Crowe Horwath International, a multinational professional services network consisting of more than 200 affiliated firms employing over 35,000 people in 750 offices distributed among 130 countries throughout the world, organized and existing as a Swiss verein, with its global headquarters located at New York City, New York.

19.     Defendant Crowe's conduct, as alleged herein, was specifically targeted toward investors located in the United States and participants in the securities markets and exchanges of the United States. Crowe was engaged by Akazoo to, and purported that it did, conduct its audits of Akazoo's financial statements and related filings in compliance with the applicable standards and regulations promulgated and enforced by the U.S. Public Company Accounting Oversight Board ("PCAOB") and attested to the accuracy and reliability of Akazoo's financial statements and related filings in connection with the acquisition of Akazoo by what would become Akazoo, S.A., and the placement of Akazoo, S.A. securities on the U.S. based NASDAQ exchange. Crowe caused its audit opinions to be incorporated into Proxy and Registration Statement filed by Akazoo, S.A. with the U.S. Securities and Exchange Commission ("SEC") on February 12, 2019, and several subsequent amended filings, as detailed below. The Proxy and Registration Statement, and each amendment thereto, further represented that the financial statements of Akazoo incorporated therein were presented in reliance upon Crowe's "expert" professional opinion, "given upon their authority as experts in accounting and auditing." Crowe specifically contemplated and approved these statements to U.S. investors.

8

20.    Additionally, in connection with its audits detailed herein and the issuance of its opinions pursuant to PCAOB auditing standards, Crowe retained and relied upon the professional services of its U.S-based affiliate, Crowe LLP ("crowe US"), an entity organized and existing under the laws of the state of Indiana, with offices located at 485 Lexington Avenue, 11th Floor, New York City, New York 10017. Crowe US personnel performed work in the United States, the state of New York, and this district in connection with Crowe's conduct alleged herein, as agents of Crowe and on its behalf.

21.    For the foregoing reasons, Crowe is subject to personal jurisdiction in the United States because its conduct, as alleged herein, was consciously directed toward the United States, and acts in furtherance of that conduct were performed by Crowe, through its agents and affiliates, within United States. Crowe thereby purposefully availed itself of the privilege of doing business in the United States, and the causes of action alleged herein arise directly from Crowe's contacts with the United States and this district.

22.    Additionally, and in the alternative, Crowe subject to personal jurisdiction in the United States and in this district because, as alleged in further detail below: (i) Crowe engaged in the fraudulent scheme and course of conduct described herein, that arose from transactions and occurrences that took place in and caused foreseeable losses in the United States; (ii) in committing the fraudulent acts complained of herein, Crowe operated as a unitary business and an integrated enterprise with substantial offices and operations, including those based in the United States; and (iii) Crowe has had and continues to have continuous and systematic contacts with this forum that render it at home in the United States.

23.    Furthermore, in connection with the acts, conduct and other wrongs alleged in this Complaint, Defendant Crowe, directly or indirectly, used the means and instrumentalities of

9

interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of a national securities exchange.

24.     Venue is proper in this judicial district pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the alleged misstatements entered and subsequent damages took place within this judicial district.

### III.     PARTIES

25.     Plaintiffs, as previously set forth in their Certifications (Dkt. No. 7-3), suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein, because they: (1) purchased or otherwise acquired the Company's securities at artificially inflated prices during the Class Period, including, but not limited to purchases or acquisitions pursuant to the private placement offering agreement ("PIPE Financing"), and/or; (2) held common stock of MMAC as of August 9, 2019 and were eligible to vote at MMAC's August 28, 2019 special meeting, and/or; (3) purchased or otherwise acquired Akazoo common stock pursuant or traceable to the Company's registration statement and prospectus ("Registration Statement") issued in connection with the September 2019 Merger.

26.     Plaintiffs and Akazoo. along with several others, entered into a *Stipulation and Agreement of Partial Settlement* dated April 22, 2021 (the "Stipulation"), that embodies the terms and conditions of the partial settlement of the Class Actions (the "Partial Settlement") (Dkt. No. 32). The Court issued its Final Order and Judgment approving the Settlement on September 9, 2021 (Dkt. No. 51). Defendant Crowe was not a party to the Partial Settlement.

27.     Defendant Crowe is a certified public accounting firm and was the auditor for Akazoo's consolidated financial statements for the years ended December 31, 2017, 2016, and 2015 and the related consolidated statements of profit or loss and other comprehensive income,

changes in equity and cash flows and the related notes for each of those three years. Crowe attested to the adequacy and accuracy of Akazoo's historical financial statements and information contained therein in its 2017 Audit Opinion and 2018 Audit Opinion. These Audit Opinions  were included in the Registration Statement. After the Merger, Crowe was appointed as the certified public accountant and auditor for the Company.

A.     **Relevant Non-Parties**

28.     Akazoo, S.A. (or, the "Company") purported to be a global on-demand music, audio streaming, media, and A.I. technology company with a focus on emerging markets and a presence in 25 countries. The Company was previously known as Akazoo Limited, Modern Media Acquisition Corp., and Modern Media Acquisition Corp. S.A., and is incorporated in Luxembourg, with its principal executive offices at One Heddon Street, W1B 4BD, London, UK. Prior to delisting, Akazoo, S.A. shares were listed on the NASDAQ under the ticker symbol "SONG" and formerly traded under the ticker symbol "MMDM." Akazoo, S.A. agreed to assign all claims against Crowe to Plaintiffs in connection with the Partial Settlement.

29.     Apostolos N. Zervos ("Zervos") was, at all relevant times, the Chief Executive Officer ("CEO") and a director of the Company. Zervos founded Akazoo in 2010 and served as its CEO until the Business Combination. Prior to founding Akazoo, from 2008-2010, Zervos was Senior Manager, Innovation for Velti Plc, a Greek company which filed for bankruptcy and collapsed in 2013 amidst allegations of fraud. Zervos also served as Chief Strategy Officer at InternetQ, Akazoo's parent company, from October 2010 until July 2015.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Background of Akazoo and Crowe

30.      Akazoo purports to be a global on-demand music, audio streaming, media, and A.I. technology company with a focus on emerging markets and a presence in 25 countries. Akazoo is incorporated under the laws of Scotland with its registered office in Edinburg, Scotland.

31.      Akazoo was founded in 2010 by Zervos, who graduated from college in 2002. The ultimate parent and controlling party of Akazoo was a Greek company named InternetQ Group Ltd. ("InternetQ").

32.      As disclosed in by Quintessential Capital Management ("QCM"), InternetQ was founded in 2000 and was listed on the London AIM market until about early 2016 when it was taken private amidst allegations of fraud. Thereafter, InternetQ spun off Akazoo and listed it on the U.S. market through a reverse merger with a cash shell.

33.      Defendant Crowe served as Akazoo's auditor in 2015, 2016, 2017, and 2018, during which time Akazoo's music streaming business allegedly generated explosive growth with revenues increasing from €17 million to over €104 million.

34.      Akazoo told Crowe it achieved this growth by outsourcing almost all operations to three entities called "aggregators". The aggregators allegedly had partnerships with telecommunication companies all over the world under which the telecommunications companies would market to their subscribers.

### B.     Akazoo's Fraudulent Operational Scheme

35.      During 2018, Akazoo's internal financial records showed that of the €104 million in reported revenue, three aggregators allegedly accounted for €97 million or ***94% of reported revenues***. These three aggregators were purportedly called Smart Mobile, Aragona, and Zed

12

Media. Smart Mobile was claimed to operate out of Singapore and covered Asia—specifically Indonesia, Malaysia, and Thailand. Aragona ostensibly was based in Cyprus and covered Poland and Russia. Zed Media allegedly operated out of in Belize City and covered ten Central and South American countries.

36.     Only the former CEO of Akazoo, Zervos, and the former CFO, Paris Triantafyllidis ("Paris") purported to have direct contact with the aggregators. Akazoo employees did not even have a phone number through which they could contact the aggregators. Zervos and Paris provided employees with a single email address for each aggregator, and other than the name of the email account holder, employees did not know the name any other person who represented or worked for the aggregators or signed documents on their behalf. None of these entities had any meaningful presence on the internet—no websites, no social media footprints, and no mention in industry publications or news articles.

37.     Curiously, Akazoo's €104 million in reported 2018 revenue was not producing substantial cash flow. Zervos and Paris explained this by claiming that the aggregators owed tens of millions to Akazoo, and that eventually most of this would be received indirectly—through the aggregators making payments to third parties on behalf of Akazoo—either to cover Akazoo's accounts payable for operational expenses or to invest in the future growth of the business—such as for software development. As a result, as of December 31, 2018, Akazoo's single largest asset (which accounted for more than half of all its book assets) was a reported €34m in "trade receivables" of which almost €28m was allegedly owed by these three aggregators.

38.     Akazoo claimed that this was the balance due after the aggregators "paid" tens of millions in third-party expenses on Akazoo's behalf during 2018. In large part, the aggregators "paid" these bills by way of a three-party agreement or "settlement" that worked as follows: (1)

13

the third party agreed to release its claim against Akazoo, and instead look exclusively to the aggregator for payment; (2) the aggregator agreed to accept liability; and (3) Akazoo released the aggregator for an amount of accounts receivable equal to the third-party account payable. These third parties ranged from software development firms to music content providers (licensing companies) to "content delivery networks" (distributed servers around the globe that allow users to download music). Akazoo did not claim the third parties had any relationship with the aggregators; it remains a mystery how Akazoo explained the willingness of these third parties to release Akazoo in favor of looking solely to unknown "aggregators" for payment.

39.   The "settlement" scheme was a transparent shell game. While Akazoo was reporting large and growing gross revenues each year on the back of purported receivable from the aggregators, it needed a way to clear accumulated receivables from its books to avoid the accumulating an ever-advancing balance of accounts receivable that never seemed to yield any cash flow. So instead, Akazoo entered "settlements" with its (non-existent) aggregators to remove (fraudulent) receivables from its books in exchange for (fake) payments to (existing, but unaware) third parties. Thus, Akazoo was able to continue reporting revenue without accumulating aging receivables or recording any cash.

40.   Instead, the (fraudulent) receivables were exchanged for (fake) operating expenses and ostensible "investment" in Akazoo's business—e.g., software development—which was recorded on Akazoo's books as a large (and growing) intangible asset. Akazoo's second largest asset, after its (fraudulent) accounts receivable—accounting for 42% of its balance sheet assets— was "intangible assets" valued at €27 million that consisted almost entirely of these investments in software. Most of this investment in software came from the aggregators via the (spurious) "settlement" arrangements. A huge portion purportedly was for software still "in development".

41.     Separate from the reported activity of the aggregators, Akazoo was an insubstantial enterprise with few full-time employees, mostly in the finance function. Even the primary finance executive—Paris—gave up his CFO title in late 2018 and operated as a consultant; the actual CFO did little and had almost no interaction with Crowe.

**C.     Background of MMAC**

42.     Modern Media Acquisition Corp. ("MMAC" or "MMDM"), a "blank check" company, was formed in 2014 for the purpose of entering a merger, share exchange, asset acquisition, stock purchase, recapitalization, reorganization, or other similar business combination with one or more business entities or entities in the media, entertainment, or marketing services industries.

43.     On May 17, 2017, MMAC completed its initial public offering ("IPO") from which it derived approximately $209 million total of net proceeds, which were placed into a trust account.

44.     The prospectus for MMAC's IPO identified MMAC's general criteria for prospective target businesses, including a focus on "media, entertainment, and marketing services companies positioned to compete in the new modern media ecosystem" and a "market-leading participant with experienced and motivated management teams."

45.     MMAC had considerable discretion in identifying and consummating a business combination, however, there were three general limitations imposed by its Second Amended and Restated Certificate of Incorporation.

- *First*, the target business that MMAC acquired or merged with had to have a fair market value equal to at least 80% of MMAC's net assets (excluding deferred underwriting discounts and commissions) at the time of such acquisition/merger,

15

determined by the MMAC Board based on standards generally accepted by the financial community.

- *Second*, MMAC only had eighteen months to complete a business combination from the closing date of the IPO (or 21 months from the closing date of the IPO if it had executed a letter of intent, agreement in principle, or definitive agreement for the business combination within 18 months from the closing date of the IPO but had not yet completed the business combination). If MMAC had not completed a business combination in time (*i.e.,* by November 17, 2018, or February 17, 2019), its corporate existence would cease, except for purposes of winding up its affairs and liquidating. As such, MMAC was required to hold the approximately $209 million of proceeds from its IPO in a trust account, which were to be released only upon the consummation of a business combination or liquidation.

- *Third*, if MMAC's stockholders approved an amendment to the Certificate of Incorporation that would affect the substance or timing of MMAC's obligation to redeem 100% of the public shares if MMAC did not complete a business combination on time, MMAC was required to provide the holders of its public shares with the opportunity to redeem all or a portion of their public shares upon approval of any such amendment.

### D.    MMAC Announces Merger with Akazoo

46.    On January 24, 2019, MMAC announced that it had reached an agreement to merge (the "Merger Agreement") with Akazoo, stating in a press release that MMAC was excited to enter this agreement with "a leading music streaming service specializing in emerging markets with 4.3 million premium subscribers in 25 countries throughout Europe, Southeast Asia, South America

16

and Africa." One of the closing conditions of the Merger Agreement was that MMAC was to have no less than an aggregate of $53 million in its trust account.

47. The Merger Agreement provided that the parties would enter into the three-step Business Combination, which would involve the following steps: (1) MMAC would merge with and into PubCo, a Luxembourg public limited entity, with PubCo remaining as the surviving publicly traded entity; (2) LuxCo, a newly formed public limited company, would acquire the entire issued share capital of Akazoo in consideration for issuing ordinary shares of LuxCo to the Akazoo shareholders; and (3) LuxCo would merge with and into PubCo, with PubCo remaining as the surviving publicly traded entity.

48. On February 8, 2019, MMAC held a special meeting in lieu of its 2018 annual stockholders meeting, where stockholders were asked to vote to extend the deadline for MMAC to complete a business combination from February 17, 2019, to June 17, 2019. In connection with the first extension, public stockholders were given the option to redeem all or a portion of their public shares. A total of nearly 6 million public shares were redeemed, leaving MMAC with about $152 million in cash remaining in trust.

**E. MMAC and Akazoo Incorporate Crowe's Audited Financial Statements in their Registration Statements**

49. On February 12, 2019, MMAC filed a Proxy and Registration Statement with the SEC ("February Registration Statement"). The February Registration Statement was required to obtain shareholder approval from MMAC's existing shareholders and to register the stock investors would receive in Akazoo, S.A.

50.     The February Registration Statement contained Akazoo's 2017 Audit along with Crowe's audit letter. Crowe not only consented to inclusion of its audit, but also Crowe (including partners its U.S. affiliate) reviewed and provided comment on the February Registration Statement.

51.     While Crowe had completed only its 2017 audit as of February 2019, a condition of the merger was completion of the 2018 audit. On June 7, 2019, Crowe completed the 2018 audit. A few days later, Akazoo caused MMAC to file an amended Proxy and Registration Statement with the SEC ("June Registration Statement") that included the 2018 Audit Opinion. The 2018 Audit Opinion was included in subsequent amended Proxy and Registration Statements with the SEC filed on July 30, 2019 ("July Registration Statement") and on August 12 and 14, 2019 ("August Registration Statements") in advance of the merger closing on September 11, 2019.

52.     Crowe signed an express consent to include the 2017 and 2018 Audit Opinions in the various public filings. Crowe's consent itself was included in the filings.

53.     Crowe was provided with drafts of each of these filings. Crowe made comments and suggestions to each one. Crowe also involved Crowe U.S. in reviewing the SEC filings prior to their submission.

**F.      The Truth About Akazoo's Fraud Begins to Emerge**

54.     On April 19, 2020, QCM released an analyst report (the "QCM Report") detailing, among other things, how Akazoo S.A. (as the successor entity to MMAC) misled investors and failed to disclose pertinent information, including: (i) Akazoo S.A. massively overstated its users, subscribers, revenue and profit; (ii) Akazoo S.A. overstated the size of the of the Company and its services; (iii) Akazoo S.A. overstated where the Company's service is actually available; (iv) Akazoo S.A. had been closing offices and losing employees for years; (v) Akazoo S.A. did not

18

specialize in "hyper-local" content; and (vi) Akazoo S.A. did not have lucrative deals with mobile operators in its markets.

55.     On this news, Akazoo S.A. shares fell $0.53 per share over the rest of the trading day and the next trading day, or over 20%, to close at $1.99 per share on April 21, 2020, damaging investors.

56.     On April 22, 2020, during market hours, the Company admitted the credibility of the QCM Report's allegations, announcing in a press release that it had formed an independent special committee to investigate the issues raised by the QCM Report.

57.     On this news, Akazoo S.A.'s share price fell over 16% to close at $1.66 per share on April 22, 2020, further injuring investors. Over the next two days, Akazoo's share price continued to drop, closing at $1.16 per share on April 24, 2020.

58.     On April 24, 2020, the Company disclosed that Alexander Macridis and David Bryan Roche, two of Akazoo S.A.'s directors and members of its Audit Committee, had resigned. Macridis and Roche further confirmed the credibility of the QCM Report, stating the following:

> With regard to the QCM allegations, we are encouraged that the board has adopted our initial position to form a special committee to investigate the extremely serious accusations contained in the QCM report….***We have been clear with the rest of the board from the outset that an independent, forensic and thorough investigation, with complete transparency of results to shareholders, is in the best interests of the Company.***

(Emphasis added).

59.     On May 1, 2020, the Company filed a Form 6-K with the SEC  (the "May 1, 2020 6-K") which announced the termination of Defendant Zervos, the Company's CEO, "for cause" and that investors could not rely on previously issued financial statements. The May 1, 2020 6-K provided the following, in pertinent part:

***Appointment of Interim CEO; Termination of Chief Executive Officer***

On May 1, 2020, the Board of Directors (the "Board") of Akazoo S.A. (the "Company") announced the appointment of Michael Knott as interim Chief Executive Officer, effective immediately. This ***followed the decision by the Board to terminate Apostolos N. Zervos as Chief Executive Officer for cause***. The Board has also requested that Mr. Zervos resign as a member of the Board.

*     *     *

***The Special Committee has nonetheless been unable to verify certain operational and financial information previously reported by the Company. Accordingly, the Special Committee has concluded that the consolidated financial statements (i) of Akazoo Limited for the years ended December 31, 2018, 2017 and 2016 (and any interim periods therein) audited by the Company's former independent registered public accounting firm and included or incorporated by reference in the Company's Shell Company Report on Form 20-F filed with the U.S. Securities and Exchange Commission (the "SEC") on September 17, 2019; (ii) of Akazoo Limited for the three- and six-month periods ended June 30, 2019 and 2018 included in the Company's Report on Form 6-K furnished to the SEC on September 27, 2019; and (iii) of the Company for the three- and nine-month periods ended September 30, 2019 and 2018 included in the Company's Report on Form 6-K furnished to the SEC on December 9, 2019 should no longer be relied upon due to the possibility that such financial statements contain material errors.***

(Emphasis added).

60.     On this news, Akazoo, S.A. shares fell 3% to close at $1.163 per share, further damaging investors, before trading was halted at 9:30 a.m. on May 1, 2020.

61.     On May 21, 2020, Akazoo, S.A. issued a press release, also attached to a Form 6-K filed with the SEC, announcing that the special committee investigation had determined that former Akazoo management and associates participated in a "multi-year fraud." The press release stated, in pertinent part:

NEW YORK and LONDON, May 21, 2020 /PRNewswire/ -- Akazoo S.A. ("Akazoo") today announced that the special committee of independent directors (the "Special Committee") has substantially completed its investigation and determined that ***former members of Akazoo's management team and associates defrauded Akazoo's investors, including the predecessor SPAC acquiring entity***

*Modern Media Acquisition Corp. ("MMAC"), by materially misrepresenting Akazoo's business, operations, and financial results as part of a multi-year fraud.*

*In particular, the Special Committee has determined, among other things, that (i) Akazoo's historical financial statements, which have been audited by multiple, experienced global accounting firms for years, were materially false and misleading; (ii) Akazoo, in fact, has had only negligible actual revenue and subscribers for years; and (iii) former members of Akazoo management and associates participated in a sophisticated scheme to falsify Akazoo's books and records, including due diligence materials provided to MMAC and its legal, financial, and other advisors in connection with the Akazoo business combination in 2019.*

As previously disclosed on April 22, 2020, Akazoo's board of directors formed the Special Committee to investigate allegations in a report released by Quintessential Capital Management on April 20, 2020. The Special Committee took immediate action. On May 1, 2020, Akazoo announced it had terminated Apostolos N. Zervos as Chief Executive Officer for cause, following a recommendation by the Special Committee based on evidence of conduct inconsistent with the Company's policies, including a lack of cooperation in the Special Committee's investigation. The termination of Mr. Zervos for cause was followed by the May 1, 2020 appointment of Michael Knott, a Senior Managing Director at FTI, as interim Chief Executive Officer. The appointment of Mr. Knott significantly expedited the Special Committee's investigation and exposure of the multi-year fraud.

The Company intends to take all available steps to maximize recovery for defrauded investors, including by seeking to unwind the original business combination between MMAC and Akazoo. The Special Committee has also directed its advisors to make referrals to, and cooperate with, appropriate regulators.

Akazoo also announced today that it has received an anticipated letter of delisting from The Nasdaq Stock Market LLC. The Company does not intend to appeal the decision, and as a result, the Company's securities will be suspended from trading on Nasdaq at the opening of business on May 27, 2020.

(Emphasis added).

62.    On June 2, 2020, Akazoo S.A.'s stock was delisted from the NASDAQ exchange,

rendering the stock effectively worthless.

63.    On September 30, 2020, the SEC filed a complaint against Akazoo S.A. in the U.S.

District Court for the Southern District of New York, Case No. 1:20-cv-08101 (AKH) (the "SEC

Action"), charging the Company with violations of Section 17(a) of the Securities Act  15 U.S.C. §77q(a), Section 10(b) of the Exchange Act15 U.S.C. §78j(b), Rule 10-b-5 thereunder, 17 C.F.R. §240.10b-5, and Sections 13(a), 15 U.S.C. §78(m), and 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act, 15 U.S.C. §§78m(b)(2)(A) and (B), and Rules 12b-20, 13a-16, and 13a-19, 17 C.F.R. §§240.12b-20, 240.13a-16, and 240.13a-19. The SEC Action alleged substantially the same course of fraudulent conduct by Akazoo detailed herein.

64.     On October 27, 2021, Final Judgment was entered against Akazoo S.A. in the SEC Action, in the amount of $38.8 million disgorgement of net profits gained because of the fraudulent conduct alleged, to be deemed satisfied upon payment by Akazoo of $35 million in connection with the Partial Settlement.

65.     Since the Business Combination, and as a result of the disclosures of material adverse facts omitted from the Registration Statement, Akazoo S.A.'s stock price traded as low as $1.16 per share, or approximately 78% below the $5.27 price upon the closing of the Business Combination. Since Akazoo S.A.'s stock was delisted from the NASDAQ, it is unmarketable and essentially valueless.

## V.     CROWE'S MATERIALLY FALSE AND/OR MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

### A.     Materially False and Misleading Statements Prior to the Merger

#### 1.     The Registration Statement and Proxy/Prospectus

66.     The Registration Statement was first filed with the SEC on Form F-4 on February 12, 2019. On March 29, 2019, June 11, 2019, July 30, 2019, August 12, 2019, and August 14, 2019, the Company filed amended versions of the registration statement for the merger on Forms F-4/A with the SEC. Amendment No. 5, filed with the SEC on Form F-4/A on August 14, 2019,

was declared effective by the SEC on August 15, 2019. On August 15, 2019, MMAC issued the Proxy Statement with the SEC on Form 424(B)(3). The prospectus was filed with the SEC on Form 424B3 on August 15, 2019. The original Form F-4 and its amendments are collectively referred to herein as the "Registration Statement" and the Form 424(B)(3) is referred to hereinafter as the "Proxy/Prospectus" or the "Proxy Statement."

67.     In a section entitled "Selected Historical Financial Data of Akazoo," the Registration Statement and Proxy/Prospectus highlighted certain financial metrics, including revenue and profit, as to Akazoo's purported growth. Specifically, the Registration Statement and the Proxy/Prospectus presented the following table:

| in thousands, except for per share values | Year Ended December 31, | | |
|---|---|---|---|
| | 2018 | 2017 | 2016 |
| **Statement of Operations Information:** | | | |
| **Revenues** | € 104,837 | € 90,015 | € 68,448 |
| Cost of revenue: | | | |
| Media Costs | (19,138) | (15,378) | (10,960) |
| Other Direct Costs | (62,316) | (53,869) | (41,874) |
| Cost of revenue | (81,454) | (69,247) | (52,834) |
| **Gross profit** | 23,383 | 20,768 | 15,614 |
| Operating expenses | (12,687) | (10,645) | (7,487) |
| Other operating income | 8 | 4 | — |
| Depreciation and amortization | (5,464) | (4,021) | (2,997) |
| **Operating income** | 5,240 | 6,106 | 5,129 |
| Finance cost | (383) | (51) | (352) |
| Finance income | 21 | 171 | 15 |
| **Profit before income tax** | 4,878 | 6,226 | 4,792 |
| Income tax | (10) | (9) | 23 |
| **Net Income** | 4,868 | 6,217 | 4,815 |
| Less: Net loss attributable to non-controlling interest | (1) | (1) | (3) |
| **Net income attributable to common shareholders** | 4,867 | 6,216 | 4,812 |
| Weighted average shares outstanding | | | |
| Basic and diluted | 4,105,706 | 4,105,706 | 4,105,706 |
| Net income per share available to common shareholders (1) | € 1.19 | € 1.51 | € 1.17 |

(1) LuxCo will acquire the entire issued share capital of Akazoo in consideration for issuing on a 100-for-1 basis ordinary shares of LuxCo to Akazoo shareholders in the Share Exchange. The net income per LuxCo share after giving effect to the Share Exchange for 2018 would have been € 0.0119.

68.     The Registration Statement and Proxy/Prospectus specifically highlighted Akazoo's purported revenue and EBITDA, stating:

> ***For the years ended December 31, 2018 and 2017, Akazoo generated revenues of approximately €104.8 million and €90.0 million, respectively.*** For the years ended

December 31, 2018 and 2017, Akazoo generated EBITDA of €10.7 million and €10.1 million, respectively. *Since 2010, Akazoo has expanded in a profitable manner to 25 markets to date without offering a "freemium" model but by adapting its services for local tastes and consumption.*

(Emphasis added).

69.      As to Akazoo's revenue growth and gross profit, the Registration Statement and

Proxy/Prospectus stated, in relevant part:

*For the year ended December 31, 2018 as compared to 2017, Revenue increased €14.8 million, or 16%, driven by an increase in Subscribers and a slight increase in overall ARPU* [Average Revenue Per User]. The Company managed its growth in 2018, as a result of limited access to growth capital.

*For the year ended December 31, 2017 as compared to 2016, Revenue increased €21.6 million or 32%, driven primarily by an increase in Subscribers, partly offset by a decrease in ARPU.* In addition, the Radio Service delivered its first, although minor, revenues in 2017.

\*          \*          \*

**Gross Profit and Gross Margin**

*For the year ended December 31, 2018 as compared to 2017, gross profit increased €2.6 million, or 13%,* and gross margin decreased slightly from 23% to 22% due to increased spending for customer acquisition.

*For the year ended December 31, 2017 as compared to 2016, gross profit increased €5.2 million, or 33%,* and gross margin remained constant at 23%. . . .

(Emphasis added).

70.      The foregoing statements were materially false and/or misleading, lacked a

reasonable basis, and/or failed to disclose material adverse facts pertaining to the Company's

business, operations, and prospects, because, as the Company has admitted: (1) Akazoo materially

overstated its revenue, profits, and cash holdings; (2) Akazoo did not operate in 25 countries; (3)

Akazoo was not "profitable"; (4) Akazoo materially overstated its user base; (5) Akazoo did not

have a "hyper-local" focus or abilities that allowed it to cater its services to emerging markets; (6)

24

Akazoo vastly overstated its claimed size, growth rate, and geographical reach; (7) Akazoo held significantly fewer distribution rights than it claimed; (8) Akazoo had had negligible revenue and subscribers for years; (9) Akazoo had been continuously losing employees and closing offices for years; (10) Akazoo's value was not equal to at least 80% of the value of MMAC's net assets; and (11) MMAC had not conducted proper due diligence of Akazoo.

71.     The Registration Statement and Proxy/Prospectus included a quarterly update from Akazoo, with preliminary financial results for its quarter ended March 31, 2019. Additionally, the Registration Statement and Proxy/Prospectus included the following chart of Akazoo's revenue forecast, which had been provided to MMAC's Board of Directors, MMAC's financial advisors, and MMAC's management in connection with the business combination:

| (€ in millions) | Fiscal Year Ending December 31, | | | | | | 16A -'18E CAGR | 18E - '21E CAGR |
|---|---|---|---|---|---|---|---|---|
| | 2016A | 2017A | 2018A | 2019E | 2020E | 2021E | | |
| Total Revenues | 68 | 90 | 105 | 134 | 203 | 285 | 24% | 40% |
| % Growth | | 32% | 16% | 28% | 51% | 40% | | |

72.     The foregoing statements about Akazoo's financial results and the Company's financial projections were materially false and misleading because, as the Company has admitted: (1) as reflected in the May 1, 2020 6-K, the consolidated financial statements of Akazoo for the years ended December 31, 2018, 2017 and 2016 and any interim periods therein, and for the three and six-month periods ended June 30, 2019 and 2018, included in the Company's September 2019 6-K were materially false and misleading; (2) the Company's consolidated financial statements for the three and nine-month periods ending September 30, 2019 and 2018, included in the Company's December 9, 2019 6-K were materially false and misleading; and (3) as reflected in the Company's May 21, 2020 press release, Akazoo had had negligible actual revenue and subscribers for years.

73.     Further, the foregoing statements were materially false and/or misleading, lacked a reasonable basis, and/or failed to disclose material adverse facts pertaining to the Company's

business, operations, and prospect, because, as the Company has admitted: (1) Akazoo did not operate in 25 countries; (2) Akazoo materially overstated its user base; (3) Akazoo did not have a "hyper-local" focus or abilities that allowed it to cater its services to emerging markets; (4) Akazoo vastly overstated its claimed size, growth rate, and geographical reach; (5) Akazoo held significantly fewer distribution rights than it claimed; (6) Akazoo had had negligible revenue and subscribers for years; and (7) Akazoo had been continuously losing employees and closing offices for years.

### 2. Crowe Falsely Certified the Accuracy of Akazoo's Financial Statements Contained in the Registration Statement

74.    In connection with the Business Combination, Crowe certified the accuracy of the information in Akazoo's financial statements, including Akazoo's financial statements for the periods ended December 31, 2018, 2017 and 2016 and any interim periods therein. These financial statements were included and incorporated by reference into the Registration Statement.

75.    Specifically, the Registration Statement contained a report from Crowe, as Akazoo's independent registered accounting firm (the "2018 Audit Opinion"), which stated in relevant part:

> We have audited the accompanying consolidated statement of financial position of Akazoo Limited (the "Company") and its subsidiaries (together with the Company, the "Group") as of December 31, 2018, 2017 and 2016 and the related consolidated statements of profit or loss and other comprehensive income, changes in equity and cash flows for each of the three years in the period ended December 31, 2018, 2017 and 2016 and the related notes numbered 1 to 21 (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the consolidated financial position of the Group as at December 31, 2018, 2017 and 2016 and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2018, 2017 and 2016 in conformity with International Financial Reporting Standards, as adopted in the European Union.

> **Basis of Opinion**

\*     \*     \*

Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

We have served as the Company's auditor since 2015.

76.     The Registration Statement also stated:

## EXPERTS

The balance sheet of Akazoo and its subsidiaries as of December 31, 2018, 2017 and 2016 and the related consolidated statements of profit or loss and other comprehensive income, changes in equity and cash flows for each of the three years in the period ended December 31, 2018, 2017 and 2016 included in this proxy statement/prospectus has been audited by Crowe U.K. LLP, an independent registered public accounting firm as stated in their report appearing herein and is included upon reliance of the report of such firm given upon their authority as experts in accounting and auditing.

77.     The foregoing 2018 Audit Opinion was materially false and misleading because

Crowe certified Akazoo's financial statements as materially accurate notwithstanding that, as the

Company admitted, Akazoo had materially overstated its financial results, including its profits,

revenues, and cash holdings; as reflected in the May 1, 2020 6-K and May 21, 2020 press release,

Akazoo had had negligible actual revenue for years, and the consolidated financial statements of

Akazoo for the years ended December 31, 2018, 2017 and 2016 and any interim periods therein

were materially false and misleading and could not be relied upon.

**B.      Crowe Misrepresented that it Followed Auditing Standards**

**1.      Crowe's Duties Under Applicable Auditing Standards'**

78.      Crowe was required to obtain an understanding of Akazoo's business, assess the risk of material misstatement of Akazoo's financial statements under audit, and obtain sufficient appropriate audit evidence in response to the assessed risks, which would have included the that Akazoo's balances for revenues and accounts receivable could be materially misleading and/or misstated, in violation of International Financial Reporting Stardards ("IFRS").

79.      An audit is a risk-driven process. An auditor is required to obtain an understanding of the entity and its environment, including internal controls relevant to the audit, to identify and assess the risks of material misstatement and to plan and perform the audit to respond to those risks. Risk assessment should consider information an auditor obtained during the client acceptance and retention evaluation. Obtaining an understanding of an entity includes understanding the nature of the company's activities, sources of its earnings, including the relative profitability of key products and services, and identifying key supplier and customer relationships.

80.      Obtaining an understanding of internal controls involves evaluating the design of relevant internal controls and determining whether they have been implemented (*i.e.,* whether the controls exist and are being used by the company). It also includes obtaining an understanding of a company's information system, including business processes relevant to financial reporting, to identify significant transaction and to understand how transactions are initiated, authorized, processed, recorded, and reported.

81.      When, while assessing risk of material misstatement, an auditor identifies significant risks (*i.e.,* those which require special audit consideration), an auditor is required to obtain an understanding of the relevant internal controls mitigating this risk and perform

substantive procedures (tests of details of accounts and disclosures and analytical procedures) which are specifically responsive to such special risks. Moreover, an auditor is required to perform substantive procedures for each material balance, class of transactions or disclosure. When substantive procedures alone cannot provide sufficient appropriate audit evidence, or when an auditor plans to rely on controls, an auditor is required to test internal controls (*i.e*., obtain evidence about the effectiveness of design and operation of internal controls).

82.     Crowe represented that it conducted the 2018 Audit by following the PCAOB auditing standards and the parallel ISAs (UK). Both sets of standards require that an auditor seek confirmation of the sorts of balances allegedly owed to Akazoo by the aggregators, and both sets of standards required that the auditor control the process by which that information is obtained, reviewed, and verified. In fact, under the PCAOB's standards there is a "presumption that the auditor will request the confirmation of accounts receivable during an audit." AS 2310.34. The rules are clear that an auditor must "maintain control" over the confirmation process which in turn is defined as "establishing ***direct communication*** between the intended recipient and the auditor" to minimize the possibility of fraud. AS 2310.28 (emphasis added). Crowe completely abdicated the confirmation process to Akazoo management and had no direct communication with the aggregators.

<blockquote>

a)      **Crowe Failed to Exercise Minimally Reasonable Professional Skepticism in Violation of Applicable Audit Standards and Professional Responsibilities**

</blockquote>

83.     An auditor is required to exercise due professional care in the planning and performance of the audit and the preparation of the audit report. AS 1015.01. Due professional care requires the auditor to exercise professional skepticism, which is an attitude that includes a questioning mind and a critical assessment of audit evidence. AS 1015.07. (See also ISAs (UK)

200 ¶¶ 15 and A20 – A24) "The auditor should conduct the engagement with a mindset that recognizes the possibility that a material misstatement due to fraud could be present, regardless of any past experience with the entity and regardless of the auditor's belief about management's honesty and integrity. Furthermore, professional skepticism requires an ongoing questioning of whether the information and evidence obtained suggests that a material misstatement due to fraud has occurred. In exercising professional skepticism in gathering and evaluating evidence, the auditor should not be satisfied with less than-persuasive evidence because of a belief that management is honest." AS 2401.13. (See also ISAs (UK) 240 ¶¶ 12, A7 – A8)

84.     Auditing accounts receivables primarily involves obtaining sufficient appropriate audit evidence regarding their existence (that they exist at the financial statement date) and valuation (that they have been included in the financial statements at appropriate amounts). Confirmation of accounts receivable is a generally accepted auditing procedure and it is presumed that an auditor will confirm accounts receivable. AS 2310.34. When properly designed, confirmations could address both existence and valuation. AS 2310.12.

85.     Although, additional procedures may be necessary. In the case of Akazoo, confirmations alone, without obtaining an understanding of internal controls at the aggregators and obtaining evidence of operating effectiveness of internal controls or performing substantive tests at the aggregators, did not provide auditors with sufficient appropriate audit evidence.

86.     An auditor is required to exercise the appropriate level of professional skepticism throughout the confirmation process (designing the confirmation request, performing the confirmation procedures, and evaluating the results of the confirmation procedures). AS 2310.15. The responses Crowe received to its confirmations should have raised red flags with the auditors and required appropriate follow up.

87.     Bad debt expense and the allowance for doubtful accounts is typically present in every company. However, in Akazoo's case there were none. Meaning, the Company claimed not to have experienced any credit losses. Auditing standards require an auditor to ensure that all accounting estimates that could be material to the financial statements, such as the allowance for doubtful accounts, have been developed by the company, evaluate whether management's estimates are reasonable, were performed in conformity with the accounting principles and are properly disclosed in the financial statements. AS 2501.07. (ISAs (UK) 330 ¶¶ 19R-1 and 540 ¶¶ 12. and 19.) Typically, when testing valuation of receivables, an auditor examines management's estimate of the allowance for doubtful accounts.

88.     Beginning in 2018, Akazoo adopted International Financial Reporting Standards ("IFRS") 9 for measuring credit losses which changed the approach to measurement of credit losses from incurred to expected. However, Akazoo disclosed in its financial statements that this change did not have a significant impact on the company:

> During the year, the Group and Company has adopted IFRS 9 Financial Instruments and IFRS 15 Revenue from Contracts with Customers from 1 January 2018. Their adoption has not had any significant impact on the amounts reported in these financial statements but may impact the accounting for future transactions and arrangements:
> IFRS 9 - *Financial Instruments effective for accounting period commencing on or after 1 January 2018.*
>
> The Group and Company adopted IFRS 9 from 1 January 2018 with retrospective effect in accordance with the transitional provisions.
>
> IFRS 9 supersedes IAS 39 Financial Instruments: Recognition and Measurement with new requirements for the classification and measurement of financial assets and liabilities, impairment of financial assets and hedge accounting. IFRS 9 introduces a new forward-looking impairment model based on expected credit losses to replace the incurred loss model in IAS 39. This determines the recognition of impairment provisions as well as interest revenue.

The Group and Company's principal financial assets are cash and cash equivalents and receivables.

The Group and Company has assessed the impact of IFRS 9 on the impairment of its financial assets, including the trade receivables balance. The Group revised its impairment methodology to the simplified approach of the expected credit loss model based on default rate percentage of similar product type assets (provision matrix) and grouped the trade receivables based on shared characteristics, including line of business, and days past due. Based on the Group and Company's historical credit loss experience the adoption of IFRS 9 causes no material impact on the financial statements, so the prior year financial statements have not been restated.

(June 11, 2019 Form F-4 (Amend No. 2), pg. F-8)

89.    Akazoo's disclosures in its financial statements (both before and after the adoption

of IFRS 9) reveal the Company's purported process for valuation of its receivables, which

ultimately relied on estimates of future cash flows:

Valuation of receivables

Valuation of receivables is based upon ongoing assessments of the probable estimated losses inherent in the receivable's portfolio. Assessments are conducted by the board employing a methodology and guidelines, which are continually monitored and improved. The primary component of this methodology comprises the general provision matrix approach by which management considers the calculation of an impairment loss based on the historical default rate percentage applied to groups of receivables segmented by product type.

The Group has adopted the simplified expected credit loss model for its trade receivables and contract assets, as required by IFRS 9 to assess impairment, for further information see Note 19.

In assessing the need for general provision, management considers historical default rates of receivables in arrears over 121 days but excludes receivables for which there are valid indications that they will be collected.

Additionally management considers claims evaluated individually for impairment **based upon best estimate of the present value of the cash flows which are expected to be received.**

Amounts individually provided for concern claims evaluated individually for impairment **based upon management's best estimate of the present value of the cash flows which are expected to be received.**

32

*The accuracy of provisions depends on the accuracy of future cash flows for specific allowances and the model assumptions and parameters used in determining collective allowances.* While this necessarily involves judgement, Management believes that their provisions are reasonable and supportable.

(Emphasis added.)(June 11, 2019 Form F-4 (Amend No. 2), pg. F-17)

90.    Similar disclosures appeared in the Company's 2017 financial statements filed as part of the initial registration statement and amendment No. 1 (pages F-13). Akazoo's 2018 financial statements included the following additional disclosures:

### 10. TRADE AND OTHER RECEIVABLES

The Group's normal trade credit term is on average 60 days. Other credit terms are assessed and approved on a case-by case basis. Trade receivables past due for more than 90 days but not impaired were less than 9% (2017: 14%) of total trade receivables and relate primarily to commercial agreements whose payment patterns differ to normal credit terms and have a low risk of default. **There are no impaired receivables and as such no bad debt provisions have been recognised.**

The fair value of trade receivables approximates their carrying amount, as the impact of discounting is not significant. No interest has been charged to date on overdue receivables.

(Emphasis added.)(June 11, 2019 Form F-4 (Amend No. 2), pg. F-23)

91.    Even though no cash had been collected on receivables from the aggregators, Akazoo did not record any allowance for doubtful accounts while supposedly employing a valuation methodology which relied on estimates of future cash flows.

92.    Auditing standards require an auditor to perform one or a combination of the following approaches when evaluating reasonableness of management's estimates, such as an allowance for doubtful accounts:

    a.    Review and test the process used by management to develop the estimate.

    b.    Develop an independent expectation of the estimate to corroborate the
        reasonableness of management's estimate.

33

      c.     Review subsequent events or transactions occurring prior to the date of the auditor's report. AS 2501.10

93.     The above steps may involve identifying controls over the preparation of estimates, analyzing historical data, and assessing whether such data is comparable, consistent, and reliable to perform an estimate, and evaluating subsequent events (*e.g.,* subsequent cash collections or a lack thereof) to support the valuation of receivables. AS 2501.11 - .13. (*See also* ISAs (UK) 540 ¶¶ 9, 13.)

94.     An auditor is required to maintain professional skepticism throughout the audit and in particular when reviewing management estimates relating to fair values, the impairment of assets and provisions. ISAs (UK) 540 ¶ 21D-1. An auditor should consider, with an attitude of professional skepticism, both the subjective and objective factors when planning and performing procedures to evaluate accounting estimates. AS 2501.04. Crowe knew that there were no cash collections on accounts receivable from Akazoo's principal aggregators and that these accounts were routinely reduced through putative settlements. Had Crowe performed any of the above steps with the appropriate level of professional skepticism, as it was required to do, it would have discovered Akazoo's receivables were overvalued and the disclosures in Akazoo's financial statements related to management's valuation of its receivables were false and misleading.

      **b)**     **Crowe's Responsibility to Obtain Adequate Audit Evidence Regarding Akazoo's Reliance On So-Called "Aggregators"**

95.     Under applicable AS, Crowe was obligated to consider specific factors in auditing the financial statements of any entity that utilizes a "service organization" to process certain transactions. *See generally,* AS 2601, *Consideration of an Entity's Use of a Service Organizations.* A "service organization" includes any "entity (or segment of an entity) that provides services to a

user organization that are part of the user organization's information system." AS 2601.02. Services are considered part of an entity.

96.     "Many entities outsource aspects of their business to organizations that provide services ranging from performing a specific task under the direction of an entity to replacing an entity's entire business units or functions, such as the tax compliance function. Many of the services provided by such organizations are integral to the entity's business operations; however, not all those services are relevant to the audit." (ISA (UK) 402 ¶ 2) An entity that uses a service organization and whose financial statements are being audited is referred to as a User Entity or User Organization and its auditor as a User Auditor. (ISA (UK) 402 ¶ 8; AS 2601 ¶ .02) "Services provided by a service organization are relevant to the audit of a user entity's financial statements when those services, and the controls over them, are part of the user entity's information system, including related business processes, relevant to financial reporting." (ISA (UK) 402 ¶ 3)

97.     An outside entity is deemed to be part of the audited entity's "information system" if it affects any of the "classes of transactions… that are significant to the entity's financial statements," the "procedures… by which the entity's transactions are initiated, recorded, processed, and reported," the "related accounting records… and specific accounts… involved in initiating, recording, processing and reporting the entity's transactions, " how the entity's information system "captures other events and conditions that are significant to the financial statements," and/or "[t]he financial reporting process used to prepare the entity's financial statements, including significant accounting estimates and disclosures." AS 2601.03.

98.     As part of obtaining an understanding of the user organization and its environment, including internal controls relevant to the audit, a user auditor should obtain an understanding of the nature of the services performed by a service organization, the degree of interaction between

the user organization and the service organization, and internal controls placed in operation by user entity and by the service entity. In instances when, as was the case with Akazoo, a service organization initiates, executes, and does the accounting processing of the user organization's transactions, there is a lower degree of interaction, and it may not be practicable for the user organization to implement effective controls for those transaction. The user auditor (*i.e*., Crowe) should consider the effect of the service organization on the user organization (*i.e.*, Akazoo)'s internal control and the availability of audit evidence. Such information should be considered by the user auditor in identifying and assessing the risks of material misstatement and designing and performing audit procedures responsive to those risks. In other words, information about a service organization is necessary to plan and perform the audit.

99.    When information about the services provided by the service organization or about the internal controls at the service organization is not available from the user organization or from other sources, the user auditor may obtain such information by either contacting the service organization through the user organization, or by requesting that the service organization engage an auditor (a service auditor) to perform procedures that will supply the necessary information to the user auditor. Similarly, a service auditor may be requested to perform certain substantive tests or tests of internal controls at the service organization. Alternatively, the user auditor may itself visit the service organization to carry out the necessary procedures.

100.    If the user auditor is unable to obtain sufficient evidence to achieve his or her audit objectives, the user auditor should qualify his or her opinion or disclaim an opinion on the financial statements because of a scope limitation. Because of the significance of the services performed by the aggregators to Akazoo's financial statements, Crowe should have disclaimed an opinion on Akazoo's financial statements.

101.    Crowe evidently failed to comply with any of the above requirements with respect to Akazoo's relationships with its three principal "aggregators"—Smart Mobile, Aragona, and Zed Media. Rather, Crowe treated these organizations simply as "customers" of Akazoo, even though Crowe acknowledged—including in their 2018 Audit Findings Report ("AFR")—that Akazoo's trade receivables "***predominantly relate to the three key aggregators***" and that "***each also provides services to Akazoo [Limited]***" and that "settlement of receivables was often achieved in part by ***offsets against related costs/liabilities and third-party settlement agreements***." Despite identifying "revenue recognition" and "recoverability of trade receivables" and their two top "key audit matters" on the engagement, Crowe failed to investigate the "aggregators" or establish any understanding of the aggregators' overall business or internal controls, as requires by AS 2601 and ISA (UK) 402. In its discussion for recovery of trade receivables, Crowe noted that, "a number of balances in relation to" Zed Media, Smart, and Aragona had "effectively been settled by non-cash transactions" in "three categories": (1) revenues offset against liabilities to the same aggregator for "content costs, advertising and leased lines," (2) revenue shares owing to the same aggregators under revenue sharing arrangements, and (3) and "Tri-Party settlement agreement" in which receivable ostensibly due to Akazoo from the aggregator were offset against a liability due from Akazoo to a third-party.

102.    The net effect of these arrangements was that Akazoo booked most of its revenues in the form of trade receivables ostensibly collectible from its three principal aggregators—while also booking substantially all its costs as offsets against those aggregator's receivables, which were either paid to or by the aggregator and offset directly or swapped by to the aggregators in exchange for concomitant offsets. Thus, the same three "aggregators" provided substantially all Akazoo's recorded revenues, while paying substantially all Akazoo's recorded costs, to themselves or others.

103.     Crowe appreciated the unusualness of this arrangement, and its significance to the overall financial statements, as Crowe noted, "Each of these factors is critical to understand the movement in receivable during the year and ***the extent to which cash has not necessarily been received from customers and/or paid*** to suppliers/service providers." Crowe's 2018 AFR provided a handful of examples of such "Tri-Party agreements, " for which it specifically and repeatedly represented, "***agreements have been obtained***", without disclosing the nature of the process by which the "agreements" were obtained or what, if any, independent confirmation Crowe might have conducted with respect to these unusual and highly-material transactions. Crowe noted that it "asked [Akazoo's] Management about the set-off arrangements/agreements…   [and] Management noted that [the agreements provide for] transfer of one party's 'any and all of our claims' top the other party who accepts 'any and all of our liabilities' and ***they consider default risks… covered without any residual risk arising to Akazoo [Limited]***." Crowe further noted they would seek representation from Management with respect to the matters.

104.     The above standards required Crowe to conduct a reasonable investigation and obtain independent verification that Akazoo's reported aggregators (and the financial results associated with them) were real and not misleading. Crowe did next to nothing, and what little Crowe did would raise glaring, red flags to any competent financial auditor.

105.     Crowe's 2018 Audit work was performed between February 2019 and June 2019. Although Crowe commenced its audit fieldwork in February, Akazoo was not able to provide Crowe with comprehensive financial statements and ledgers to support its audit until at least April 2019. Accordingly, Crowe began its substantive audit work in May 2019, at which point the Company began demanding Crowe accelerate its audit procedures to meet an early June 2019 filing deadline with the SEC. The bulk of the actual audit work was done by one employee from

Crowe's affiliate in Greece, named Despina Markopoulou, which was ostensibly then reviewed by an audit partner and manager from Crowe prior to signing off on the Crowe audit letter on June 7, 2019.

106.    While Crowe initially provided draft confirmation letters to Akazoo in mid-February 2019, Ms. Markopoulou was still awaiting confirmation of various amounts reflected on the then-existing financial statements—the most significant of which were receivables reportedly owed to Akazoo by the aggregators—in late March 2019. Ms. Markopoulou e-mailed Akazoo regarding confirmation letters on March 27, 2019, inquiring as to whether the letters had been sent, and noting that she did not appear to have been copied, if they had:

Message
_____

From:          Despina Markopoulou [dmarkopoulou@solcrowe.gr]
Sent:          3/27/2019 11:39:48 AM
To:            Vassiliki Prifti [v.prifti@akazoo.com]
CC:            Paris Triantafyllidis [p.triantafyllidis@akazoo.com]; Ioannis Laoupis [i.laoupis@akazoo.com]; palamanos
               [palamanos@solcrowe.gr]; dsamoilis [dsamoilis@solcrowe.gr]; sbakas [sbakas@solcrowe.gr]; Evangelia Kardakari
               [ekardakari@solcrowe.gr]; Andreas A. Alamanos [analamanos@solcrowe.gr]; Joanne Beckley
               [Joanne.Beckley@crowe.co.uk];  Nigel Bostock [Nigel.Bostock@crowe.co.uk]
Subject:       Akazoo confirmation letters
Attachments:   CROWE.png


Hello Vasiliki


Just a quick question,

Have you sent all the confirmation letters via email? because I havent been cc'd to anything.

Thank you in advance

--
Kind regards,


**Despina Markopoulou**
Certified Public Accountant




**SOL S.A.**
Member of Crowe Global Network
3 Fokionos Negri str.
112 57, Athens - Greece

107.    Mrs. Markopoulou initially told Akazoo that Crowe would "assist [them]  with this process"—though, crucially, independently obtaining audit evidence sufficient to support these figures is ***required*** under relevant auditing standards.  Crowe should have controlled the "process" and grew frustrated because Crowe lacked any means to contact the three primary aggregators:

**From:** Despina Markopoulou <dmarkopoulou@solcrowe.gr>
**Sent:** Wednesday, March 27, 2019 2:06 PM
**To:** Vassiliki Prifti <v.prifti@akazoo.com>
**Cc:** Paris Triantafyllidis <p.triantafyllidis@akazoo.com>; Ioannis Laoupis <i.laoupis@akazoo.com>; palamanos <palamanos@solcrowe.gr>; dsamoilis <dsamoilis@solcrowe.gr>; sbakas <sbakas@solcrowe.gr>; Evangelia Kardakari <ekardakari@solcrowe.gr>; Andreas A. Alamanos <analamanos@solcrowe.gr>; Joanne Beckley <Joanne.Beckley@crowe.co.uk>; Nigel Bostock <Nigel.Bostock@crowe.co.uk>
**Subject:** Re: Akazoo confirmation letters


Yes we said that we will assist you with this process because things were quite hectic for you.


Bearing in mind that you didnt provide us with all the relevant e-mail addresses, and  even though it was quite time consuming for us we have managed to gather only <u>some</u> of the email addresses.


Unfortunately we are unable to find all  the correct e-mail addresses from the audited invoices as you have suggested.

108.     In response, Akazoo requested that Ms. Markopoulou provide *Akazoo* with a list of the addresses Crowe had "already gathered." Ms. Markopoulou responded that Crowe had assembled a list of emails "through our research from invoices/relevant sites." The attached list reveals that ***Crowe was unable to independently locate*** contact information for Smart Mobile, Aragona, or Zed Media, Akazoo's ***three principal aggregators.*** Ms. Markopoulou copied Nigel Bostock, the Crowe audit partner ultimately responsible for the Akazoo audit, and his subordinate, Joanne Beckley. Akazoo provided Crowe with a single e-mail address for each of its major aggregators. All three of Aragona, SmartMobile, and Zed Media were identified by Akazoo as ***both customers and suppliers***:

41

Message

| | |
|---|---|
| **From:** | Vassiliki Prifti [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=8B5B52D0F08C485DB062CA4FEA5FE8FB-VASSILIKI P] |
| **Sent:** | 3/28/2019 4:26:03 PM |
| **To:** | Maria Tsakiri [m.tsakiri@akazoo.com] |
| **CC:** | Ioannis Laoupis [i.laoupis@akazoo.com]; Paris Triantafyllidis [p.triantafyllidis@akazoo.com] |
| **Subject:** | Audit 2018_DwC 31.12.2018_Akazoo Confirmation Letters |
| **Attachments:** | DwC_Confirmation letters.zip |

DwC – Customers:
> ARAGONA ENTERPRISES LTD
> SMARTMOBILE COMMUNICATIONS PTE LTD
> PROMINDUSTRY LTD
> SOLUTION SYSTEM TOUCHMEDIA SDN BHD
> MINIMOB LIMITED

DwC – Suppliers:
> GRANT THORNTON
> DUBAI WORLD CENTRAL
> ARAGONA ENTERPRISES LTD
> SMARTMOBILE COMMUNICATIONS PTE LTD
> APRA-AMCOS
> CRYONERI LTD
> ONE STOP MUSIC BERHAD
> PROGRESS CONSULTING LTD

> **CY – Customers:**
  - MDI LTD
  - INTERNETQ GMBH
  - ZED MEDIA LTD
  - INTERNETQ AE
  - VEOO LTD

> **CY – Suppliers:**
  - E.A CORPORATE SERVICES LIMITED
  - LAMDA HELLIX
  - JAN SUVAK
  - INTERNETQ AE
  - MERLIN BV
  - ELMI SYSTEMS
  - DIYOMI SOFT LIMITED
  - INTERNETQ GMBH
  - WEA RECORDS
  - ONERPM LIMITED
  - THE ORCHARD
  - SONY MUSIC ENTERTAINMENT
  - GOTHAM ENERGY TRADE & LOGISTICS LLC
  - GPSOLUTIONS.COM LTD
  - A-TRY TELECOMMUNICATIONS CO.LTD
  - ZED

(Highlighting added).

42

109.    As of March 2019, Crowe had previously audited Akazoo's financials for 2016 and 2017. In each year, the same three aggregators accounted for the lion's share of Akazoo's reported business. In late March and early April of 2019, Akazoo — not Crowe — wrote emails to the three aggregators seeking confirmation of the receivable balances owed by each to Akazoo as of December 31, 2018. Crowe was ***_copied_*** on the emails. Smart Mobile, along with Aragona, eventually returned signed confirmations to Akazoo, notwithstanding that the letters themselves indicated that the confirmations should be sent directly to Crowe. Zed Media failed to respond at all until, after Crowe requested follow up on the account on May 17, 2019.

110.    As of April 2019, Crowe made no effort whatsoever to communicate directly with the aggregators. Even if Crowe had wanted to engage in such communications, it lacked any contact information by which Crowe could have reached out to the aggregators. Crowe attempted to locate contact information independently and found none. This alone should have presented a huge, red flag prompting further independent inquiry to confirm the legitimacy of the putative aggregators' responses.

111.    Additional red flags occurring during Crowe's audit included an undocumented "post year-end collection" of $4.3 million Euros from Aragona Enterprises in March 2018, which was subsequently backdated to year-end 2018:

Message
_____

| | |
|---|---|
| **From:** | Despina Markopoulou [dmarkopoulou@solcrowe.gr] |
| **Sent:** | 7/22/2019 8:28:37 AM |
| **To:** | Vassiliki Prifti [v.prifti@akazoo.com] |
| **CC:** | Paris Triantafyllidis [p.triantafyllidis@akazoo.com]; Evangelia Gogou [e.gogou@akazoo.com]; Joanne Beckley [Joanne.Beckley@crowecw.co.uk] |
| **Subject:** | Akazoo DWC |
| **Attachments:** | CROWE.png |
| | |
| **Flag:** | Follow up |

Hello Vassiliki,


For the finalisation of Akazoo DWC 2017  can you please provide us with the following

1. The amount of adjustments (grossing up revenue)

| Dr | Direct Cost (Other costs) | 11,090,804 |
|---|---|---|
| Cr | Revenue | 11,090,804 |

can you send us details of the amount?

2. For leased lines amounts to AED 2,226,672, the contents were invoiced to DWC. However the costs of the same amount were recharged back. In the report as well we have presented them as part of transactions with related parties, classified them as revenue with the Akazoo Cyprus. If you had a chance to have a look at the TB in the financials for DWC, there was an adjustment passed of the same amount as well.


Dr Trade payables  2,226,672

Cr Trade receivables  2,226,672

3. Lastly, on the subsequent collections of receivables, there was a post year-end collections of AED 4,338,556 from Aragona Enterprises Ltd on March 2018. Would highly appreciate if I could obtain the bank statements, which I believe you already have, to verify this amount.

Thank you

--
Kind regards,

**Despina Markopoulou**
Certified Public Accountant



(Highlighting added).

112.    During Crowe's audit, it became clear that the balances confirmed by Smart Mobile

and Aragona were in fact ***incapable*** of being reconciled. The "confirmation" Akazoo sent to Zed

Media also contained a wildly incorrect amount owed as of December 31, 2018. Akazoo's management later attempted to explain this away by taking the position that the "confirmations" represented activity for the first half of 2018 and that Akazoo's internal records were out-of-date. Stated differently, Akazoo itself told Crowe that its own financial records as of late March 2019 were missing _**half a year**_ (or, per Akazoo's contemporaneous financial reports, _**tens of millions of dollars**_) in revenue and receivables from the prior year. It is difficult to imagine a more significant "red flag" that would be expected to trigger further audit inquiry.

113.    Zervos and Paris—who were distracted from November 2018 to March 2019 with the merger—forgot to create fake reports from the aggregators for the second half of 2018 showing alleged billings collected from subscribers. Until Akazoo received these reports, Akazoo's finance department would not be able to generate invoices to the aggregators for resulting receivables due as of December 31, 2018. In late April 2019, Zervos and Paris had the finance staff within Akazoo "request" that the aggregators provide such reports and backdate them to look like they were sent monthly during the second half of 2018, and then once the reports were received, generate backdated invoices to the aggregators for tens of millions in receivables.

114.    Similarly, Zervos and Paris neglected to create documentation of the aggregators "settling" with third parties to offset a significant portion of Akazoo's reported receivables. Absent such offsetting "settlements", the amounts owed by the aggregators would have been staggering. Again, Zervos and Paris prepared the relevant documents in late April through mid-May of 2019, but subsequently backdated the agreements for December 31, 2018.

115.    In or around mid-May 2019, Ms. Markopoulou began to inquire about the confirmations from Smart Mobile and Aragona. For example, on May 16, 2019, she wrote an email to Akazoo explaining that the confirmation for Smart Mobile "came back for not finding the

45

recipient. Please provide the contact information to confirm the existence of the above." Rather than providing Ms. Markopoulou with new contact information for Smart Mobile, Akazoo simply sent her copies of the false confirmations allegedly received from Smart Mobile. The amounts on these confirmations no longer reconciled with Akazoo's "updated" financial records:

---

Message

| | |
|---|---|
| **From:** | Despina Markopoulou [dmarkopoulou@solcrowe.gr] |
| **Sent:** | 5/22/2019 1:58:57 PM |
| **To:** | Vassiliki Prifti [v.prifti@akazoo.com]; Maria Tsakiri [m.tsakiri@akazoo.com] |
| **CC:** | Paris Triantafyllidis [p.triantafyllidis@akazoo.com]; sbakas [sbakas@solcrowe.gr]; Joanne Beckley [Joanne.Beckley@crowe.co.uk]; Joel Gelderd [Joel.Gelderd@crowe.co.uk]; dsamoilis [dsamoilis@solcrowe.gr]; Ioannis Laoupis [i.laoupis@akazoo.com]; gmoundros [gmoundros@solcrowe.gr] |
| **Subject:** | Re: AKAZOO audit |
| **Attachments:** | CROWE.png; AKAZOO checks v2.xlsx |

Hello

Please find attached the differences we found between MMR, TBs, FA registries, and aging.

Can you please explain the differences?

Thank you

Despina

---

**Από:** "dmarkopoulou" <dmarkopoulou@solcrowe.gr>
**Προς:** "Vassiliki Prifti" <v.prifti@akazoo.com>, "Maria Tsakiri" <m.tsakiri@akazoo.com>
**Cc:** "Paris Triantafyllidis" <p.triantafyllidis@akazoo.com>, "sbakas" <sbakas@solcrowe.gr>, "Joanne Beckley" <Joanne.Beckley@crowe.co.uk>, "Joel Gelderd" <Joel.Gelderd@crowe.co.uk>, "dsamoilis" <dsamoilis@solcrowe.gr>, "i laoupis" <i.laoupis@akazoo.com>, "gmoundros" <gmoundros@solcrowe.gr>
**Απεσταλμένα:** Τετάρτη, 22 Μάιος, 2019 2:01:45 μ.μ.
**Θέμα:** AKAZOO REVENUES

Hello all,

We have compared the total revenues as it is depicted in segment analysis compared to the stats that Maria sent us.

Can you please explain the differences? Do we have any countries that are missing from the stats?

Thank you

--
Kind regards,

**Despina Markopoulou**
Certified Public Accountant

Crowe

**SOL S.A.**
Member of Crowe Global Network
3 Fokionos Negri str.

46

116.    Ms. Markopoulou also was sent a signed version of an inconsistent confirmation for Aragona. This "red flag", too, did not prompt Ms. Markopoulou or Crowe to initiate any additional audit inquiry.

117.    Finally, on May 21, 2019, Akazoo sent Ms. Markopoulou an entirely different set of "confirmations" for Smart Mobile and Aragona. These were a series of documents titled "Balances Confirmations and Reconciliations Procedure" that reflected entirely different December 31, 2018 balances. The documents indicate that an additional €33 million in 2018 revenues from Smart Mobile and Aragona's business had been discovered since April 2019. This, likewise, did not raise any concerns for Crowe. To offset the potential receivables, the documents purported to show that Aragona "paid" more than €10 million in music content fees and server hosting expenses on behalf of Akazoo.  Crowe did not substantiate these expenses.

118.    The documentation for Smart Mobile confirmed a balance owing as of December 31, 2018 that was €10 million too high. To reconcile this discrepancy, Akazoo provided documents indicating Smart Mobile agreed on December 31, 2018 to "pay" €10 million in software development fees to offset the receivables. To support this claim, Akazoo provided two documents titled "Reallocation of AR-AP Balances." These were tri-party agreements among Akazoo, Smart Mobile, and third-party software companies whereby the third party essentially agreed to give up its claim against Akazoo for payment and instead accept a claim against Smart Mobile. Here is an example where a company called GP Solutions gives up its claim against Akazoo:

REALLOCATION OF AR-AP BALANCES

| | |
|---|---|

We, **GP Solutions.com Ltd**, have an open Trade Receivable from **Akazoo DWC-LLC** of total value 7.000.000,00 EUR as at 31/12/2018 with the following details:

| DATE | INVOICE | AMOUNT |
|---|---|---|
| 28/08/2018 | INV 169 | 1.981.250,00 € |
| 20/09/2018 | INV 176 | 1.850.360,00 € |
| 16/10/2018 | INV 184 | 971.200,00 € |
| 30/10/2018 | INV 192 | 882.260,00 € |
| 19/12/2018 | INV 197 | 1.314.930,00 € |

Hereby state that we transfer any and all of our claims regarding our Trade Receivable balance, for the amount of 6.906.340,79 EUR from **Akazoo DWC-LLC** to **Smart Mobile Communications PTE Ltd**
Accordingly, we hereby 6.906.340,79 release **Akazoo DWC-LLC** from repayment of 6.906.340,79 EUR of Trade Receivable balance, and we hereby acknowledge and accept **Smart Mobile Communications PTE Ltd** to record the amount of 6.906.340,79 EUR as an obligation/liability towards our company.
IBAN: EE73 0000 0093 2004 4255
Bank: TBB LTD
Beneficiary: GP Solutions.com Ltd
SWIFT: TABUEE22XXX

Date of Signature
December 31, 2018

One behalf of GP Solutions
Name: Markus Schmit
Title: Marketing Director
Signature:

We, **Smart Mobile Communications PTE Ltd**, have an open Trade Payable to **Akazoo DWC-LLC** of total value 17.046.796,52 EUR as of 31/12/2018.

Hereby accept the transfer of **GP Solutions.com Ltd**'s claim of 6.906.340,79 EUR with the following details:

| DATE | INVOICE | AMOUNT |
|---|---|---|
| 31/12/2018 | 2018/0027 | 3.417.585,06 € |
| 31/12/2018 | 2018/0028 | 3.488.755,73 € |

regarding our Trade Payable balance from **Akazoo DWC-LLC** to **GP Solutions.com Ltd** and we hereby state that, following such transfer of claim to our company, we hereby accept any and all of our liabilities in favor of **GP Solutions.com Ltd** regarding the payable balance of 6.906.340,79 EUR.

Accordingly, we hereby acknowledge and accept **GP Solutions.com Ltd** to record the amount of 6.906.340,79 EUR as Trade Payable balance from our company.

Date of Signature
December 31, 2018

One behalf of Smart
Name: John Chow
Title: Director
Signature:

We, **Akazoo DWC-LLC**, have an open Trade Payable balance towards **GP Solutions.com Ltd** of total value 7.000.000,00 EUR as of 31/12/2018, with the following details

| DATE | INVOICE | AMOUNT |
|---|---|---|
| 28/08/2018 | INV 169 | 1.981.250,00 € |
| 20/09/2018 | INV 176 | 1.850.360,00 € |
| 16/10/2018 | INV 184 | 971.200,00 € |
| 30/10/2018 | INV 192 | 882.260,00 € |
| 19/12/2018 | INV 197 | 1.314.930,00 € |

and an open Trade Receivable balance from **Smart Mobile Communications PTE Ltd** of total value 17.046.796,52 EUR as of 31/12/2018.
We hereby accept the transfer of **GP Solutions.com Ltd** claim for the amount of 6.906.340,79 EUR of the Trade Receivable balance from our company against our Trade Receivable balance with **Smart Mobile Communications PTE Ltd** and we state and acknowledge that following such transfer of claim, **Smart Mobile Communications PTE Ltd** is released from repayment of 6.906.340,79 EUR towards our company.

Date of Signature
December 31, 2018

One behalf of Akazoo DWC-LLC
Name: Apostolos Zervos
Title: CEO
Signature:

119.     All the above documents were dated December 31, 2018, but Crowe knew full well all this documentation was ***created long afterward***. Crowe made no effort to contact GP Solutions to determine if the invoices were real or whether GP Solutions, which was a real software company in Germany, in fact agreed to release Akazoo and look only to Smart Mobile—an unknown company, ostensibly based in Singapore—for payment. An identical tri-party settlement arrangement, with identical documentation, was prepared for another software company called Diyomi Soft.

120.     As noted above, Zed Media ignored the original confirmation request Akazoo sent in late March 2019. On May 20, 2019, Akazoo provided Crowe confirmations allegedly signed and returned from Zed Media on May 17. Unlike with the Smart Mobile and Aragona documents,

the Zed Media confirmation looks like a confirmation that an auditor might traditionally generate. However, it contained one major facial error: the Zed Media "confirmation" was the original confirmation sent in late March, indicating that Zed Media owed Akazoo €19 million as of December 31, 2018; the Zed Media respondent ***crossed out that number*** and replaced it with €3,702,750.14—which was the amount incorporated into the final financial statements. Crowe made no further attempts to clarify or corroborate the confirmation.

121.    This discrepancy itself allegedly related to Akazoo's failure to account properly for another series of "settlement" agreements that reduced Zed Media's receivables. A music content provider, One RPM,  agreed to release Akazoo of liability for invoice totaling €11 million between June and December of 2018.

122.    Although One RPM is a real provider of digital music rights to streaming services located in Nashville, Tennessee the invoices listed as One RPM's address the exact same address (***including the same suite number***) in Belize City as listed in the invoices for Zed Media:



# INVOICE

**ONE RPM**
Whitfield Tower, 3ʳᵈ floor, 4792, Coney Drive
PO BOX 1825
Belize City, Belize
Reg. No. 152638

JULY 31, 2018
INVOICE # 4417

TO

AKAZOO (CY) LTD
214, ARC. MAKARIOS III AVE, LIMASSOL 3030, CYPRUS
10342532E

|  | July Media |
|---|---|
| Ecuador | 89,407.60 € |
| Guatemala | 46,756.91 € |
| Nicaragua | 31,479.94 € |
| Paraguay | 9,685.17 € |
| Brazil | 110,830.09 € |
| Mexico | 50,367.78 € |
| Chile | 12,324.17 € |
| Argentina | 16,964.50 € |
| Costa Rica | 18,018.88 € |
| Peru | 2,430.65 € |
| **TOTAL (€)** | **388,265.69 €** |

Make all checks payable to ONE RPM

**Thank you for your business!**



**AKAZOO CY**
214,ARC. MAKARIOS III AVE, LIMASSOL 3030, CYPRUS

**INVOICE**

| To: | Zed Media Ltd |
|---|---|
| **Reg No:** | 140,472 |
| **Address:** | Whitfield Tower, 3rd Floor, 4792 |
| | Coney Drive, PO BOX 1825, |
| | Belize City, Belize |

| Invoice Number: | 2018/0004 |
|---|---|
| **Invoice Date:** | 16 Oct 2018 |
| **Our VAT Number:** | CY10342532E |

| Description | Quantity | Amount (€) |
|---|---|---|
| Akazoo Services for Ecuador Mar 2018 | | 322.986,41 |
| (aggregator's payout:     80.746,61 ) | | |
| Akazoo Services for Guatemala Mar 2018 | | 162.946,77 |
| (aggregator's payout:     40.736,70 ) | | |
| Akazoo Services for Nicaragua Mar 2018 | | 155.743,10 |
| (aggregator's payout:     38.935,78 ) | | |
| Akazoo Services for Paraguay Mar 2018 | | 90.650,82 |
| (aggregator's payout:     22.662,71 ) | | |
| Akazoo Services for Brazil Mar 2018 | | 301.754,12 |
| (aggregator's payout:     75.438,53 ) | | |
| Akazoo Services for Mexico Mar 2018 | | 140.437,40 |
| (aggregator's payout:     35.109,35 ) | | |
| Akazoo Services for Chile Mar 2018 | | 42.400,06 |
| (aggregator's payout:     10.600,01 ) | | |
| Akazoo Services for Argentina Mar 2018 | | 47.533,58 |
| (aggregator's payout:     11.883,40 ) | | |
| Akazoo Services for Costa Rica Mar 2018 | | 66.088,51 |
| (aggregator's payout:     16.522,13 ) | | |
| Akazoo Services for Peru Mar 2018 | | 11.422,51 |
| (aggregator's payout:     2.855,63 ) | | |
| **Payment terms:** please pay immediate upon presentation | Subtotal (€) | 1.341.963,28 |
| **Payment by bank transfer** | GST 0% | 0,00 |
| **Bank**: Barclays Bank Plc. | Total (€) | 1.341.963,28 |

**Beneficiary:** Akazoo (CY) Ltd
**Swift Code:** BARCGB22
**IBAN:**     GB70 BARC 2078 9843 1757 22
**Account's Currency**: EURO

*computerised generated invoice,signature not required

123.     Moreover, the putative One RPM invoices request payment by  "checks payable

to ONE RPM" without providing any account information—as if such payments are  typically

made by dispatching a paper check for millions of Euros to an address in Belize, rather than wiring

the funds. The One RPM invoices look like something a child might generate.

124.     As supporting documentation, Crowe was provided another "Reallocation of AR-

AP Balances" document  among One RPM, Zed Media, and Akazoo:



125.     This "Reallocation" was, again,  allegedly executed as of December 31, 2018, but

the circumstances would lead any reasonable auditor to conclude that they were likely created in

an attempt to paper over the discrepancy in late May 2019—together with the questionable

invoices from One RPM, dated for the second half of 2018—one of which is excerpted above.

126.    Once again, Crowe made no effort to contact One RPM to check the validity of this agreement or of the underlying invoices, which were suspect on their face.

127.    Crowe was not involved whatsoever in preparing, requesting, or receiving these documents supposedly confirming the receivable balances and the "settlement" arrangements. The documents were simply provided by Akazoo to Crowe. As noted above, the documents for Smart Mobile did not even "confirm" the correct balance as of December 31, 2018, unless one considers the separate tri-party settlement agreement. No legitimate auditor would accept this documentation as acceptable confirmation evidence.

128.    On or about May 27, 2019, facing a June 6 deadline, Crowe's audit partner in London, Nigel Bostock, realized the paperwork was a mess and incomplete. Mr. Bostock struggled to understand all the offsets to the receivables, as he wrote to Paris:

**From:** Nigel Bostock <Nigel.Bostock@crowe.co.uk>
**Sent:** Δευτέρα, 27 Μαΐου 2019 8:39 μμ
**To:** Paris Triantafyllidis <p.triantafyllidis@akazoo.com>; Joanne Beckley <Joanne.Beckley@crowe.co.uk>; Joel Gelderd <Joel.Gelderd@crowe.co.uk>
**Cc:** Pierre Schreuder <p.schreuder@akazoo.com>
**Subject:** RE: Akazoo Update

Thanks Paris

I am struggling to reconcile some of the debtor figures for Aragona, Zed and Smartmobile given the late adjustments made and various offsets.  Perhaps I can have a chat with Jo tomorrow and we can follow this up with you further.

Kind regards,

Nigel

**Nigel Bostock**
*Chief Executive*

129.    As of June 5, 2019, Mr. Bostock's primary colleague on the audit in London wrote to Paris that Crowe was "still struggling" to close the audit due to lack of understanding "what the latest position is with the major aggregators":

| | |
|---|---|
| Subject: | RE: Akazoo - financial statements review |
| Date: | Wednesday, June 5, 2019 at 11:50:42 AM Central Daylight Time |
| From: | Joanne Beckley |
| To: | Nigel Bostock, Paris Triantafyllidis |
| CC: | Joel Gelderd |
| Attachments: | image005.png, image006.png, image007.png, image008.png, image009.gif, image010.png, image011.png, image012.png, image013.png, image014.jpg, image001.png, image002.png, 119060517504501599.jpg |

Hi Paris,

Thank you for providing the information below. The area I think we are still struggling to close is as follows:

- Information on off-setting debtor balances and cash received in the year

This includes understanding what the latest position is with the major aggregators, (post year end) whether any cash has been received/further set off agreements have been entered into.

If you could please provide us with some further information around this, that would be really helpful.

Many thanks,

Kind Regards,

**Jo Beckley**
Manager

130.    In response to Ms. Buckley, Paris responded that Akazoo's finance department was stretched thin and busy with other matters, so all the 2018 activity did not get recorded correctly during 2018 and into the first part of 2019.

131.    Akazoo's financials depended almost entirely on the legitimacy and accuracy of its reported transactions with aggregators. Despite all the above red flags, Crowe did not make any effort to reach out to the aggregators directly to obtain reasonable, independent audit evidence of their legitimacy as required. As a result, on the eve of issuing its audit opinion on June 6, 2019, Crowe requested that Akazoo obtain formal "confirmations" from Smart Mobile and Aragona. Amazingly, Paris produced signed confirmations ***the same evening*** for both Smart Mobile (located in Singapore) and Aragona.

54

132.    Crowe was not involved in preparing, sending, or receiving these confirmations from the aggregators. After all the questionable conduct related above, the aggregators simply appeared on demand from Akazoo. Crowe signed the audit letter the next morning.

**c)    Crowe's Responsibility to Obtain Independent Confirmatory Evidence to Support Akazoo's Financial Reports**

133.    Crowe failed to execute confirmation procedures in accordance with the applicable auditing standards and failed to appropriately evaluate confirmation replies. Crowe represented that it conducted the 2018 Audit by following the auditing standards promulgated by the PCAOB and ISAs (UK). Both sets of standards require that an auditor seek confirmation of the sorts of balances allegedly owed to Akazoo by the aggregators, and both sets of standards required that the auditor control the process. In fact, under the PCAOB AS , there is a "presumption that the auditor will request the confirmation of accounts receivable during an audit." AS 2310.34. The rules are clear that an auditor must "maintain control" over the confirmation process which in turn is defined as "establishing *direct communication* between the intended recipient and the auditor" to minimize the possibility of fraud. AS 2310.28 (emphasis added). Crowe completely abdicated the confirmation process to Akazoo management and had no direct communication with the aggregators.

134.    Even if Crowe had sent the confirmations directly by email to the aggregators, this would have been insufficient. AS 2310.29 warns that certain forms of confirmation should not be treated as valid audit evidence without additional backup because of "the difficulty of ascertaining the sources of the responses." While AS 2310.29 mentions as an example, facsimile confirmations, email communication to a single email address supplied by the client is even more susceptible to fraud. ISA Standard 505.A12 instructs auditors relying on electronic confirmation to "incorporate

various techniques for validating the identity of a sender of information in electronic form, for example, through the use of encryption, electronic digital signatures, and procedures to verify web site authenticity."

135.    Crowe's reliance on confirmations which were sent to and purportedly received from a single email address (some, notably, associated with random domain names facially unrelated to the entity they purported to speak for) without additional independent corroboration was a flashing, neon sign signaling potential fraud. Crowe—which never found or obtained more contact information for the aggregators than a single email address for each—found no evidence of the aggregators in its own search of the internet. Both the AS and ISAs (UK) ***contain multiple, clear, and unambiguous standards prohibiting*** auditors from relying on confirmations where such risk of fraud exists.

136.    Crowe's conduct is more shocking given the significance of the transactions to Akazoo's financials, the unusual nature of the transactions, and the transactions' complexity. Auditing Standards 2310.07 through .09  require an audit to demand greater evidence where transactions are especially material, unusual, complex, or involve control or audit risk. All these factors applied to the transactions with the aggregators. Even Crowe—when summarizing its audit work—acknowledged that the top three "key areas of audit risk and focus" were the three financial metrics that reflected almost entirely transactions with the aggregators. Yet, Crowe did nothing to verify whether the transactions with the aggregators that created over 94% of the revenue, 90% of the trade receivables, and all the increase in intangible assets during 2018 were real.

137.    Crowe did not confirm the validity of the alleged tri-party "Settlement Agreements" by confirming the terms with the third-party vendor (*e.g.*, the computer software company or One RPM). The validity of these settlement agreements were part and parcel of determining the

accounts receivable. Defendant Crowe's own 2018 Audit Findings Report ("AFR") given to Akazoo management post-audit said that understanding these settlement agreements was "critical to understand the movement in receivables during the year." As a result, the presumption requiring confirmation of receivables applied such that Crowe had to seek confirmation from the third parties about the validity of these alleged agreements. Even if the presumption did not apply, the auditing rules regarding confirmation apply to obtaining evidence about any "financial statement assertions made by management," AS 2310.06, especially given the unusual nature of these arrangements. "Due professional care requires the auditor to exercise professional skepticism… [which includes] modifying the planned audit procedures to obtain more reliable evidence regarding the relevant assertions and [] obtaining sufficient appropriate audit evidence to corroborate management's explanations or representations concerning important matters, such as through third-party confirmation." AS 2301.07. There is no evidence Crowe made any effort at all to confirm the agreements.

138.    AS 2310.15 required Crowe to "exercise an appropriate level of professional skepticism throughout the confirmation process." During confirmation, Crowe needed to "maintain control over the confirmation requests and responses, [meaning] establishing direct communication between the intended recipient and the auditor to minimize the possibility that the results will be biased…." AS 2310.28. "If the combined evidence provided by the confirmations, alternative procedures, and other procedures is not sufficient, the auditor should request additional confirmations or extend other tests…" AS 2310.33. Similarly, under ISAs (UK) 505.7, the auditor is expected to "maintain control over external confirmation requests, including: (a) [d]etermining the information to be confirmed or requested; (b) [s]electing the appropriate confirming party; (c)… determining that requests are properly addressed and contain return information for

responses to be sent directly to the auditor; and [s]ending the confirmation requests, including follow-up requests where applicable…" Under ISAs (UK) 505.A17, when the response is unreliable, the auditor should "revise the risks of material misstatement at the assertion level" and modify the audit plan accordingly. "[A]n unreliable response may indicate a fraud risk factor that requires evaluation." *Id.*

139. Crowe's procedures, as discussed above, wholly failed to perform and reasonable inquiry as to the adequacy or reliability of the putative confirmations upon which its audit opinion relied.

### d) Crowe Failed to Obtain Adequate Audit Evidence to Support its Audit Opinion

140. Having failed to plan its audit properly -- including failing to obtain an understanding of Akazoo and its environment, including internal controls relevant to the audit, failed to identify risks of material misstatements and develop and carry out procedures to address those risks-- Crowe elected to confirm the balance of Akazoo's accounts receivable with its aggregators. This procedure was inherently flawed and, even if executed in accordance with the applicable audit requirements for external confirmations, which it was not, could not provide Crowe with the sufficient appropriate audit evidence related to the existence of accounts receivable.

141. Pursuant to PCAOB AS 1105, *Audit Evidence,* "[t]he auditor must plan and perform audit procedures to obtain sufficient appropriate audit evidence to provide a reasonable basis for his or her opinion." Sufficiency is "the measure of the quantity of audit evidence." *Id.* Appropriateness is "the measure of the quality of audit evidence." *Id.* To be "appropriate", audit evidence must be "both relevant and reliable in providing support for the conclusions on which

the auditor's opinion is based." *Id.* Reliability depends upon the "nature and source of the evidence", and evidence obtained directly by the auditor "is more reliable than evidence obtained indirectly." *Id.* Evidence obtained from a "knowledgeable source that is independent of the company" is preferred. *Id.* When using information provided by the audited company, the auditor must evaluate the information through "performing procedures to… test the accuracy and completeness of the information, or test controls… and evaluate whether the information is sufficiently precise and detailed" to support its audit opinion. *Id.*

142.    The prevailing requirements under ISAs (UK) 500, *Audit Evidence,* are substantially similar. The auditor must design and perform its audit procedures to obtain "sufficient appropriate audit evidence to be able to draw reasonable conclusions on which to base the auditor's opinion." Appropriateness is a measure of "quality…. relevance and [] reliability…", and sufficiency is a measure of "quantity of [] audit evidence needed" as determined by the "auditor's assessment of the risks of material misstatement and also by the quality of such audit evidence." *Id.* The reliability of evidence is influenced by its "source and nature, and the circumstances under which it is obtained, including… controls…" *Id.* The reliability of audit evidence is increased "when it is obtained from independent sources outside the entity." *Id.* Evidence obtained ""directly by the auditor" is deemed more reliable, as is evidence obtained from "original documents." *Id.* Where an auditor must use information produced by the audited entity, they "shall evaluate whether the information is sufficiently reliable… including, as necessary, obtaining audit evidence about the accuracy and completeness of the information [and] evaluating whether the information is sufficiently precise and detailed…" *Id.*

143.    An auditor is also required to evaluate its audit procedures to assess whether the audit evidence obtained is sufficient and appropriate to support its opinion. Under PCAOB AS

2810, *Evaluating Audit Results,* when "the auditor has not obtained sufficient appropriate audit evidence about a relevant assertion or has substantial doubt about a relevant assertion, the auditor should perform procedures to obtain further audit evidence…If the auditor is unable to obtain sufficient appropriate audit evidence to have a reasonable basis to conclude about whether the financial statements as a whole are free of material misstatement, AS 3105 indicates that the auditor should express a qualified opinion or a disclaimer of opinion." *Id.* Similarly, under ISAs (UK) 330, *The Auditor's Responses to Assessed Risks*, the auditor is required to "conclude whether sufficient appropriate audit evidence has been obtained." If an auditor has not obtained sufficient audit evidence as to any "material financial statement assertion," the auditor must "express a qualified opinion or disclaim an opinion." *Id.*

144.    Because Crowe failed to obtain an understanding of Akazoo and its environment, including internal controls, it failed to recognize that the purported services provided by the aggregators were part of Akazoo's information system and, consequently, any information provided to Crowe by the aggregators in response to the confirmation requests, in fact, came from Akazoo's own information system. Thus, the confirmation procedure was circular and, in the absence of any evidence about the existence and effectiveness of the relevant internal controls at the aggregators, the evidence Crowe obtained from the confirmations was not sufficiently reliable to meet Crowe's audit objectives with respect to existence and collectability of accounts receivable appearing in Akazoo's financial statements.

**2.      The Financial Statements Crowe Audited Contained Obvious Misstatements**

145.    In its 2018 Audit Opinion, as incorporated into the Registration Statements, Crowe represented that after conducting its audit pursuant to the governing standards, the financial statements prepared by Akazoo "present fairly, in all material respects, the consolidated financial

position of the Group as of December 31, 2018… and the consolidated results of its operations and its cash flows." Putting aside the fact that almost all the numbers reported in the financial statements were false, the notes to the financial statements—which are part of the financial statements—contained glaring misstatements and omissions; Crowe knew these statements did not "present fairly, in all material respects" the financial position, results of operations, and cash flows of Akazoo.

146.    Most conspicuously, note 17 to the 2018 audited financial statements discussed Akazoo's exposure to financial instruments—by far the largest such instrument listed was the trade receivables owed to the aggregators. This discussion is riddled with false statements that Crowe knew were false:

17.   **FINANCIAL INSTRUMENTS**

In common with other businesses, the Group is exposed to the risk that arises from its use of financial instruments. This note describes the Group's objectives, policies and processes for managing those risks and the methods used to measure them. Further quantitative information is found throughout these consolidated financial statements.

**Financial instruments recognised in the consolidated statement of financial position**

All financial instruments are recognised initially at their fair value and subsequently measured at amortised cost:

| In € thousand | 2018 € | Group 2017 € |
|---|---|---|
| **Loans and receivables:** | | |
| Cash and cash equivalents | 501 | 2,107 |
| Trade and other receivables | 34,683 | 31,343 |
| | 35,184 | 33,449 |
| **Other financial liabilities:** | | |
| Borrowings- Convertible loan notes | 2,317 | — |
| Trade and other payables | 16,002 | 15,539 |
| | 18,318 | 15,539 |

**Fair values of financial assets and liabilities.**

The fair value of trade debtors and creditors included in net current assets is equivalent to the balance sheet carrying values. Borrowings are held at amortised cost.

**Financial risk management objectives and policies**

**Credit risk**

As of balance sheet date there were no significant concentrations of credit risk. The Group's exposure to credit risk arises mainly from counterparty's failure to meet its obligation to settle a financial asset. Analysis of the trade receivables past due is disclosed in note 10 and analysis of trade and other receivables by foreign currency exposure is noted below. The Directors consider the Group's exposure to credit risk arising from trade receivables to be minimal. Credit risk arising from other receivables is controlled through monitoring procedures, including credit approvals and credit limits, with the balance largely offset by separate liabilities held on the balance sheet relating to the same party

The Group relies on the expertise of large third-party service providers for payment processing and aggregation services, including for direct carrier billing and the processing of credit and debit cards. Receivable balances are reconciled regularly to ensure that the risk of exposure to bad debts is minimized and balances due are settled within months of arising.

(Highlighting added).

147.    Akazoo's financial statements were prepared purportedly in accordance with the IFRS, which require disclosure of material concentration risks. The assertion that Akazoo faced "no significant concentrations of credit risk" is patently false: €28 million of the €34 million (82%) of the trade receivable was owed by three aggregators—actually, Smart Mobile and Aragona alone allegedly owed €25 million. This misrepresentation is especially significant considering that Akazoo purportedly had very little cash on hand (or borrowing facilities); the trade receivables were essentially Akazoo's only lifeline for cash if needed, so the risk that an aggregator failed to pay was material.

148.    The note contains a reference of sorts to the aggregators—the only such reference in the financial statements—saying the Company "relies" on "large third-party service providers" for "aggregation services." This reference is misleading at best. The note does not say that Akazoo relies almost exclusively on such entities for all functions. The note calls such entities "large," which is incomprehensible given that Crowe knew nothing about these entities except that they had zero presence on the internet and apparently had one employee apiece. Worse, the note describes the service provided by these entities as simply payment processing when these entities did everything from marketing to customer acquisition to payment of Akazoo's bills.

149.    Finally, the last sentence claims that "receivable balances are reconciled regularly" and "balances due are settled within months." In fact, Crowe knew that Akazoo had failed to reconcile the balances for *many* months and as a result, its financial records failed to capture activity for *half of 2018*. Many of the balances still outstanding as of June 2019 related to invoices purportedly for activity from July 2018. In fact, before Crowe signed its audit letter on June 6, 2019, Crowe obtained a representation from Akazoo management that receivable balances from

the second half of 2018 would finally be settled completely with new costs during the first half of 2019.

150.     The notes from Akazoo's financial statements contain other misrepresentations. For example, the notes claim that the Company's "normal trade credit terms" for trade receivables was 60 days when the overwhelming majority of trade receivables, which were owed by the aggregators, were not paid for many months—almost a year in some cases—and, when paid, were paid via "settlement."[1]

151.     Another example of outright misstatements in the financial statements can be found in the note describing the Company's outsized intangible asset. The note explains the asset largely consists of investments in purchased software as opposed to investments in software under development; purchased software can be amortized (software under development cannot) and is more valuable since it is functioning software presumably. The note shows that during 2018, Akazoo added €11 million in software investment of which €10 million was for purchased software and almost none in software under development:

8.   INTANGIBLE ASSETS
     Group

| In € thousand | Patents & Licenses € | Purchased Software € | Internally generated software € | Software under development € | Totals € |
|---|---|---|---|---|---|
| COST | | | | | |
| At 1 January 2018 | 2,828 | 22,109 | 4,195 | 558 | 29,690 |
| Additions | — | 10,437 | 646 | 283 | 11,365 |
| Exchange differences | 90 | — | (21) | 4 | 73 |
| At 31 December 2018 | 2,918 | 32,546 | 4,820 | 845 | 41,128 |
| AMORTISATION | | | | | |
| At 1 January 2018 | 1,533 | 6,130 | 740 | — | 8,403 |
| Amortisation for year | 142 | 3,549 | 1,405 | — | 5,096 |
| Exchange differences | 60 | — | (12) | — | 48 |
| At 31 December 2018 | 1,735 | 9,679 | 2,133 | — | 13,546 |
| NET BOOK VALUE | | | | | |
| At 31 December 2018 | 1,183 | 22,867 | 2,687 | 845 | 27,582 |
| At 31 December 2017 | 1,295 | 15,979 | 3,455 | 558 | 21,287 |

---

[1] Admittedly, this note says that 9% of such receivables are more than 90 days past due, but this figure grossly understates the truth.

(Highlighting added).

152.    This representation is patently false. After the 2018 Audit was completed, Crowe

prepared an Audit Findings Report ("2018 AFR") that provided detail on the audit findings. In the

2018 AFR, Crowe acknowledged that ***all the €10 million in additions during 2018 were for***

***software development***. (These "investments" were made via the "settlement" agreements among

Akazoo, Smart Mobile, and two software companies—GP Solutions and Diyomi Soft.). After it

signed off on the financial statements including the note quoted above, Crowe wrote the following:

- For the Dubai additions of software totalling €10m, a large sample of the main additions have been
  agreed back to additions from the software developers as follows:
    - ❑ Diyomi Soft Malta Limited are a business who specialise in innovative web-based iT solutions which
      include mobile application development and reference both 'Akazoo chat' and a testimonial from
      Panagiotis Dimitropolous (InternetQ) on their website. Diyomi have provided software development
      fees totalling €3m covering (i) User Segmentation Engine (€820k), Orchestration Platform System
      Development - 10 Country Deployment (€1.35m) and Album Deduplication Repository
      Analysis/Norm Software (€830k).  Details of how the liability for the purchase of this software was
      settled in part by a tri-partite agreement is outlined within the recovery of trade receivables section.
      This software has not been amortised at the year end due to it still being in development.
    - ❑ GP Solutions are a European software development house focused on custom software
      development, IT consulting and support.  Their services include mobile application development.
      GP Solutions provided software development totalling €7m during FY18 covering a range of related
      services including trending data aggregation modules for content recommendations and search,
      user profiling analysis, messaging broadcaster, DB cluster logic for trending data, user demographic
      analysis platform, stat processing system, mobile client real time transcode (radio), billing reporting
      modules and analytics including credit card processing, and, compliance submodule. Details of how
      the liability for the purchase of this software was settled in part by a tri-partite agreement is outlined
      within the recovery of trade receivables section.  This software has not been amortised at the year
      end due to it still being in development.

(Highlighting added).

153.    Crowe's characterization in its 2018 AFR is correct. Crowe's patent failure to

identify obvious misstatements in the financial statements illustrates Crowe's utter disregard for

the accuracy of those statements when signing its audit letter or providing consent to inclusion of

its audit opinion in the various public filings.

### 3.    Crowe Reviewed the Misleading Public Filings

154.    As noted above, Crowe received and reviewed each version of the Registration Statement Akazoo filed —each of which included a version of Crowe's audit letter. AS 4101.10 says that before an auditor can permit use of audited financial statements in a subsequently filed registration statement, the auditor must "[r]ead the entire prospectus and other pertinent portions of the registration statement."

155.    Each Registration Statement contains a lengthy discussion of Akazoo's business. The discussion does not refer anywhere to the aggregators or their involvement in Akazoo's business. Instead, the documents repeatedly represent that Akazoo has entered "partnerships" with "leading," "regional and local" mobile phone companies and original equipment manufacturer ("OEM") providers. *See* July Registration Statement, at , 48, 136 (section titled "Local Partnerships"); *id.* at 135 (section titled, "De-risked customer acquisition through partnerships"); *id.* at 136 (section titled, "Partner Campaigns"); *id.* at 138 (section titled, "Increasing Partnerships"). The documents tout these "partnerships" and Akazoo's "relationships with these companies" as critical to its success and future. *See id*. When read in its entirety, the document portrays Akazoo as having succeeded by developing close relationships with telecommunications providers around the world.

156.    In fact, Akazoo had no such "partnerships" with telecommunications providers or OEMs. Akazoo made no secret of this to Crowe. At most, Akazoo purported to have contracts with aggregators who in turn had partnerships with the telecommunications providers. There is no way Crowe could have read these documents and not realized they were grossly misleading to the investing public that was not privy (as Crowe was) to Akazoo's true business model.

### 4. Crowe Supported Misrepresentations to Akazoo's Consultant, RSM Capital Partners, In Connection With Due Diligence Inquiries

157. MMAC conducted due diligence on Akazoo in part by hiring RSM Capital Partners ("RSM") as a consultant. Among other things, RSM investigated Akazoo's accounting for revenue. To answer various questions that RSM asked, Akazoo's management proposed providing RSM with copies of Crowe's Audit Findings Reports for the 2017 and 2018 audits. Although the documents were prepared only for Akazoo's internal purposes, Crowe consented to Akazoo showing the document (with edits) to RSM. Moreover, Crowe agreed to participate in multiple calls with RSM in late 2017 and early 2018 and then again in early September 2019 as RSM was doing final due diligence before closing of the merger on September 11, 2019.

158. Crowe permitted Akazoo's management to make significant edits to Crowe's AFR before sending it to RSM. While management claimed the edits were required to protect Akazoo's business secrets, the edits go well beyond any such justification. First, multiple pages describing the unusual "settlement" arrangements were deleted. As a result, the edited document does not give a full or fair picture of Akazoo's financial statements.

159. All the discussion in the foregoing, of Crowe's 2018 AFR concerning accounting for trade receivables, offsets, and "tri-party agreements" with respect to the Akazoo's three principal aggregators was omitted entirely from the version of the 2018 AFR that Akazoo shared with ASM. Akazoo made edits throughout the AFR in or around August 30, 2019—months after it was originally issued from Crowe to Akazoo—to hide the identities of its aggregators, the extent to which its revenues and receivables were concentrated with those aggregators, and any explanation of the various "offset" arrangements among and between them. Crowe was given the opportunity to review and comment on the sanitized 2018 AFR—and approved Akazoo providing

the sanitized version to RSM. Akazoo's management provided its modified version of the 2018 AFR to RSM on September 4, 2019, without disclosing that it had been modified from the original version Crowe provided.

160.    Crowe agreed to participate in a call to review its audit papers with RSM in connection with RSM's due diligence review on behalf of MMAC. RSM provided a detailed agenda for the call, in which they requested information from Crowe regarding its audit process and findings. RSM asked requested to review Crowe's 2018 audit papers, and asked, for example: "***Which 'few major clients' did the Company generate significant revenue with in 2018?*** It appears this information was excluded from the 2018 AFR. ***What else was excluded from the 2018 AFR? Has Management assisted with the drafting of the 2018 AFR…?***"

161.    Akazoo's management refused to provide RSM access to the audit papers, asserting they were "***bound by confidentiality restrictions***"[2] and had "***no right to disclose… aggregator specific data***… besides where legally obligated… There is high sensitivity on this and we will not risk the commercial relationship." Management further asserted that "The AFR report is a very detailed document – it is an in-depth internal report not available in most companies plus specific questions can be asked during the call with management & Crowe…"

162.    In response to RSM's query about the "few major clients" referred to in the edited 2018 AFR, Management responded simply that, "Names & references to... aggregators have been omitted on management's request due to commercial confidentiality restrictions."

163.    With respect to RSM's question about whether Akazoo's management had a part in drafting the version of the AFR RSM was provided, Management lied outright: "***No -***

---

[2] In the document quoted herein, Akazoo management's responses were conveyed in ALL CAPS. Counsel has adjusted Management's capitalization for the sake of the reader.

**_Management has reviewed the AFR and provided review comments during the course of the audit._**"

164.    The edited AFR did disclose that Akazoo's revenue depended on a "few major clients." RSM asked who these clients were, and rather than saying the three aggregators, Akazoo management proposed responding, "A mix of members of well know[n] direct billing carrier groups + direct commercial relationships."

165.    While investors did not know about these representations to RSM (for example, that Akazoo's revenue depended on a "few major clients"), Crowe's failure to voice any objection to these obviously misleading responses speaks volumes about its—at a minimum—cavalier regard for the truth.

166.    Crowe was entirely aware that Akazoo's management had modified its original 2018 AFR to remove any reference to the specific aggregators or the nature and extent of the parties' receivable offsets and "Tri-Party agreements." Crowe also reviewed and went along with Management's lie that it had not "assisted in drafting" the 2018 AFR they were reviewing and that its involvement was limited to "comments during the course of the audit." Management had modified the AFR for RSM's consumption—with Crowe's assistance and approval… in late August and September of 2019, nearly two months after Crowe's 2018 AFR was finalized.

167.    RSM set a follow-up discussion with Management and Crowe on September 9, 2019, for which they also provided an agenda with detailed questions, including: "Explain the actual, specific procedures that Crowe performed on Revenue & [Accounts Receivable]… Discuss all errors, misstatements, etc. That fell below your testing materiality and were not discussed in the 2018 [AFR]… What specific testing was performed to make sure gross vs. net revenue was property reported…?  How many [Accounts Receivable] confirmations were sent, and of those,

how many were received? … [W]hat additional testing did you perform? What specific testing was conducted on the Company's [Accounts Receivable] reserve, if any?"

168.    Despite being provided such ample opportunity to explain its audit process and clarify or correct the false and misleading representations to RSM regarding the 2018 AFR and Crowe's audit procedures and findings, Crowe chose instead to collaborate in Akazoo Management's efforts to obfuscate and mislead RSM and MMC concerning its business.

## VI.    SCIENTER ALLEGATIONS

### A.    Crowe's Scienter

169.    Crowe served as Akazoo's auditor since 2015, auditing its financial statements for the years ended December 31, 2018, 2017, and 2016, and any interim periods therein. Each of these financial statements were included with the Registration Statement, Crowe continued as the Company's auditor after the Merger. Crowe gave Akazoo unqualified, clean audit opinions.

170.    Crowe represented, in its 2017 and 2018 Audit Opinions (as incorporated into the Registration Statements), that:

> Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

171.    As the Company admitted, however, after conducting an investigation that lasted about one week, all the financial statements that Crowe had attested to the accuracy and adequacy of, and gave clean, unqualified audit opinions for, were materially false and misleading. Further, the Company admitted that Akazoo had ***had negligible actual revenues for years.***

172.    Crowe's 2017 Audit Opinion and 2018 Audit Opinion made misrepresentations of material facts (or purported facts), including the following: (a) Crowe conducted its audits of Akazoo in accordance with auditing standards of the PCAOB  ISAs(UK); (b) Crowe had planned and performed the audits so as to obtain reasonable assurance that the covered financial statements were free from material misstatement; (c) that Crowe had audited the consolidated statement of financial position of Akazoo [] and its subsidiaries… as of December 31, 2018, 2017 and 2016 and the related consolidated statements of profit or loss and other comprehensive income, changes in equity and cash flows for each of the three years in the period ended December 31, 2018, 2017 and 2016 and the related notes numbered 1 to 21"; (d) that Akazoo's financial statements "presented fairly, in all material respects, the consolidated financial position of [Akazoo]" as at December 31, 2018, 2017 and 2016 and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2018, 2017 and 2016" in conformity with International Financial Reporting Standards; (e) that Crowe had "perform[ed] procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks… includ[ing] examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements"; and (f) that Crowe believed that their audits "provide a reasonable basis for [their] opinion".

173.    The Registration Statements included statements reviewed and approved by Crowe, titled "Experts", which made misrepresentations of material facts (or purported facts), including: (a) that the "balance sheet of [Akazoo] and its subsidiaries as of December 31, 2018, 2017 and 2016 and the related consolidated statements of profit or loss and other comprehensive income, changes in equity and cash flows for each of the three years in the period ended December 31,

2018, 2017 and 2016 included in this proxy statement/prospectus [had] been audited by [Crowe]" and were "included upon reliance of the report of [Crowe] as experts in accounting and auditing."

174.    Whether Crowe failed to evaluate and investigate Akazoo's financial results, including its revenues, or performed its evaluation and disregarded the results of its audit procedures indicating that Akazoo had materially misstated its financial results, including that Akazoo had virtually no revenue for years, its actions were knowing or reckless, and its audit opinions false. Crowe's audit opinions amounted to no audit at all. As detailed in the foregoing sections, Crowe disregarded specific red flags that would place a reasonable auditor on notice that the aggregators—and the revenue associated with them—were a complete sham.

175.    Crowe knew that the 2018 Audit Opinion would be used by potential investors to decide whether to invest in Akazoo. Crowe knew the point of the audit was to meet a condition of the merger and was required for public filings upon which potential investors would rely. Akazoo management told Crowe one reason the 2018 audit needed to be completed hurriedly was so that Akazoo and MMAC could begin marketing to investors based on the 2018 results.

176.    Defendant Crowe's conduct in failing to perform even the most basic audit procedures to validate the representations of Akazoo management in and with respect to the financial statements Crowe audited was "highly unreasonable, representing an extreme departure from the standards of ordinary care" applicable to financial auditors. *See, Rothman v. Gregor*, 220 F.3d 81, 98 (2d Cir. 2000); *In re IMAX Sec. Litig.*, 587 F. Supp. 2d 471, 483-85 (S.D.N.Y. 2008) (scienter allegations sufficient where auditor had extensive involvement in process that had significant consequences for how company's financial health was publicly portrayed).

177.    In fact, the evidence detailed herein establishes that Crowe's audits were "so shoddy as to constitute no audit at all." *Stephenson v. PricewaterhouseCoopers LLP*, 482 F. App'x.

618, 623 (2d Cir. 2012). Further, Crowe disregarded specific "red flags" that would place a reasonable auditor on notice that the aggregators—and the revenue associated with them—were a complete sham. *See, Id.*

178.   For example, during its 2018 Audit, Crowe attempted, but was unable, to locate contact information for any of Akazoo's three principal aggregators independently. Crowe eventually obtained "confirmation" only by having Akazoo send requests—to which Crowe was merely copied—and never obtained independent contact information or followed up with the purported aggregators for verification. This alone should have presented a major red flag and prompted further investigation under applicable auditing standards. The fact that it later became clear during Crowe's audit that the "confirmations" it obtained were ***plainly false***, and that Akazoo admitted to Crowe that it was simply ***missing*** any internal documentation or reports to support its claimed billings for over six months of the audit period, should have immediately foreclosed any possibility of clean audit opinion absent a thorough, independent forensic audit.

179.   Crowe received and reviewed the so-called "tri-party agreements" between Akazoo and its aggregators. These agreements were intensely suspicious on their face. These agreements purportedly assigned payables owing from the aggregators to Akazoo to third parties in exchange for concomitant relief from payables to third parties—effectively a shell game transferring shifting assets and liabilities between parties—The fact that they concerned accounts ostensibly owing from the very aggregators who accounted for nearly the entirety of Akazoo's reported revenues should have yielded immediate investigation. Crowe willingly overlooked this obvious evidence of fraud without any substantial inquiry whatsoever.

180.   Crowe reviewed Akazoo's statements in the July Registration Statement, in which Akazoo included substantial discussion of its "partnerships" with "leading" "regional and local"

companies and manufacturers (July Registration Statement, at 49, 136). Crowe, having audited Akazoo's financial statements for several years, knew (or should have known) full well that these statements were untrue.

181.    Crowe also allowed Akazoo's management to make significant and highly suspicious edits to the AFR prior to disclosing it to RSM during MMAC's diligence process. The breadth and extensiveness of these edits would have raised significant concerns for any auditor acting in good faith. Similarly, Akazoo's refusal to identify its three principal aggregators in response to a direct request from RSM should have been a red flag.

182.    Taken together, these "red flags" were so numerous, substantial, and material to the financial statements under audit that Crowe's failure to follow up with any reasonable inquiry or to obtain any independent confirmatory evidence was plainly violative of the applicable auditing standards, constituting a reckless disregard for the truth or falsity of the statements under audit. Crowe's "audit" was so far beneath the standard of practice for auditors of the financial statements of a publicly traded company as to demonstrate willful fraud.

183.    As set forth above, Crowe knew that it did not conduct audits of Akazoo's 2018, 2017, and 2016 financial statements and related reports in accordance with applicable PCAOB and ISAs (UK) standards. Crowe knew about and disregarded numerous  risk factors, including fraud risk factors and "red flags", and took none of the steps it should have taken under applicable auditing standards as a result. Crowe failed to plan and perform the audit to obtain reasonable assurance that Akazoo's financial statements were free of material misstatement, and as a result, Crowe's audits, because of their patent inadequacy under applicable PCAOB and ISAs (UK) standards, did not provide a "reasonable basis" for Crowe's opinions, including, specifically but without limitation, with respect to its three principal "aggregators", which together generated

substantially all of Akazoo's reported revenues and profits, and would be deemed service organizations under AS 2601 and ISA 402.  Despite the foregoing, Crowe issued "clean" opinions in both the 2017 and 2018 Audit Opinions.

184.    Crowe knowingly and recklessly failed to fulfill even the most basic aspects of its duties as auditors and accountants in connection with the 2017 and 2018 Audit Opinions, in that:

(a)    Crowe did not conduct its audits of Akazoo in accordance with auditing standards of PCAOB or ISAs (UK) , including without limitation AS 1105 (*Audit Evidence*), AS 2101 (*Identifying and Assessing Risks of Material Misstatement*), AS 2301 (*The Auditor's Responses to the Risks of Material Misstatement*), AS 2310 (*The Confirmation Process*), AS 2401 (*Consideration of Fraud in a Financial Statement Audit*), AS 2601 (*Consideration of an Entity's Use of a Service Organization*), AS 2810 (*Evaluating Audit Results)*, ISA 240 (*The Auditor's Responsibilities Relating to Fraud in an Audit of Financial Statements*), ISA 315 (*Identifying and Assessing the Risks of Material Misstatement Through Understanding of the Entity and Its Environment*), ISA 330 (*The Auditor's Responses to Assessed Risks)*, ISA 402 (*Audit Considerations Relating to an Entity Using a Service Organization*), ISA 500 (*Audit Evidence*), and ISA 505 (*External Confirmations*);

(b)    numerous risks, including fraud risks and "red flags" were present, including:

(i)    consolidated management control and lack on internal controls;

(ii)    unusually rapid growth and/or profitability relative to the industry;

(iii)    reliance upon a small number of "aggregators" which should have been deemed outside service entities;

74

(iv)      unusual noncash settlement agreements involving the aggregators;

(v)      an extensive and globally distributed foreign business;

(vi)      low cash flow relative to reported revenue; and

(vii)      extensive reliance upon transactions in accounts payable and account receivable;

But, regardless, Crowe took none of the steps it should have taken under PCAOB and ISAs (UK) auditing standards as a result—to the contrary, Crowe failed to flag the aggregators or Akazoo's accounts receivable balances as a risk, despite the numerous red flags and risk factors of which it was aware;

(c)      Crowe did not plan and perform the audit to obtain reasonable assurance that Akazoo's financial statements were free of material misstatement, including examining, on a test basis, evidence supporting the material objects of the financial statements—instead, Crowe ignored the numerous fraud risk factors and red flags and conducted only superficial and inadequate testing, replying upon inadequate and often facially defective confirmations;

(d)      Crowe's audits, because of their patent inadequacy under applicable PCAOB and ISAs (UK), did not provide a "reasonable basis" for Crowe's opinions;

(e)      under applicable auditing standards, Crowe should not have undertaken to issue the 2017 Audit Opinion and/or 2018 Audit Opinion at all, without obtaining a robust understanding of Akazoo's dealings with and internal controls in place with respect to its three principal "aggregators", which together generated substantially all Akazoo's reported revenues and profits, and would be deemed service organizations under AS 2601 and ISA 402, *et seq.*; and

75

      (f)    Akazoo's financial statements, consolidated statements of profit or loss and other comprehensive income, changes in equity and cash flows for each of the three years in the period ended December 31, 2018, 2017 and 2016 did not present fairly, in all material respects, the financial position of Akazoo and its subsidiaries, in conformity with accounting principles generally applicable in the United States or international accounting standards—to the contrary, as set forth above, almost no legitimate Akazoo business existed at all and there was no legitimate "financial position" to "present".

185.    Defendant Crowe did not merely err in failing to uncover Akazoo management's fraudulent behavior. Akazoo's fraudulent conduct would have been obvious to any competent auditor. Crowe's conduct was so deficient—so far beneath the minimum expectation of any reasonable user of the financial statements—as to "constitute no audit at all."

186.    Defendant Crowe's foregoing acts and omissions evidence a profound lack of concern as to the truth or falsity of the 2017 and 2018 Audit Opinions and the financial statements and reports opined upon therein. Crowe and its responsible audit partner(s) caused the 2017 and 2018 Audit Opinions to be issued and incorporated into the Registration Statements  without having any reasonable basis to believe that the matters stated therein were true.

187.    Defendant Crowe's conduct in issuing its "clean" audit opinions on the 2017 and 2018 Audit Opinions, as incorporated with Crowe's knowledge and consent into the Registration Statements, as set forth above, constituted actionable recklessness in derogation of the rights of others, such recklessness being tantamount to fraud for purposes of imposing liability.

## VII.    LOSS CAUSATION

188.    Throughout the Class Period, as detailed herein, Defendant made materially false and/or misleading statements and/or omissions. This course of wrongful conduct caused the price

of Akazoo S.A. securities to be artificially inflated. But for Defendant Crowe's misrepresentations and/or omissions, Plaintiffs and the other members of the Class would not have purchased Akazoo S.A. securities or would not have purchased such securities at artificially inflated prices. Later, when Defendant Crowe's prior misrepresentations and/or omissions were disclosed to the market, the price of Akazoo S.A. shares fell significantly as the prior artificial price inflation was dissipated. As a result of their purchases and/or acquisition of Akazoo S.A. securities during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.,* damages, under the Exchange Act, and Securities Act. The timing and magnitude of the decline in the prices of the Company's shares negates any inference that the economic losses and damages suffered by Plaintiffs and other members of the Class were caused by changed market conditions, macroeconomic factors, or Company-specific facts unrelated to Defendant' wrongful conduct.

189.    The truth about the material misrepresentations and/or omissions was partially revealed to the public on or around: (i) April 20-21, 2020; (ii) April 22-24, 2020; (iii) May 1, 2020; and (iv) May 21, 2020.

190.    On April 19, 2020, QCM released the QCM Report and corresponding presentation alleging that many of the Company's purported metrics and operations had been overstated.

191.    On this news, Akazoo S.A.'s share price fell $0.53, or 20%, over two consecutive trading sessions to close at $1.99 per share on April 21, 2020, on unusually heavy trading volume.

192.    The price declines on April 20 and 21, 2020 were the result of the nature and extent of Akazoo's wrongful conduct being partially revealed to investors and the market. *Inter alia*, the disclosure revealed that Akazoo operated in only five countries, rather than the 25 countries that Akazoo had stated to, was closing offices and losing employees, had materially overstated its

revenues, profits, cash holdings, subscriber and user numbers, and that as a result, the Company's financial metrics and subscriber count had been overstated.

193.    On April 22, 2020, during market hours, the Company acknowledged the credibility of the QCM Report's allegations, announcing that it had appointed an independent special committee to investigate the allegations.

194.    On this news, Akazoo S.A.'s share price fell over 16%, to close at $1.66 on April 22, 2020. Akazoo S.A.'s share price fell over the next two days, to close at $1.16 per share on April 24, 2020, further injuring investors.

195.    The price declines between April 22, 2020, and April 24, 2020 were the result of the nature and extent of Defendant's wrongful conduct being partially revealed to investors and the market. *Inter alia*, the disclosure revealed that Akazoo operated in only five countries, rather than the 25 countries that the Akazoo had claimed, was closing offices and losing employees, had materially overstated its revenues, profits, cash holdings, subscriber and user numbers, and that as a result, the Akazoo S.A.'s financial metrics and subscriber count had been overstated.

196.    On May 1, 2020, the Company announced that Zervos was terminated for cause from his position as CEO and that certain financial statements should no longer be relied upon due to the possibility that they contained material errors.

197.    On this news, Akazoo S.A.'s share price fell $0.04 before NASDAQ halted trading on May 1, 2020.

198.    The price decline on May 1, 2020, was the result of the nature and extent of Defendant's the wrongful conduct being partially revealed to investors and the market. *Inter alia*, the disclosure revealed that Zervos had engaged in improper conduct as alleged in the QCM

Report, leading to his termination, and simultaneously that the Company's financial statements were materially false and misleading.

199.    On May 21, 2020, the Company announced that it would seek to unwind the Business Combination. Specifically, the Company admitted that "Akazoo's historical financial statements were materially false and misleading [and] that Akazoo has had only negligible actual revenue and subscribers for years[,]" and that former members of Akazoo S.A.'s management team had falsified its books and records, defrauding investors.

200.    Trading for Akazoo S.A. stock remained halted until June 2, 2020, when Akazoo S.A.'s stock was delisted from the NASDAQ exchange, rendering the stock effectively worthless.

## VIII.   PLAINTIFFS' CLASS ACTION ALLEGATIONS

201.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who: (1) purchased or otherwise acquired the publicly traded securities of Akazoo S.A. during the Class Period, including but not limited to those who purchased Akazoo S.A. securities pursuant to the PIPE Financing, seeking to recover compensable damages caused by Defendant Crowe's violations of the federal securities laws and to pursue remedies under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder; (2) held common stock of Modern Media Acquisition Corp. as of August 9, 2019, eligible to vote at MMAC's August 28, 2019 special meeting, seeking to pursue remedies under Section 14(a) of the Exchange Act, and/or; (3) purchased or otherwise acquired S.A. common stock pursuant or traceable to the Company's registration statement and prospectus issued in connection with the September 2019 Merger, seeking to pursue remedies under Sections 11 of the Securities Act. Excluded from the Class are Defendant Crowe, the officers and directors of the Defendant, at all relevant times, and members of their immediate families and

their legal representatives, heirs, successors or assigns and any entity in which Defendant has or had a controlling interest; Apostolos Zervos and all officers and directors of Akazoo Limited, at all relevant times, and members of their immediate families and their legal representatives, heirs, successors or assigns; and Lewis W. ("Lew") Dickey (together, the "Excluded Parties").

202.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NASDAQ. Based on information currently available, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice like that customarily used in securities class actions.

203.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendant Crowe's wrongful conduct in violation of federal law that is complained of herein.

204.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

205.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)   whether Defendant Crowe's acts as alleged violated the federal securities laws;

(b)     whether Defendant Crowe's statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(c)     whether Crowe's statements to the investing public during the Class Period omitted material facts necessary to make the statements made, considering the circumstances under which they were made, not misleading;

(d)     whether Defendant Crowe acted knowingly or recklessly in issuing false and misleading audit opinions and public statements during the Class Period;

(e)     whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendant Crowe's conduct complained of herein; and

(f)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

206.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

207.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)     Defendant Crowe made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)      the Company's securities are traded in efficient markets;

(d)      the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e)      the Company traded on the NASDAQ, and was covered by market analysts;

(f)      the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

(g)      Plaintiffs and members of the Class purchased and/or sold the Company's securities between the time the Defendant Crowe failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(h)      Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

208.     Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## IX.     APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

209.     The market for Akazoo S.A.'s securities was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Akazoo S.A.'s securities traded at artificially inflated prices during the Class Period. On June 25, 2019, the Company's share price closed at a Class Period high of $13.68 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Akazoo's securities and market information relating to Akazoo S.A. and have been damaged thereby.

210.   During the Class Period, the artificial inflation of Akazoo S.A.'s shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendant Crowe made or caused to be made a series of materially false and/or misleading statements about Akazoo's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Akazoo S.A. and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company's shares. Defendant Crowe's materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

211.   At all relevant times, the market for Akazoo S.A.'s securities was an efficient market for the following reasons, among others:

(a)   Akazoo S.A. shares met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)   As a regulated issuer, Akazoo S.A. filed periodic public reports with the SEC and/or the NASDAQ;

(c)   Akazoo S.A. regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     Akazoo S.A. was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

212.    As a result of the foregoing, the market for Akazoo S.A.'s securities promptly digested current information regarding Akazoo from all publicly available sources and reflected such information in Akazoo S.A.'s share price. Under these circumstances, all purchasers of Akazoo S.A.'s securities during the Class Period suffered similar injury through their purchase of Akazoo S.A.'s securities at artificially inflated prices and a presumption of reliance applies.

213.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendant' material misstatements and/or omissions. Because this action involves Defendant' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendant were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## X.     CAUSES OF ACTION

### COUNT I
### Violation of Section 10(b) of The Exchange Act and Rule 10b-5

214.     Plaintiffs repeat and reallege each allegation contained above as if fully set forth herein.

215.     This Count is asserted against Defendant Crowe and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

216.     During the Class Period, Defendant Crowe, by and through its employees and agents, disseminated or approved the false statements specified above, it knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary to make the statements made, considering the circumstances under which they were made, not misleading.

217.     Defendant Crowe violated §10(b) of the Exchange Act and Rule 10b-5 in that it, at relevant times: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

218.     Defendant Crowe acted with scienter at relevant times, in that it knew that the public documents and statements issued or disseminated in the name of the Akazoo S.A. were materially false and misleading; knew that its own expressed audit opinions with respect to the Akazoo's financial statements, as incorporated therein, were materially false and misleading; knew

that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. Defendant Crowe, by virtue of its receipt of information reflecting the true facts of Akazoo, participated in the fraudulent scheme alleged herein.

219.    As a result of the foregoing, the market price of the Akazoo S.A.'s securities was artificially inflated during the Class Period. In ignorance of the falsity of the Defendant's statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated because of Defendant Crowe's false and misleading statements.

220.    Had Plaintiffs and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Defendant Crowe's misleading statements and by the material adverse information which the Defendant did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

221.     As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

222.    By reason of the foregoing, the Defendant Crowe has violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II
## Violation of Section 11 of the Securities Act

223.    Plaintiffs repeat and re-allege each allegation contained above.

224.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against Defendant Crowe.

225.    Crowe's 2017 Audit Opinion and 2018 Audit Opinion, together with the Registration Statements which incorporated and reproduced them, were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

226.    Defendant Crowe failed to make a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

227.    Defendant Crowe was the auditor for Akazoo. In the Registration Statement, Defendant Crowe affirmatively consented to being referenced under the "Experts" section, attesting to the adequacy and accuracy of Akazoo's historical financial statements and information contained therein. Defendant Crowe certified Akazoo's false and/or misleading financial statements included or incorporated by reference in the Registration Statement, including the consolidated statement of financial position of Akazoo and its subsidiaries as of December 31, 2018, 2017 and 2016 and the related consolidated statements of profit or loss and other comprehensive income, changes in equity and cash flows for each of the three years in the period ended December 31, 2018, 2017 and 2016 and the related notes. Additionally, in the Registration Statement, Defendant Crowe also falsely represented, among others: (1) that Akazoo's Financial

Statements were prepared in conformity with IFRS; and (2) that Defendant Crowe had conducted its audits of Akazoo in accordance with (ISAs (UK) and the auditing standards of the PCAOB.

228.    By reasons of the conduct herein alleged, Defendant Crowe violated Section 11 of the Securities Act.

229.    Plaintiffs acquired Akazoo S.A.   shares pursuant and/or traceable to the Registration Statement for the Business Combination.

230.    Plaintiffs and the Class have sustained damages. The value of Akazoo, S.A. common stock has declined substantially after and due to Defendant Crowe's violations of Section 11 Defendant of the Securities Act.

## XI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demands judgment against Defendant as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class Representatives;

B.    Requiring Defendant Crowe to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: February 11, 2022                    Respectfully submitted,

                                            **THE ROSEN LAW FIRM, P.A.**

                                            /s/Phillip Kim
                                            Phillip Kim, Esq. (PK 9384)
                                            Laurence M. Rosen, Esq. (LR 5733)
                                            275 Madison Ave., 40th Floor
                                            New York, NY 10016
                                            Tel: (212) 686-1060
                                            Fax: (212) 202-3827
                                            Email: lrosen@rosenlegal.com
                                            Email: pkim@rosenlegal.com

                                            *Counsel for Lead Plaintiffs*